# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF DELAWARE

|  |  |
|---|---|
| JOSE TREVINO and LORRY S. TREVINO, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>MERSCORP, INC. and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., CITIGROUP, INC., COUNTRYWIDE FINANCIAL CORPORATION, FANNIE MAE, FREDDIE MAC, GMAC-RFC HOLDING COMPANY, LLC d/b/a GMAC RESIDENTIAL FUNDING CORPORATION, HSBC FINANCE CORPORATION, JPMORGAN CHASE & CO, WASHINGTON MUTUAL BANK, and WELLS FARGO & COMPANY,<br><br>        Defendants. | C.A. No. 07-568-*** |

## DEFENDANTS MERSCORP INC.'S AND MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Kevin F. Brady (No. 2248)
Jeremy D. Anderson (No. 4515)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE  19899
302-658-9141

*Attorneys for Defendants MERSCORP Inc.
And Mortgage Electronic Registration Systems, Inc.*

OF COUNSEL:
Robert M. Brochin
Sean M. O'Neill
MORGAN LEWIS & BOCKIUS LLP
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-2339

Dated: January 29, 2008

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

I.     NATURE AND STAGE OF THE PROCEEDINGS ....................................... 1

II.    SUMMARY OF THE ARGUMENT ............................................................. 2

III.   STATEMENT OF FACTS ............................................................................ 4

       A.    Lenders And The Residential Mortgage Market .................................. 4

       B.    The Creation of MERS ........................................................................ 5

       C.    How MERS Works ............................................................................... 5

       D.    The Claims Brought by Plaintiffs Jose and Lorry Trevino.................... 6

IV.    LEGAL DISCUSSION .................................................................................. 9

       A.    Law Applicable to Evaluating Plaintiffs' Claims ................................. 9

       B.    Legal Standard .................................................................................... 10

       C.    Count I – Breach of Contract – Fails To State A Claim ...................... 11

             1.    Plaintiffs Fail To Plead The Elements For A Breach Of Contract .......... 12

                   a.    The Promissory Note Cannot Be The Basis For A Breach Of
                         Contract Claim By Plaintiffs, As Borrowers, Against MERS
                         Because The Note Does Not Obligate MERS To Perform........... 13

                   b.    Plaintiffs Have Not Alleged Damages......................................... 15

       D.    Count II – Unjust Enrichment – Fails To State A Claim...................... 16

             1.    Plaintiffs Fail To Plead The Elements Required To State A Claim
                   For Unjust Enrichment.......................................................................... 16

                   a.    The Complaint Fails To Allege Facts Showing Any Benefits To
                         MERS.......................................................................................... 17

                   b.    MERS Neither Accepted Nor Retained Any Benefit .................. 18

                   c.    Any Benefit Was Not Unjust....................................................... 19

       E.    Count III – Breach of Duty of Good Faith and Fair Dealing – Fails to State a
             Claim.................................................................................................... 20

             1.    Plaintiffs Breach of Fair Dealing Claim Fails As A Matter of Law
                   Because They Fail To State A Claim For Breach of Contract................. 21

             2.    Plaintiffs Fail To Plead The Elements of A Claim For Breach of
                   Duty of Good Faith And Fair Dealing .................................................... 21

CONCLUSION.................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allegheny Gen. Hosp. v. Phillip Morris, Inc.*,
   228 F.3d 429 (3d Cir. 2000) ...................................................................... 10

*Bell Atl. Corp. v. Twombly*,
   127 S.Ct. 1955, 1964-65 (2007) ........................................................... 10, 11

*Birdsong v. Bydalek*,
   953 S.W.2d 103 (Mo. App. S.D. 1997) .................................................... 21

*Bouchard v. Price*,
   694 A.2d 670 (R.I. 1997) ......................................................................... 18

*Childress Painting & Assoc. v. John Q. Hammons Hotels Two, L.P.*,
   106 S.W.3d 558 (Mo. App. W.D. 2003) ............................................... 17, 18

*City of Pittsburgh v. West Penn Power, Co.*,
   147 F.3d 256 (3d Cir. 1998) ..................................................................... 11

*Clay v. Am. Tobacco Co., Inc.*,
   188 F.R.D. 483 (S.D. Ill. 1999) ................................................................ 17

*Coca-Cola Bottling of Elizabethtown*
   *v. Coca-Cola Co.*, 668 F.Supp. 906
   (D. Del. 1987) ............................................................................................. 9

*East Texas Motor Freight Sys., Inc. v. Rodriguez*,
   431 U.S. 395 (1977) ................................................................................. 20

*Erie R.R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ................................................................................... 10

*ESI, Inc. v. Coastal Power Prod. Co.*,
   13 F. Supp. 2d 495 (S.D.N.Y. 1998) .................................................... 7, 11

*Farmers New World Life Ins. Co., Inc. v. Jolley*,
   747 S.W.2d 704 (Mo. App. W.D. 1998) .................................................. 19

*Finova Capital Corp. v. Ream*,
   230 S.W.3d 35 (Mo. App. S.D. 2007) ...................................................... 21

*Gasperini v. Ctr. for Humanities, Inc.*,
   518 U.S. 415 (1996) ................................................................................. 10

*Gen. Tel. Co. of Southwest v. Falcon*,
   457 U.S. 147 (1982) ................................................................................. 20

*Graves v. Berkowitz,*
   15 S.W.3d 59 (Mo. App. W.D. 2000).................................................................... 19

*In re SHC, Inc.,*
   329 B.R. 438 (D. Del. 2005)...................................................................... 11, 12

*Jackson v. Williams, Robinson, White & Rigler, P.C.,*
   230 S.W.3d 345 (Mo. Ct. App. 2007)........................................................ 12, 15

*JB Contracting, Inc. v. Bierman,*
   147 S.W.3d 814 (Mo. App. S.D. 2004) ........................................................... 18

*Kincaid Enters., Inc. v. Porter,*
   812 S.W.2d 892 (Mo. App. W.D. 1991)........................................................... 16

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
   313 U.S. 487 (1941)........................................................................................... 9

*Koger v. Hartford Life Ins. Co.,*
   28 S.W.3d 405 (Mo. App. W.D. 2000)............................................................ 22

*Kost v. Kozakiewicz,*
   1 F.3d 176 (3d Cir. 1993) ................................................................................ 10

*Laas v. Wright,*
   191 S.W.3d 93 (Mo. App. S.D. 2006) ............................................................. 13

*Lilly v. Ford Motor Co.,*
   2002 WL 507126 (N.D. Ill. Apr. 3, 2002) ...................................................... 17

*Nat'l Union Fire Ins. Co. v. RLC Corp.,*
   449 A.2d 257 (Del. Super. Ct. 1982) ................................................................. 9

*Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.,*
   111 F.3d 1386 (8th Cir. 1997) ......................................................................... 20

*Oliver B. Cannon and Son v. Dorr-Oliver,*
   394 A.2d 1160 (Del. Super. Ct. 1978) ............................................................... 9

*Ozark Air Lines, Inc. v. Valley Oil Co., LLC,*
   2007 WL 4165338 (Mo. App. W. Dist. 2007).................................................. 16

*Patrick V. Koepke Const., Inc. v. Woodsage Const. Co.,*
   844 S.W.2d 508 (Mo. App. E.D. 1992)............................................................ 17

*Petrie v. LeVan,*
   799 S.W.2d 632 (Mo. App. W.D. 1990)........................................................... 17

*Press v. Chemical Investment Services Corp.,*
    988 F.Supp. 375 (S.D.N.Y. 1997) ........................................................................... 4

*Robinson v. Powers,*
    777 S.W.2d 675 (Mo. App. S.D. 1989) ............................................................... 21

*Smith v. Delaware First Fed. Credit Union,*
    395 F.Supp.2d 127 (D. Del. 2005) ....................................................................... 10

*Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.,*
    40 F.Supp.2d 644 (W.D. Pa. 1999) ................................................................. 11, 12

*Tellabs, Inc. v. Makor Issues & Rights., Ltd.,*
    127 S. Ct. 2499 (2007) ......................................................................................... 11

*Travelers Indem. Co. v. Lake,*
    594 A.2d 38 (Del. 1991) ......................................................................................... 9

*Twp. of South Fayette v. Allegheny County Hous. Auth.,*
    27 F. Supp. 2d 582 (W.D. Pa. 1998) ................................................................... 11

*Williams v. Williams,*
    2003 WL 1477064 (Mo. App. W. Dist. 2003) ..................................................... 16

*Winer Family Trust v. Queen,*
    503 F.3d 319 (3d Cir. 2007) .................................................................................. 4

**Statutes**

12 U.S.C. §§ 1451-59, 1716-23 ................................................................................. 4, 5

Missouri Revised Statutes § 400-003.104 (2007) .................................................. 13, 19

**Other Authorities**

5 Williston, Contracts (Rev. Ed.) § 1479 .................................................................. 20

Restatement (Second) of Conflicts of Laws § 188(2) .................................................. 9

Restatement (Second) of Contracts, § 205 .............................................................. 21

U.C.C. § 3-104 ......................................................................................................... 13

**Rules**

Fed. R. Civ. P. 10(c) ............................................................................................ 11, 12

## I.     NATURE AND STAGE OF THE PROCEEDINGS

This case, brought as a class action, seeks to recover damages on state common law theories based on a Promissory Note to which Defendants MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc.[1] (collectively "MERS") have no contractual obligations and was not a party.  Plaintiffs filed suit alleging that MERS "extracted" and "demanded" from Plaintiffs and the purported class members expenses, costs, and fees in excess of those MERS actually incurred or was obligated to pay in connection with the enforcement of a Note. Plaintiffs claim that such **demands** breach the terms and conditions of the Promissory Note and entitle Plaintiffs to damages for breach of contract, unjust enrichment, and breach of duty of good faith and fair dealing.

This is MERS' opening brief in support of its motion to dismiss the Amended Complaint (Docket Item "D.I." 10).

---

[1]     Mortgage Electronic Registration Systems, Inc., d/b/a MERS, is a wholly owned subsidiary of MERSCORP, Inc.

## II.    SUMMARY OF THE ARGUMENT

For several reasons, the Amended Complaint should be dismissed because the allegations fail to state a claim.

1.    The **Promissory Note** cannot form the basis for a breach of contract action **by Plaintiffs against MERS** because, on its face, nothing in the Promissory Note obligates MERS to perform under its terms.  Indeed, by its terms, the provision of the Promissory Note upon which Plaintiffs base their breach of contract claim actually imposes obligations upon the **Plaintiffs** – and only the Plaintiffs – to pay expenses, costs, and fees in connection with an enforcement action, while conferring on the lender or note holder the right to recover those sums.  Plaintiffs cannot state a claim for breach of contract against MERS where the provision alleged to have been breached is actually an obligation imposed on Plaintiffs under the express terms of the Promissory Note.

2.    Even if Plaintiffs could state a claim for breach of contract based upon the Promissory Note, the Amended Complaint fails to allege any facts showing the Plaintiffs have been damaged and, thus entitled to relief.  Plaintiffs allege that MERS made "demands" on borrowers or attempted to "extract" from borrowers excess expenses, costs, and fees.  But nowhere in the Amended Complaint do Plaintiffs allege that they **actually paid** MERS anything or suffered any losses as a result of such demands.  As such, the Amended Complaint is woefully deficient because it fails to show that Plaintiffs have been harmed.

3.    Plaintiffs' unjust enrichment claim is also legally deficient because Plaintiffs have not – and cannot – plead the elements required to state a cause of action for unjust enrichment in that Plaintiffs have not alleged facts that Plaintiffs conferred any benefit on MERS or that MERS accepted any such benefits.  And even if Plaintiffs pled those facts, their unjust enrichment claim

2

would fail as a matter of law because such a claim cannot lie where, as here, Plaintiffs allege the existence of an express contract – the Promissory Note – between themselves and MERS. Therefore, Plaintiffs' unjust enrichment claim fails to state a claim and, as with the breach of contract claim, fails to show Plaintiffs have been damaged.

4.      Plaintiffs' breach of duty of good faith and fair dealing count fails to state a claim for two reasons.  First, a duty of good faith and fair dealing claim must arise from a contract which imposes mutual obligations on the parties thereto.  Yet, the "contract" here imposes no such obligations on MERS.  In other words, because Plaintiffs fail to state a claim for breach of contract, they also fail to state a claim for breach of duty of good faith and fair dealing, a duty which is implied into every contract.  Second, even assuming the Promissory Note did impose obligations on MERS – an allegation which is contradicted by the very terms of the Note – Plaintiffs have not alleged any facts which would support such a claim.

For these reasons, all of Plaintiffs' claims fail to state causes of action and the Amended Complaint should be dismissed in its entirety.

## III.   STATEMENT OF FACTS

### A.   Lenders And The Residential Mortgage Market

MERS was formed to play an integral part in a federally established free-market system created to increase liquidity in the market for home loans. When a mortgage lender loans money to a home buyer, it obtains two documents: (1) a promissory note in the form of a negotiable instrument from the borrower;[2] and (2) a mortgage instrument.[3] The mortgage instrument is recorded in the local land records.[4] In almost all instances, however, the lender does not continue to own the note.[5] Instead, the lender sells the note into the secondary mortgage market, most often to one of the government or government-sponsored entities created by statute to purchase residential mortgage loans from banks and other lenders.[6] In turn, these entities resell

---

[2]     *See* D.I. 10, Exhibit ("Ex.") A. A copy of Exhibit A (the "Promissory Note" or "Note") to Plaintiffs' Amended Complaint is attached to this Motion for convenience as MERS' Exhibit A.

[3]     Plaintiffs attached to their Amended Complaint a copy of the first page of the Deed of Trust which Plaintiffs executed when they borrowed money to purchase their homes. *See* D.I. 10 ¶ 19 and Ex. B. A complete copy of the Deed of Trust signed by the Plaintiffs naming MERS as the beneficiary (as "nominee" for the lender, its successors, and assigns) is attached to the instant Motion as MERS' Exhibit B. Because Plaintiffs explicitly refer to the Deed of Trust in their Amended Complaint, this Court may properly consider the entire deed of trust in deciding MERS' Motion to Dismiss. *See Press v. Chemical Investment Services Corp.*, 988 F.Supp. 375, 377 (S.D.N.Y. 1997) (holding that where a plaintiff refers to a document in his complaint, but only attaches part of that document as an exhibit thereto, a court may consider the document in its entirety on a motion to dismiss); *see also Winer Family Trust v. Queen*, 503 F.3d 319, 328-39 (3d Cir. 2007) (where plaintiff elects not to attach a document that is "integral to and/or … explicitly relied upon" in the complaint, a district court may nevertheless consider that document in deciding a motion to dismiss without converting it to one for summary judgment).

[4]     *See* Ex. B, pg. 2.

[5]     *See* D.I. 10 ¶ 8(e).

[6]     *See* 12 U.S.C. §§ 1451-59, 1716-23 *et seq.* (creating the Government National Mortgage Association ("Ginnie Mae"), Federal National Mortgage Association ("Fannie Mae"), and Federal Home Loan Mortgage Corporation ("Freddie Mac")).

notes into a tertiary mortgage-backed securities market, usually as part of a bundle of notes held in trust for investors. As a result, the owners of the "beneficial interest" in these notes can be thousands of people whose identities change as these negotiable instruments are sold and resold in these markets, and as the investors sell and resell their shares in the mortgage-backed securities.

Because of the secondary and tertiary mortgage markets, the original lender is then able to make the funds from the first sale of the note available to additional home buyers. The availability of these funds is the specific and intended result of the statutes that created the government and government-sponsored entities – to increase funds for home ownership in the United States.[7]

**B.      The Creation of MERS**

In 1993, the Mortgage Bankers Association, Ginnie Mae, Fannie Mae, Freddie Mac and others in the real estate finance industry created MERS, an electronic registration system and clearinghouse that is similar to the process used with great success by the Depository Trust Company for the securities industry. MERS was formed to track both beneficial ownership interests in, and servicing rights to, mortgage loans as they change hands throughout the life of the loan. This tracking assists the mortgage banking industry by reducing questions regarding these contractual interests as they are bundled into mortgage-backed securities. In this manner, MERS facilitates liquidity in the secondary mortgage markets.

**C.      How MERS Works**

In the mortgage contract, the borrower assigns his or her right, title, and interest in the property to MERS. The borrower contractually agrees that, in the event of default, MERS is the

---

[7]      *See* 12 U.S.C. §§ 1451, 1716.

5

proper party to foreclose on the home. The mortgage instrument is then recorded in the local

land records with MERS as the named mortgagee. When the note is sold by the original lender

to others, the various sales of the notes are documented on the MERS® System. As long as the

sale of the note involves a MERS member, MERS remains the named mortgagee of record, and

continues to act as a nominee for the new note holder. This relationship is memorialized in the

original mortgage instrument to which the borrower is a party, as well as in the MERS

membership agreements. If a member is no longer involved with the note after it is sold, an

assignment from MERS to the non-MERS member is recorded in the county where the real

estate is located, and the Mortgage is "deactivated" from the MERS® System.

### D.     The Claims Brought by Plaintiffs Jose and Lorry Trevino

Jose and Lorry Trevino, the named Plaintiffs in this action ("Plaintiffs"), are residential

mortgage loan borrowers residing in the state of Missouri.[8]  As part of the mortgage transaction,

Plaintiffs signed a deed of trust[9] and executed a promissory note secured by a mortgage on their

residence (the "Promissory Note" or "Note").[10]  The Promissory Note forms the basis of

Plaintiffs' claims in the instant lawsuit.[11]

The terms of the Promissory Note indicate that it is an unconditional promise by

Plaintiffs, as borrowers, to pay a specified sum of money, and imposes on Plaintiffs various

obligations with respect to such payment.  Under a section titled "BORROWERS PROMISE TO

---

[8]      *See* D.I. 10 ¶ 7.

[9]      *Id.* at ¶ 24 and Ex. B.

[10]     *See id.* at Ex. A.

[11]     *See id.* at ¶ 56 ("Like excessive attorneys' fees, any other costs, fees and expenses demanded of the borrower that are not actual verifiable costs, fees and expenses that were incurred by the lender, **constitute a breach of the plain language of the Mortgage Note**.") (emphasis supplied); *see also* ¶¶ 7, 19, 20, 23, 34-38, 41-43, 57-59, 69, 71-73, 79-82 and Ex. A.

PAY," Plaintiffs expressly "promise to pay U.S. $194,000.00 (this amount is called

"Principal")..., to the order of the Lender."[12] Because the Note imposes obligations only upon

Plaintiffs, only Plaintiffs, as borrowers, signed the Note.[13] Indeed, MERS neither signed the

Note nor is mentioned anywhere in the Note.[14]

The Promissory Note further provides that if Plaintiffs, as borrowers, failed to perform

this promise, they would be in "default."[15] And, in the event of default, the Note confers rights

on the lender or Note holder, including the right to enforce the Note against Plaintiffs and the

"right to be paid back by [Plaintiffs] for all of its costs and expenses in enforcing this Note....

including... reasonable attorneys' fees."[16]

Plaintiffs defaulted on their obligations and were thus subject to an enforcement action.[17]

As part of this enforcement action, Plaintiffs allege to have received a "**demand** for payment of

costs and expenses, including attorneys' fees, in excess of amounts [MERS] actually incurred or

---

[12]    *See* Ex. A, ¶ 1.

[13]    *Id.* at pg. 3.

[14]    In their Complaint, Plaintiffs allege that "[w]hen a borrower executes a Mortgage Note,
MERS automatically becomes an assignee of the MERS member (*i.e.*, the principal lender). The
mortgage loan is registered on the MERS System, and title is held in the name of MERS." *See*
D.I. 10 ¶ 21; *see also* ¶ 32 ("MERS then, is the assignee under the Mortgage Note executed by
Plaintiffs and each putative Class member."). This statement is simply not true and the very
Note attached to Plaintiffs' Amended Complaint – which never even mentions MERS – shows
that it is not true. *See generally* Ex. A. By contrast, the deed of trust does mention MERS and,
specifically, states that "MERS is a separate corporation that is acting solely as a nominee for
Lender and Lender's successors and assigns. MERS is the beneficiary under this Security
Instrument." *See* Ex. B, ¶ E. This Court need not credit Plaintiffs' allegations that are
contradicted by the documents attached to the Complaint as exhibits. *See, e.g., ESI, Inc. v.
Coastal Power Prod. Co.,* 13 F.Supp.2d 495, 497 (S.D.N.Y. 1998) ("If the allegations of a
complaint are contradicted by documents made a part thereof, the document controls and the
Court need not accept as true the allegations of the complaint.") (citation omitted).

[15]    *Id.* at ¶ 6(B).

[16]    *See* D.I. 10 ¶ 34 and Ex. A, ¶ 6(E).

[17]    *See* D.I. 10 ¶ 7.

[was] obligated to pay."[18]  In this action, Plaintiffs maintain that such a **demand** for costs and expenses "constitutes a breach of the plain language of the [Promissory] Note."[19]

Plaintiffs filed their Amended Complaint[20] naming as Defendants MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., in addition to nine shareholders of MERSCORP, Inc.[21]  The Amended Complaint is styled as a class action and seeks relief on three common law claims: (1) breach of contract; (2) unjust enrichment; and (3) breach of the duty of good faith and fair dealing.[22]  All three claims are based on MERS' alleged demands for expenses, costs, and fees in excess of those actually incurred or paid in connection with foreclosure and enforcement proceedings.[23]

---

[18]    *Id.*(emphasis supplied); *see also* ¶¶ 49, 51. 56.

[19]    *Id.* at ¶ 56.

[20]    Plaintiffs previously filed their initial Complaint, which was similar to the Amended Complaint in some ways such that it was also styled as a class action and sought relief based on the same three legal theories.  The initial Complaint differed from the Amended Complaint in two material respects:  (1) the initial Complaint named as defendants only MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., whereas the Amended Complaint names some nine additional defendants; and (2) Plaintiffs based their claims on MERS' alleged demands for **attorneys' fees** in excess of those actually incurred or paid by MERS in connection with foreclosure and enforcement proceedings, whereas the Amended Complaint now alleges excess costs, expenses, and attorneys' fees.

[21]    *Id.* at "Introduction," ¶ 9.

[22]    *See, generally,* D.I. 10.

[23]    *Id.* at ¶ 1.  Plaintiffs Amended Complaint contains nearly nine pages – or 1/3 of the entire pleading – of media from *The New York Times, Bloomberg.com,* and *The Wall Street Journal,* among others, regarding and "reiterating disconcerting foreclosure statistics." *See* D.I. 10 ¶¶ 55, 63, 64, 65, 66, 67.  Similarly, only two Exhibits (a mere five pages) of the 153 pages of Exhibits appended to Plaintiffs' Amended Complaint bears any relevance to Plaintiffs' claims. *See* Exs. A and B.  The other 148 pages of Exhibits are copies of documents found on MERS' website. *See* Exs. D and E to Plaintiffs' Amended Complaint.  It is curious why Plaintiffs went to such an extreme to republish articles in the body of a pleading.  These countless article references and exhibits are completely irrelevant and add nothing to Plaintiffs' claims.

8

## IV.    LEGAL DISCUSSION

### A.    Law Applicable to Evaluating Plaintiffs' Claims

The named Plaintiffs in this class action lawsuit, Jose and Lorry Trevino, are Missouri

residents acting as representatives of the purported class. *See* D.I. 10 ¶ 7. The Promissory Note

upon which the named Plaintiffs base their contract claims was signed in Missouri to borrow

money to purchase a home in Missouri. *See* Ex. A. After Plaintiffs defaulted on their Note

obligations, the Note was enforced through a non-judicial foreclosure action in Missouri. *See*

D.I. 10 ¶ 7. As such, the substantive law of Missouri is applicable to MERS' Rule 12(b)(6)

Motion for failure to state a claim upon which relief can be granted.

It is well-settled that a federal court sitting in diversity should apply the choice of law

rule of the forum in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496

(1941). Therefore, this Court looks to Delaware's choice of law rules. In Delaware, courts apply

the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *See*

*Travelers Indem. Co. v. Lake,* 594 A.2d 38, 41, 47 (Del. 1991). Where, as here, the parties have

not effected a choice of law provision, Delaware courts adjudicating breach of contract claims

apply the factors set forth in the Second Restatement, including: (1) the place of contracting;

(2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of

the contract; and (5) the domicile, residence, nationality, place of incorporation and place of

business of the parties. *See, e.g., Coca-Cola Bottling of Elizabethtown v. Coca-Cola Co.,* 668

F.Supp. 906, 918-19 (D. Del. 1987); *Nat'l Union Fire Ins. Co. v. RLC Corp.,* 449 A.2d 257, 261

(Del. Super. Ct. 1982); *Oliver B. Cannon and Son v. Dorr-Oliver,* 394 A.2d 1160, 1166 (Del.

Super. Ct. 1978); *see also* Restatement (Second) of Conflicts of Laws §188(2). It is appropriate

to apply Missouri law to Plaintiffs' claims because Missouri is the place where: (1) the Note was

executed; (2) the subject matter – here, the property purchased with the loan proceeds – is located; (3) the Plaintiffs reside; and (4) the Note was enforced.[24]  These facts all suggest that Missouri has the most significant relationship to the Plaintiffs' claims.[25]

### B.    Legal Standard

The purpose of a motion to dismiss is to test the sufficiency of a complaint.  *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir. 1993).[26]  As such, the court must accept all facts alleged in the complaint as true and draw all reasonable conclusions arising from those facts in favor of the Plaintiffs.  *See Allegheny Gen. Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429, 434-35 (3d Cir. 2000); *Smith v. Delaware First Fed. Credit Union,* 395 F.Supp.2d 127, 129 (D. Del. 2005).

While a complaint need not include detailed factual allegations, "a plaintiff's obligation to provide the **grounds of his entitlement to relief** requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (citations omitted) (emphasis supplied).  Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the

---

[24]    It is worth noting that the Deed of Trust where Plaintiffs named MERS as the beneficiary contains a choice of law provision whereby the parties agreed that Missouri law applies.  *See* Deed of Trust, MERS' Ex. B, at ¶ 16.  ("This Security Instrument shall be governed by the federal law and the law of the jurisdiction in which the Property is located.")

[25]    That Plaintiffs attempt to bring this lawsuit as a nationwide class action, *See* D.I. 10 ¶¶ 10-18, does not alter the conclusion that the law of Missouri applies.  So while the laws of the fifty states may have to be considered in determining whether the suit is maintainable as a class action, it is proper to apply the law of the State of Missouri to Plaintiffs' claims on MERS' Rule 12(b)(6) Motion to Dismiss.

[26]    Under the principles stated in *Erie R.R. Co. v. Tompkins,* federal courts sitting in diversity apply state substantive law and federal procedural law.  *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938); *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 427 (1996).  Where the matter in question is one covered by the Federal Rules of Civil Procedure, "it is settled that… the Federal Rule applies regardless of contrary state law." *Id.*

assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Id.* at 1965 (citations omitted).

The court may look beyond the factual allegations of the complaint and consider exhibits which were attached thereto. *City of Pittsburgh v. West Penn Power, Co.,* 147 F.3d 256, 259 (3d Cir. 1998); *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see also In re SHC, Inc.,* 329 B.R. 438 (D. Del. 2005) ("The Court may consider documents which are incorporated into the complaint… , even if they contradict the allegations."). "If the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint." *ESI, Inc. v. Coastal Power Prod. Co.,* 13 F. Supp. 2d 495, 497 (S.D.N.Y. 1998) (citations omitted); *see also Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.,* 40 F.Supp.2d 644, 649 (W.D. Pa. 1999) ("In the event of a factual discrepancy between the pleading and the attached exhibit, the exhibit controls.") (citations omitted).

Similarly, the court may look to matters of public record, including decisions, pleadings, and other documents related to prior proceedings, without converting the motion into one for summary judgment. *Tellabs, Inc. v. Makor Issues & Rights., Ltd.,* 127 S. Ct. 2499, 2509 (2007); *Twp. of South Fayette v. Allegheny County Hous. Auth.,* 27 F. Supp. 2d 582, 594 (W.D. Pa. 1998) (in ruling on a motion to dismiss, a court may consider matters of which "they may take judicial notice [of]… publicly available records and transcripts from judicial proceedings 'in related or underlying cases which have a direct relation to the matters at issue.'") (citations omitted).

### C.    Count I – Breach of Contract – Fails To State A Claim

Plaintiffs' breach of contract claim is centered on their allegation that MERS breached the terms and conditions of the **Promissory Note,** which they attach to the Amended Complaint

11

as Exhibit A (and which is attached to this Motion for convenience as MERS' Exhibit A).  *See*

D.I. 10 ¶ 71.[27]  Specifically, Plaintiffs allege that MERS breached the **Note** by "causing,

directing and/or allowing their loan servicers and retained attorneys to overcharge for costs, fees

and expenses in connection with enforcement or foreclosure proceedings, in an amount in excess

of the amounts actually incurred or obligated to be paid."  *Id.* at ¶ 72.  These "facts" fail to state a

claim for breach of contract.

### 1.    Plaintiffs Fail To Plead The Elements For A Breach Of Contract

To state a claim for breach of contract, a plaintiff must allege four elements:  (1) the

existence of an enforceable contract between the parties; (2) mutual obligations arising under its

terms; (3) breach of the obligations imposed by the contract by the party being sued; and (4)

damages.[28]  *Jackson v. Williams, Robinson, White & Rigler, P.C.*, 230 S.W.3d 345, 348 (Mo. Ct.

App. 2007).  Plaintiffs' allegations, as pled in the Amended Complaint, fail to plead these

elements.  First, Plaintiffs cannot base a breach of contract action on the Promissory Note,

which, by its terms, does not impose any obligations on MERS.  Second, even if Plaintiffs could

---

[27]    Because Plaintiffs' attached the Promissory Note (and the Deed of Trust) to the Complaint as an exhibit, this Court treats it as part of the pleading for all purposes and thus may properly review it in deciding MERS' Motion to Dismiss.  *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see also In re SHC, Inc.*, 329 B.R. 438 (D. Del. 2005) ("The Court may consider documents which are incorporated into the complaint… , even if they contradict the allegations."); *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 649 (W.D. Pa. 1999) ("In the event of a factual discrepancy between the pleading and the attached exhibit, the exhibit controls.") (citations omitted).

[28]    Since Plaintiffs style their Amended Complaint as a "class action" and seek relief for a purported nationwide class of individuals for unjust enrichment, this Court will need to apply contract law of 50 states, which has various nuances in terms of elements of the cause of action and available defenses, to the allegations presented in the Amended Complaint.

Case 1:07-cv-00568-JJF    Document 41    Filed 01/29/2008    Page 19 of 34

base their claim on the Promissory Note, they fail to allege that they were damaged as a result of

MERS' alleged breach. As such, their breach of contract claim fails to state a claim.

**a.    The Promissory Note Cannot Be The Basis For A
Breach Of Contract Claim By Plaintiffs, As Borrowers,
Against MERS Because The Note Does Not Obligate
MERS To Perform**

The gravamen of Plaintiffs' breach of contract claim is that MERS breached the terms

and conditions of the Promissory Note by making demands on Plaintiffs for fees, costs, and

expenses exceeding those actually incurred by MERS in enforcement proceedings. *See* D.I. 10 ¶

43 ("[I]f MERS or the loan servicer seeks to collect costs, fees, and expenses based on cost

estimates, services not provided, costs and/or fees not incurred, or any amounts other than those

actually paid or obligated to be paid by them, the clear terms of the Mortgage Note have been

breached."); *see also* ¶¶ 56, 58, 59, 69, 71-73, 79-82. In other words, the contract upon which

Plaintiffs base their claim is the Promissory Note itself. The Promissory Note, however, cannot

form the basis of a breach of contract claim **against MERS** because, on its face, nothing in the

Note obligates MERS to perform under its terms.

A note, such as the Promissory Note is a negotiable instrument which, as defined under

Missouri Revised Statutes § 400-003.104 (2007), is an "**unconditional promise… to pay** a fixed

amount of money…." *See* Missouri Revised Statutes § 400-003.104 (2007) (emphasis supplied)

(codifying U.C.C. § 3-104). Thus, while under Missouri law a promissory note is considered a

written contract, it is more accurately characterized by courts in that state as a **specific type** of

contract: one for the **payment** of money. *Laas v. Wright,* 191 S.W.3d 93 (Mo. App. S.D. 2006)

("[a] promissory note is a written contract for the payment of money") (citation omitted). In

other words, a promissory note obligates one party to the contract – *i.e.*, the borrower – to pay

the sum specified. It follows logically that because the Promissory Note obligates Plaintiffs –

13

and not MERS – to pay the sum specified in the Note that Plaintiffs, as the party obligated to

perform, may not maintain an action for its breach.[29]

On the first page of the Promissory Note, under a section titled "BORROWERS

PROMISE TO PAY," **Plaintiffs "promise to pay** U.S. $194,000.00 (this amount is called

"Principal"), plus interest, to the order of the Lender." *See* Exhibit A, ¶ 1 (emphasis supplied);

*see also* ¶ 1 ("**I will make** all payments under this Note….") (emphasis supplied); ¶ 2 ("**I will**

**pay** interest at a yearly rate.") (emphasis supplied); ¶ 3 ("**I will pay** principal and interest by

making a payment every month.") (emphasis supplied).  Later, under a section titled

"OBLIGATIONS OF PERSONS UNDER THIS NOTE," Plaintiffs, as borrowers, agreed to

"keep all of the **promises** made in this Note, **including the promise to pay** the full amount

owed." *Id.* at ¶ 8 (emphasis supplied).  Finally, Plaintiffs, as borrowers, agreed that if they failed

to keep any of these promises, the note holder was entitled to "enforce its rights under this Note"

against them. *Id.*

Whereas the Note imposes **obligations** on Plaintiffs, as borrowers, and has them

**promising to pay** pursuant to the terms of the Note, the Note confers **rights** upon other parties

(*i.e.*, the lender and the Note holder).  *See id.* at ¶ 1 (Lender's **right** to receive payments under

the Note); ¶ 4 (Lender's **right** with respect to prepayments); ¶ 6 (Lender's **rights** with respect to

default).  Significantly, the Note confers on the lender or the Note holder "the **right** to be paid

back by [Plaintiffs] all of its costs and expenses in enforcing this Note…. These expenses

---

[29]    Plaintiffs allege that they "entered into contracts for mortgages with MERS named as the lender, assignee or beneficiary, and/or which were subsequently assigned to MERS." *See* D.I. 10 ¶ 71.  Plaintiffs then proceed to allege that MERS breached the "Mortgage Note," *Id.* at ¶¶ 43, 56, 58, 59, 69, 71-73, 79-82, and cite to the provisions of the Note. *Id.* at ¶¶ 23, 34, 41. Thus, it is the Promissory Note, and not the Deed of Trust, upon which Plaintiffs base their breach of contract claim.

include, for example, reasonable attorneys' fees." *Id.* at ¶ 6(E). As a matter of law, it cannot be said that MERS could breach a **right** conferred to the lender on the face of the Promissory Note.

In short, nothing in the Note obligates **any party** to perform **except for the Plaintiffs, as borrowers**, who, by signing the instrument, obligated themselves to pay the sum specified. Because there are no mutual obligations – an element required to state a claim for breach of contract – Plaintiffs' allegations fail to state a claim and, therefore, should be dismissed.

### b.     Plaintiffs Have Not Alleged Damages

Even assuming that the Note could form the basis of a breach of contract claim by Plaintiffs against MERS, Plaintiffs have not pled facts showing they have been harmed. Plaintiffs cannot make such allegations because they have not been harmed. To state a claim for breach of contract, a plaintiff must allege that he suffered damages. *See Jackson,* 230 S.W.3d at 348. While the Plaintiffs need not plead specific allegations regarding the amount of damages they seek, their allegations must include facts that, if true, would entitle them to the requested relief. *See Twombly,* 127 S.Ct. at 1964-65. A careful reading of the Amended Complaint reveals that Plaintiffs' allegations fail to meet this standard.

Throughout the Amended Complaint, Plaintiffs allege that MERS, through its attorneys, made "**demands**" on borrowers "for payment of fees and expenses that exceed actually incurred or obligated amounts...." *See* D.I. 10 ¶ 2 (emphasis supplied); *see also* ¶¶ 38, 42-43, 49, 56, 57-59, 72. But nowhere does the Amended Complaint allege that Plaintiffs ever actually **paid** the allegedly excessive fees and expenses to MERS or anyone else. In other words, Plaintiffs' allegation of damages rests solely on MERS' asking for or requesting them to pay additional fees. It cannot, however, be said that a **mere demand** for payment of a sum of money, absent an allegation that Plaintiffs' **actually paid** the sums requested, constitutes damages for purposes of stating a breach of contract claim. *See, e.g., Kincaid Enters., Inc. v. Porter,* 812 S.W.2d 892, 900

15

(Mo. App. W.D. 1991) ("[a]n injury [compensable by a breach of contract action] arises when the legal right of the person is violated").

The purpose of a breach of contract action further reveals the insufficiency of Plaintiffs' allegations. It is well-established that the purpose of a breach of contract action is to restore the plaintiff to the same economic position he would have been in had the contract been fully performed. *Williams v. Williams,* 2003 WL 1477064 (Mo. App. W. Dist. 2003) ("the goal is to award a sum that will put the non-breaching party in as good a position as he could have been had the contract been fully performed"). Such an action seeks to make the plaintiff as economically whole as possible without allowing him to realize a profit. *Ozark Air Lines, Inc. v. Valley Oil Co., LLC,* 2007 WL 4165338 (Mo. App. W. Dist. 2007) ("[t]he general rule is that a party may not... be put in a better condition that he would have been had the wrong not been committed"). Thus, a breach of contract action requires that the Plaintiffs suffered a change in position as a result of the breach to allege the necessary element of damages.

Plaintiffs' allegations, however, indicate the opposite because Plaintiffs remained in **the same position** both before and after the alleged demand for excessive fees. Put simply, no excessive fees were ever allegedly paid by Plaintiffs to MERS. Absent an allegation that Plaintiffs' actually paid the sums requested, Plaintiffs' bald assertions that they somehow incurred damages based on mere demands for payment are insufficient to state a claim for breach of contract.

### D.    Count II – Unjust Enrichment – Fails To State A Claim

#### 1.    Plaintiffs Fail To Plead The Elements Required To State A Claim For Unjust Enrichment

Count II of Plaintiffs' Amended Complaint seeks recovery on an unjust enrichment theory based on "a demand for payment of fees and expenses that exceed actually incurred or obligated amounts...." *See* D.I. 10 ¶ 2. To state a claim for unjust enrichment, Plaintiffs must

allege that: (1) they conferred a benefit on MERS; (2) MERS accepted and retained the alleged

benefit; and (3) MERS was unjustly enriched at Plaintiffs' expense. *See, e.g., Childress Painting*

*& Assoc. v. John Q. Hammons Hotels Two, L.P.,* 106 S.W.3d 558, 562 (Mo. App. W.D. 2003).

Plaintiffs fail to plead facts showing entitlement to relief, *Twombly,* 127 S. Ct. at 1964-65, and as

such, their unjust enrichment count fails to state a claim.[30]

> a.   **The Complaint Fails To Allege Facts Showing Any Benefits To MERS**

First, Plaintiffs fail to allege that they ever conferred any benefit on MERS.  For purposes

of an unjust enrichment claim, a person confers a benefit by **giving** an adverse party possession

of, or an interest in, personal property, or by **adding** to the property of the adverse party.  *See,*

*e.g., Patrick V. Koepke Const., Inc. v. Woodsage Const. Co.,* 844 S.W.2d 508 (Mo. App. E.D.

1992) (**site improvements** to land a benefit for purposes of unjust enrichment); *Petrie v. LeVan,*

799 S.W.2d 632 (Mo. App. W.D. 1990) (**payment of money** a benefit for purposes of unjust

enrichment).  Thus, to state a claim for unjust enrichment, Plaintiffs must allege facts stating that

Plaintiffs gave or paid MERS something of value.  The factual allegations in the Complaint fail

to support such a conclusion.

Indeed, nowhere in the Amended Complaint do Plaintiffs allege they gave or paid MERS

anything.  Rather, Plaintiffs allege only that MERS **demanded** from them expenses, costs, and

fees in excess of the amounts actually incurred by MERS.  *See* D.I. 10 ¶ 7 ("Plaintiffs . . . signed

---

[30]   Plaintiffs' claim for unjust enrichment is not properly maintained as a class action. *See, e.g., Clay v. Am. Tobacco Co., Inc.,* 188 F.R.D. 483, 501 (S.D. Ill. 1999) (holding that proposed class action for unjust enrichment would be "unmanageable" because "variances exist in state common laws of unjust enrichment" and "[t]he actual definition of 'unjust enrichment' varies from state to state"); *Lilly v. Ford Motor Co.,* 2002 WL 507126 (N.D. Ill. Apr. 3, 2002) ("Even if the law of… unjust enrichment is similar in all fifty-one jurisdictions, a class action is not the superior method of adjudicating these claims…. [because] [t]here would be individual questions as to whether a particular class member if subject to equitable defenses.").

a Mortgage Note, were subject to an enforcement action, **received a demand for payment of costs and expenses**, including attorneys' fees, in excess of amounts Defendants actually incurred or were obligated to pay, and suffered damages as a result") (emphasis supplied).  Because Plaintiffs fail to allege that they conferred value upon MERS, the Amended Complaint does not state a claim for unjust enrichment.[31]

### b.    MERS Neither Accepted Nor Retained Any Benefit

Even if Plaintiffs did confer a benefit on MERS – which they did not – Plaintiffs' claim fails because they have not alleged that **MERS** accepted or retained any such benefit.  For purposes of an unjust enrichment claim, the defendant must be the one who accepts and retains the alleged benefit. *See, e.g., Childress Painting & Assoc.,* 106 S.W.3d at 562.  Plaintiffs fail to make such allegation.

Plaintiffs allege that MERS **"directed and/or permitted their** agents" to retain the fees and expenses that were in excess of those agreed upon as well as the interest or other profits

---

[31]    Plaintiffs do allege that MERS benefited from the demands for excess fees and expenses in the form of "unjustified earnings and/or profits...." *See* D.I. 10 ¶ 75.  But this allegation falls far short.  There is an unexplained gap between allegations that MERS received profits as a result of making **demands** for payment.  To withstand a Motion to Dismiss, a complaint must alleged facts that raise the right to pleader's relief above the speculative level. *Twombly,* 127 S. Ct. at 1965.  Alleging that MERS "retained profits" because it **demanded** excess fees leave one to speculate completely as to how MERS retained profits from such demands. *Id.* at ¶ 7 ("Plaintiffs..., signed a Mortgage Note, were subject to an enforcement action, **received a demand for payment of costs and expenses**, including attorneys' fees, in excess of amounts Defendants actually incurred or were obligated to pay, and suffered damages as a result) (emphasis supplied); *see also* ¶¶ 1, 51, 56, 57.  Moreover, future earnings or profits do not constitute a "benefit" for the purposes of unjust enrichment as a matter of law.  As one court has explained, "[t]here is nothing in this doctrine [of unjust enrichment] that suggests that a party must pay restitution for the creation of a **rather slim possibility that the party may receive some benefit in the future.**" *JB Contracting, Inc. v. Bierman,* 147 S.W.3d 814, 820 (Mo. App. S.D. 2004) (citations omitted) (emphasis supplied); *see also Bouchard v. Price,* 694 A.2d 670 (R.I. 1997) (holding that there is no unjust enrichment claim where the only purported benefits to a defendant are "speculative profits").  Thus, Plaintiffs' reliance on earnings and profits – amounts that could not have been due to mere demands for payment and which are influenced and determined by a milieu of factors – is insufficient to support an unjust enrichment claim.

earned on the proceeds...." *See* D.I. 10 ¶ 76 (emphasis supplied).  Nowhere in the Amended

Complaint do Plaintiffs allege that **MERS** accepted or retained any alleged benefit.  By contrast,

Plaintiffs expressly identify other entities as the recipients of the alleged benefits.  *Id.*

### c.    Any Benefit Was Not Unjust

Finally, even assuming Plaintiffs pled all the foregoing elements required to state a claim

for unjust enrichment, Count II fails to state a claim because Plaintiffs have not alleged any

wrongful conduct by MERS that would render any benefit unjust.  To determine whether it

would be unjust for the defendant to retain the benefit, Missouri courts consider whether **"any**

**wrongful conduct by the defendant** contributed to the plaintiff's disadvantage."  *Graves v.*

*Berkowitz,* 15 S.W.3d 59, 61 (Mo. App. W.D. 2000) (emphasis supplied).  **"Mere receipt of**

**benefits is not enough** when there is no showing that it would be unjust for defendant to retain

the benefit received."  *Id., quoting Farmers New World Life Ins. Co., Inc. v. Jolley,* 747 S.W.2d

704, 706 (Mo. App. W.D. 1998).  "There must be something more than passive acquiesce, such

as fault or undue advantage on the part of the defendant, for defendant's retention of the benefits

to be unjust."  *Id.* at 64.

Plaintiffs' Amended Complaint contains no such allegation.  Indeed, as discussed,

Plaintiffs' only allegation with respect to MERS is that MERS **"directed and/or permitted**

**their agents,** including the loan servicers, lenders and attorneys... to retain the fees and expenses

that were in excess of those agreed upon as well as the interest or other profits earned on the

proceeds...."  *See* D.I. 10 ¶ 76. (emphasis supplied).  But MERS' act of  "directing or

permitting" others to retain excess fees and expenses, even if true, simply does not rise to the

level of "wrongful conduct" which is required for a claim of unjust enrichment.[32] [33]

---

[32]    Alternatively, Plaintiffs' unjust enrichment claim fails as a matter of law because
(cont.)

Plaintiffs' allegations that MERS was unjustly enriched as a result of mere demands made by MERS' attorneys to Plaintiffs for payment of expenses, costs, and fees in excess of amounts actually incurred, fail to state a claim that would entitle Plaintiffs to relief of any kind. As such, Plaintiffs' unjust enrichment claim should be dismissed.

###    E.    Count III – Breach of Duty of Good Faith and Fair Dealing – Fails to State a Claim

Count III of Plaintiffs' Complaint claims that MERS breached a duty of good faith and fair dealing allegedly owed to Plaintiffs by virtue of the Note, which Plaintiffs maintain is a contract. *See* D.I. 10 ¶ 79. This claim also fails as a matter of law for two reasons. First, because the duty of good faith and fair dealing is implied into every contract, and because, as discussed above, Plaintiffs' fail to state a claim for breach of the Promissory Note, their breach of duty claim likewise fails. Second, Plaintiffs' breach duty claim fails because Plaintiffs have not alleged any facts which would support such a claim.

---

Plaintiffs allege the existence of an express contract between themselves and MERS, *See* D.I. 10 ¶ 20 ("The Mortgage Note is a contract…."), and **expressly premise** their unjust enrichment claim on it. *Id.* at ¶ 67 ("**As a result of the breach of contract described above,** Defendant will be and has been unjustly enriched at the expense of plaintiffs and the Class…") (emphasis supplied). Simply put, a claim for unjust enrichment cannot lie where there is an express contract regulating the relationship of the parties with respect to a disputed issue. *See, e.g.,* 5 Williston, Contracts (Rev. Ed.) § 1479 ("Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract."); *Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc.,* 111 F.3d 1386 (8th Cir. 1997) (denying recovery on unjust enrichment theory where there was an express contract that governed the parties' relations).

[33]    The fact that the named Plaintiffs fail to state a claim for unjust enrichment renders them ineligible to represent the putative nationwide class of individuals on whose behalf they purport to bring the instant action. *See Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 (1982) ("a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members"). Where, as here, a named plaintiff suffers no injury or has no actionable claim, she is "simply not eligible to represent a class of persons who did allegedly suffer injury." *Id., citing East Texas Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403-404 (1977).

1.    **Plaintiffs Breach of Fair Dealing Claim Fails As A Matter of Law Because They Fail To State A Claim For Breach of Contract**

As an initial matter, because the Plaintiffs fail to allege a breach of contract claim, *see supra*, Section III.D, their breach of duty of good faith and fair dealing claim necessarily fails because that duty must arise from an enforceable contract. *See* Restatement (Second) of Contracts, § 205 cmt. (a) (1981); *Finova Capital Corp. v. Ream*, 230 S.W.3d 35, 45 (Mo. App. S.D. 2007) (implied into every contract is a covenant of good faith and fair dealing). Here, Plaintiffs allege that the Promissory Note is a contract between themselves and MERS and purport to base their breach of contract on the Note itself. *See* D.I. 10 ¶¶ 7, 19, 20, 23, 34-38, 41-43, 56-59, 69, 71-73, 79-82. As previously discussed, however, because the Note neither mentions nor imposes any contractual duties on MERS upon which Plaintiffs could maintain a suit for breach, it cannot be the basis for a breach of contract claim. Without a breach of contract claim, then, Plaintiffs' breach of duty of good faith and fair dealing claim fails as a matter of law because Plaintiffs fail to state a claim for breach of contract.

2.    **Plaintiffs Fail To Plead The Elements of A Claim For Breach of Duty of Good Faith And Fair Dealing**

Even if the Promissory Note could form the basis of a breach of contract action – which it cannot – Plaintiffs' breach of duty of good faith and fair dealing claim nevertheless fails to state a claim because Plaintiffs have not alleged facts entitling them to relief of any kind.

The duty of good faith and fair dealing is a general duty to "cooperate as to enable performance and achievement of expected benefits, and a general duty not to prevent or hinder performance by the other party." *Birdsong v. Bydalek*, 953 S.W.2d 103, 121 (Mo. App. S.D. 1997); *Robinson v. Powers*, 777 S.W.2d 675, 681 (Mo. App. S.D. 1989) (the obligation of good faith requires that contracting parties not prevent or hinder performance by the other party). A party breaches its duty when it, in bad faith, utilizes contract language allowing unilateral action

21

to improperly deny the other party expected benefits of the contract. *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 412 (Mo. App. W.D. 2000).  In their Amended Complaint, Plaintiffs allege that MERS "breached [its duty] by, ... pursuing enforcement and foreclosure proceedings and then, subsequently, causing, directing or giving approval to its loan servicers, attorneys, or other agents to seek costs, expenses, including attorneys, from borrowers in excess of amounts actually incurred or obligated to be paid." *See* D.I. 10 ¶ 80.  Yet nowhere in the Amended Complaint do Plaintiffs allege any facts that could support a claim that MERS, in bad faith, utilized the language of the Promissory Note to improperly deny Plaintiffs any benefits they expected to receive under its terms.  Thus, Plaintiffs fail to state a claim for breach of duty of good faith and fair dealing and, therefore, their claim should be dismissed.

**CONCLUSION**

For the foregoing reasons, Counts I, II, and III of the Amended Complaint fail to state a

cause of action entitling Plaintiffs' to relief of any kind.  As such, the entire Amended Complaint

should be dismissed with prejudice.

CONNOLLY BOVE LODGE & HUTZ LLP


By:   /s/ Kevin F. Brady
         Kevin F. Brady (No. 2248)
         Jeremy D. Anderson (No. 4515)
         The Nemours Building
         1007 N. Orange Street
         P.O. Box 2207
         Wilmington, DE  19899
         302-658-9141
         kbrady@cblh.com
         janderson@cblh.com

         *Attorneys for Defendants MERSCORP Inc.*
         *And Mortgage Electronic Registration Systems, Inc.*


OF COUNSEL:
Robert M. Brochin
Sean M. O'Neill
MORGAN LEWIS & BOCKIUS LLP
5300 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, FL  33131-2339
302-415-3000

Dated: January 29, 2008

## CERTIFICATE OF SERVICE

I hereby certify on January 29, 2008, I electronically filed the foregoing ***Defendant MERS' Motion to Dismiss Plaintiffs' Class Action Complaint and Memorandum of Law*** with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Carmella P. Keener
Rosenthal, Monhait & Goddess, P.A.
Mellon Bank Center, Suite 1401
P.O. Box 1070
919 Market Street
Wilmington, DE 19899-1070
ckeener@rmgglaw.com
*Counsel for Plaintiff*

Jeffrey M. Norton, Esq.
*Admitted Pro Hac Vice*
Robert I. Harwood, Esq.
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
rharwood@hfesq.com
jnorton@hfesq.com
*Of Counsel for Plaintiff*

Kenneth J. Nachbar
Morris, Nichols, Arsht & Tunnell LLP
Chase Manhattan Centre, 18th Floor
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
T: (302) 351-9294
F: (302) 658-3989
knachbar@mnat.com
*Counsel for Defendant Citigroup Inc.*

Katharine V. Jackson
Reed Smith LLP
1201 Market Street
Suite 1500
Wilmington, DE 19801
T: (302) 778-7500
F: (302) 778-7575
kjackson@reedsmith.com
*Counsel for Defendant GMAC-RFC Holding Company, LLC*

Stephen E. Herrmann
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
T: (302) 658-6541
F: (302) 651-7701
herrmann@rlf.com
*Counsel for Defendant HSBC Finance Corporation*

David S. Eagle
Kelly A. Green
Klehr, Harrison, Harvey, Branzburg & Ellers
919 Market Street
Suite 1000
Wilmington, DE 19801
T: (302) 426-1189
F: (302) 426-9193
deagle@klehr.com
kgreen@klehr.com
*Counsel for Defendant JP Morgan Chase & Co.*

I further certify that a copy of the foregoing document and the notice of electronic filing

was sent by [U.S. Mail] to the following non-CM/ECF participants:

Matthew S. Chase, Esq.
THE CHASE LAW FIRM, PC
8123 Delmar Boulevard
University City, MO 63130-3729
Tel: (314) 726-4040
Fax: (314) 726-6543
matthew@chaselawpc.com
*Of Counsel for Plaintiff*

25

Thomas Hefferon
Scott Nardi
Goodwin Procter
901 New York Avenue, NW
Washington, DC 20001
T: (202) 346-4000
F: (202)-346-4444
thefferon@goodwinprocter.com
snardi@goodwinprocter.com
*Counsel for Defendants Washington Mutual Bank,*
*Countrywide Financial Corporation, and Wells Fargo & Company*

Richard D. Kirk
The Bayard Firm
222 Delaware Ave.
Suite 900
P.O. Box 25130
Wilmington, DE 19899
T: (302) 655-5000
F: (302) 658-6395
rkirk@bayardfirm.com
*Counsel for Defendants Washington Mutual Bank, Countrywide Financial*
*Corporation, and Wells Fargo & Company*

Lucia Nale
Thomas V. Panoff
Mayer, Brown
71 S. Wacker Drive
Chicago, IL 60606
T: (312) 706-0600
F: (312) 701-7711
lnale@mayerbrown.com
tpanoff@mayerbrown.com
*Counsel for Defendant Citigroup Inc.*

John Dorsey
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
T: (302) 571-6600
F: (302) 571-1253
jdorsey@ycst.com
*Counsel for Defendant Fannie Mae*

William McKenna
Jill Murch
Foley & Lardner LLP
321 North Clark
Suite 2800
Chicago, IL 60610
T: 312.832.4541
F: 312.832.4700
WMcKenna@foley.com
jmurch@foley.com
*Counsel for Defendant Fannie Mae*

David Baldwin
Peter J. Walsh Jr.
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, DE  19801
T: (302) 984-6017
F: (302) 658-1192
dbaldwin@potteranderson.com
pwalsh@potteranderson.com
dmoore@potteranderson.com
*Counsel for Defendant Freddie Mac*

Henry Reichner
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103
T: (215) 851-8100
F: (215) 851-1420
hreichner@reedsmith.com
*Counsel for Defendant GMAC-RFC Holding Company, LLC*

27

Irene Freidel
Bruce Allensworth
K&LGates
State Street Financial Center
One Lincoln Street
Boston, MA  02111-2950
T: (617) 951-9154
F: (617).261-3175
bruce.allensworth@klgates.com
irene.freidel@klgates.com
*Counsel for Defendant HSBC Finance Corporation*

LeAnn Pedersen Pope
Danielle Szukala
Burke, Warren, MacKay & Serritella
330 N. Wabash Avenue
22nd Floor
Chicago, Illinois  60611
T: (312) 840-7013
F: (312) 840-7900
lpope@burkelaw.com
dszukala@burkelaw.com
*Counsel for Defendant JP Morgan Chase & Co.*


　　　　　　　　　　　/s/ Kevin F. Brady
　　　　　　　　　　　Kevin F. Brady (No. 2248)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF DELAWARE

|  |  |
|---|---|
| JOSE TREVINO and LORRY S. TREVINO, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>MERSCORP, INC. and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., CITIGROUP, INC., COUNTRYWIDE FINANCIAL CORPORATION, FANNIE MAE, FREDDIE MAC, GMAC-RFC HOLDING COMPANY, LLC d/b/a GMAC RESIDENTIAL FUNDING CORPORATION, HSBC FINANCE CORPORATION, JPMORGAN CHASE & CO, WASHINGTON MUTUAL BANK, and WELLS FARGO & COMPANY,<br><br>        Defendants. | C.A. No. 07-568-*** |

## EXHIBITS IN SUPPORT OF DEFENDANTS MERSCORP INC.'S AND MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Kevin F. Brady (No. 2248)
Jeremy D. Anderson (No. 4515)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE  19899
302-658-9141

*Attorneys for Defendants MERSCORP Inc.
And Mortgage Electronic Registration Systems,
Inc.*

# EXHIBIT A

# EXHIBIT A

LOAN #: 34339
CASE #: 31-31-6-0367870
MIB #: 1003527-0003040093-9

**NOTE**



# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

MAY 16, 2003                         CLEARWATER,                              FLORIDA
[Date]                               [City]                                   [State]

7724 BURR OAK LANE, SAINT LOUIS, MO 63130
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.    $134,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  MEARS, N.A., DBA VETERAN HOME LOANS, A GEORGIA CORPORATION.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    5.000%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1ST    day of each month beginning on  JULY 1, 2003.
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    JUNE 1, 2018,    I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
1295 LAKES PARKWAY BLDG00
LAWRENCEVILLE, GA 30043

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S.    $1,059.66.

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200 1/01 MODIFIED
© 1999-2001 Online Documents, Inc.                    Page 1 of 3                    V5200CNOT  0107



**LOAN #: 34359**

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charges shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **6.000%** of my overdue payment. I will pay this late charge promptly but only once on each late payment.

### (B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200 1/01 MODIFIED
© 1999-2001 Online Documents, Inc.                    Page 2 of 3                    V3200NOT

LOAN #: 36359

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 11. ALLONGE TO THIS NOTE

If an allonge providing for payment adjustments or for any other supplemental information is executed by me together with this Note, the covenants of the allonge are incorporated into and amends and supplements the covenants of this Note as if the allonge were a part of this Note. [Check applicable box]

☐ Graduated Payment Allonge     ☐ Other [Specify]

## 12. V.A. REGULATIONS

Regulations (38 C.F.R. Part 36) issued under the Department of Veterans Affairs ("VA") Guaranteed Loan Authority (38 U.S.C. Chapter 37) and in effect on the date of loan closing shall govern the rights, duties and liabilities of the parties to this loan and any provisions of this Note which are inconsistent with such regulations are hereby amended and supplemented to conform thereto.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
JESS A. TREVINO

_____ (Seal)
LORENE S. TREVINO

Pay To The Order Of _____
Without Recourse
nBank N.A.
By _____ SVP
Carol Lummus SVP

[CORPORATE SEAL]

*[Sign Original Only]*

# EXHIBIT B





*2003061200186*

## JANICE M. HAMMONDS, RECORDER OF DEEDS
### ST. LOUIS COUNTY MISSOURI
41 SOUTH CENTRAL, CLAYTON, MO 63105

TYPE OF
INSTRUMENT              GRANTOR                TO              GRANTEE
DT          TREVINO JOSE A ETUX                      NBANK N A  ETAL

PROPERTY            BLACKBERRY LOT PT 9 AND 10    PB 48 PG 12
DESCRIPTION:

| Lien Number | Notation | Locator |
|-------------|----------|---------|
|             |          |         |

NOTE: I, the undersigned Recorder of Deeds, do hereby certify that the information shown on this Certication Sheet as to the TYPE OF INSTRUMENT, the NAMES of the GRANTOR and GRANTEE as well as the DESCRIPTION of the REAL PROPERTY affected is furnished merely as a convenience only, and in the case of any discrepancy of such information between this Certification Sheet and the attached Document, the ATTACHED DOCUMENT governs. Only the DOCUMENT NUMBER, the DATE and TIME of filing for record, and the BOOK and PAGE of the recorded Document is taken from this CERTIFICATION SHEET.

### RECORDER OF DEEDS DOCUMENT CERTIFICATION

STATE OF MISSOURI   )
                    )  SS.
COUNTY OF ST. LOUIS )

| Document Number |
|-----------------|
| 186             |

I, the undersigned Recorder of Deeds for said County and State, do hereby certify that the following and annexed instrument of writing, which consists of ____18____ pages, (this page inclusive), was filed for record in my office on the ____12____ day of ____June____ ____2003____ at ____07:39 AM____ and is truly recorded in the book and at the page shown at the top and/or bottom of this page.

In witness whereof I have hereunto set my hand and official seal the day, month and year aforesaid.

_JoAnn Reber_
Deputy Recorder

____ N.P
____ N.P.C
____ N.N.C.
____ N.N.I.

_Janice M. Hammonds_
Recorder of Deeds
St. Louis County, Missouri

RECORDING FEE ____$71.00____
(Paid at the time of Recording)

Mail to:

Destination code: ____    M     B-14957 P-0611/0628

Description: St Louis,MO Document-Book.Page 14957.611 Page: 1 of 18

I7

--------------------------------[Space Above This Line For Recording Date]--------------------------------

# RECORDING COVERSHEET
## (MISSOURI)

Pursuant to Missouri law (MO Revised Statutes Section 59.310.2), the following information is required to be
Supplied on this coversheet in order to present the document or instrument for recording.

Title of Document: DEED OF TRUST

Date of Document: MAY 16, 2003

Name of Grantor: JOSE A. TREVINO AND LORRIE S. TREVINO, HUSBAND AND WIFE

Address of Grantor(s): 7724 BURR OAK LANE, SAINT LOUIS, MO 63130

Name of Grantee(s): NBANK, N.A., DBA VETERAN HOME LOANS

Address of Grantee(s): 1255 LAKES PARKWAY BLD 200, LAWRENCEVILLE, GA 30043

Legal Description of Property: EXHIBIT "A", ON PAGE 14

Reference Book:                    Page:

Recording Coversheet (Missouri)

LOAN #: 34359

———————————— [Space Above This Line For Recording Data] ————————————

*D 122493*
*T 240791*

**DEED OF TRUST**

CASE #: 31-31-6-0367870

MIN 1002527-0003040093-9

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
(A) "Security Instrument" means this document, which is dated MAY 16, 2003,                    together with all Riders to this document.
(B) "Borrower" is JOSE A. TREVINO AND LORRIE S. TREVINO, HUSBAND AND WIFE.

*TAX ID #17K 320 511*
Borrower is the trustor under this Security Instrument.
(C) "Lender" is NBANK, N.A., DBA VETERAN HOME LOANS.

Lender is a CORPORATION,
GEORGIA.
PARKWAY BLD200, LAWRENCEVILLE, GA 30043.

(D) "Trustee" is TRANSCONTINENTAL TITLE.

organized and existing under the laws of
Lender's address is 1255 LAKES

PREPARED BY & RETURN TO:
RAY HUNDLEY
TRANSCONTINENTAL TITLE CO
2605 ENTERPRISE RD. E #300
CLEARWATER, FL 33759
1-800-225-7897

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated MAY 16, 2003.
The Note states that Borrower owes Lender ****ONE HUNDRED THIRTY FOUR THOUSAND AND NO/100
************************************************* Dollars (U.S.    $134,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JUNE 1, 2018.
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

Initials:

MISSOURI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3026 1/01
© 1999-2002 Online Documents, Inc.              Page 1 of 12              HOEVADED        MOEVADLD  0211

**LOAN #: 34359**

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Other(s) [specify]
☐ 1-4 Family Rider    ☐ Biweekly Payment Rider
☒ V.A. Rider

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, bargains, sells, conveys and confirms to Trustee, in trust, with power of sale, the following described property located in the SAINT LOUIS COUNTY          [Type of Recording Jurisdiction] of
SAINT LOUIS                            [Name of Recording Jurisdiction]:
THE WEST 66.41 FEET OF LOT 9 AND THE EAST 1.67 FEET OF LOT 10 OF BLACKBERRY TERRACE SECOND ADDITION, AS PER PLAT THEREOF RECORDED IN PLAT BOOK 48 PAGE 12 OF THE ST. LOUIS COUNTY RECORDS.
AP #: 17K320511

Initials: _____

MISSOURI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3026 1/01
© 1999-2002 Online Documents, Inc.                    **Page 2 of 12**                                        MOEVADLD

Description: St Louis,MO Document-Book.Page 14957.611 Page: 4 of 18

LOAN #: 34359

which currently has the address of 7724 BURR OAK LANE, SAINT LOUIS,

[Street] [City]

Missouri    63130        ("Property Address"):
            [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Initials: _____

MISSOURI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3026 1/01
© 1999-2002 Online Documents, Inc.        Page 3 of 12                              MOEVADLD

LOAN #: 34359

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and if, Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of

Initials: ___

MISSOURI–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3026 1/01
© 1999-2002 Online Documents, Inc.    Page 4 of 12    MOEVADLD

LOAN #: 34359

the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when

Initials: [signature]

MISSOURI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3026 1/01
© 1999-2002 Online Documents, Inc.                Page 5 of 12                         MOEVADLD

LOAN #: 34359

the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

Initials: _____

MISSOURI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3026 1/01
© 1999-2002 Online Documents, Inc.            **Page 6 of 12**                                     MOEVADLD

LOAN #: 34359

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the note, another insurer, any reinsurer, any other entity, or affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provided that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Initials: _____

MISSOURI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3026 1/01
© 1999-2002 Online Documents, Inc.    Page 7 of 12    MOEVADLD

LOAN #: 34359

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument,

Initials: ___

LOAN #: 34359

including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c)

Initials: _____

LOAN #: 34359

entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous

Initials: ___

MISSOURI–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3026 1/01
© 1999-2002 Online Documents, Inc.                              **Page 10 of 12**                              MOEVADLD

*Description: St Louis,MO Document-Book.Page 14957.611 Page: 12 of 18*

LOAN #: 34359

Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall mail copies of a notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property to any later time on the same date by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Lease of the Property. Trustee hereby leases the Property to Borrower until this Security Instrument is either satisfied and released or until there is a default under the provisions of this Security Instrument. The Property is leased upon the following terms and conditions: Borrower, and every person claiming an interest in or possessing the Property or any part thereof, shall pay rent during the term of the lease in the amount of one cent per month, payable on demand, and without notice or demand shall and will surrender peaceable possession of the Property to Trustee upon default or to the purchaser of the Property at the foreclosure sale.

26. Homestead Exemption. Borrower hereby waives all homestead exemptions in the Property to which Borrowers would otherwise be entitled under Applicable Law.

27. Notice. Oral agreements or commitments to loan money, extend credit or to forebear from enforcing repayment of debt including promises to extend or renew such debt are not enforceable. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

Initials: ___

MISSOURI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3026 1/01
© 1999-2002 Online Documents, Inc.     Page 11 of 12     MOEVADLD

Description: St Louis,MO Document-Book.Page 14957.611 Page: 13 of 18

LOAN #: 34359

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
JOSE A. TREVINO

_____ (Seal)
LORRIE S. TREVINO

**STATE OF MISSOURI**                    County ss: St. Louis

On this 16th day of May, 2003 before me personally appeared Jose A. Trevino and Lorry S. Trevino

_____ ,

to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that ___they___ executed the same as ___their___ free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the ___County___ and State aforesaid, the day and year first above written.

**My Term Expires:**

July 25, 2004

_____
Notary Public
Joseph J. Sell

JOSEPH J SELL
NOTARY PUBLIC - NOTARY SEAL
STATE OF MISSOURI
ST. LOUIS COUNTY
MY COMMISSION EXP. JULY 25, 2004

MISSOURI–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3026 1/01
© 1999-2002 Online Documents, Inc.                    Page 12 of 12                    MOEVADLD

Description: St Louis,MO Document-Book.Page 14957.611 Page: 14 of 18

EXHIBIT "A"

THE FOLLOWING DESCRIBED REAL ESTATE, SITUATED IN THE COUNTY OF ST. LOUIS AND STATE OF MISSOURI, TO-WIT:

THE WEST 66.41 FEET OF LOT 9 AND THE EAST 1.67 FEET OF LOT 10 OF BLACKBERRY TERRACE SECOND ADDITION, AS PER PLAT THEREOF RECORDED IN PLAT BOOK 48 PAGE 12 OF THE ST. LOUIS COUNTY RECORDS.

BEING THE SAME PROPERTY CONVEYED TO JOSE A. TREVINO AND LORRIE S. TREVINO, HUSBAND AND WIFE BY DEED FROM CATHY FRIEDMAN, RECORDED 02/16/2000 IN DEED BOOK 12450, PAGE 254.