## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOSE TREVINO and LORRY S. TREVINO,
Individually and On Behalf Of All Others
Similarly Situated,

        Case No. 07-568-JJF

        Plaintiffs,

   vs.

MERSCORP, INC., et al.,

        Defendants.

## PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE OF
## CERTAIN PUBLIC RECORDS AND WRITTEN COMPANY MATERIALS

Plaintiffs request that this Court take judicial notice, under Rule 201 of the Federal Rules of Evidence, of the following materials:

1.    St. Louis County "Deed Search Results" for Plaintiffs' property showing no filings or updates between 2003 and 2005 and listing Mortgage Electronic Registration Systems, Inc. as mortgagee of record (annexed hereto as Exhibit A);

2.    Relevant portions of the Record on Appeal in the matter *Merscorp, Inc. and Mortgage Electronic Registration Systems, Inc. v. Romaine*, Case No. 2004-04735 (Court of Appeals, State of New York):

    a.    The deposition testimony of R.K. Arnold, President and CEO of Merscorp, Inc. and Mortgage Electronic Registration Systems, Inc. (collectively "MERS") (annexed hereto as Exhibit B);

    b.    The deposition testimony of Mark Fleming, Vice President of the Federal Home Loan Mortgage Corporation, and former director of MERS (annexed hereto as

Exhibit C);

     c.     Transcript of proceedings held before the Honorable James M. Catterson, Supreme Court, State of New York, County of Suffolk, on May 15, 2001 - argument of Charles C. Martorana, counsel for MERS (annexed hereto as Exhibit D);

3.     The MERS "Rules of Membership" available on the MERS website at: http://www.mersinc.org/MersProducts/forms.aspx?mpid=4 (annexed hereto as Exhibit E);

4.     MERS press release, dated May 24, 2007, entitled "50 Millionth Loan Registered on the MERS® System," posted on the MERS corporate website and available at: http://www.mersinc.org/newsroom/press_details.aspx?id=194 (annexed hereto as Exhibit F).

## ARGUMENT

Under Rule 201, the Court may take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Such facts include matters of public record, including transcripts of hearings in other matters (*see In re Peregrine Sys., Inc.*, 311 B.R. 679, 691-92 (D. Del. 2004)) and depositions (*see Phonometrics, Inc v. Hospitality Intl., Inc.*, 120 Fed. Appx. 341, 345 (Fed. Cir. 2005)). *See also Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983) (courts may "take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to the matters at issue"); *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892-93 (D. Del. 1991) ("Court can take judicial notice of the contents of court records from another jurisdiction."). Publicly available information contained on a company's website may also be

- 2 -

taken judicial notice of. *See O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224-25 (10th Cir. 2007)(taking judicial notice of materials contained on and linked from defendant's website). In order to sustain their burden that judicial notice is warranted, plaintiffs need to demonstrate (a) that "the particular fact is not reasonably subject to dispute and is capable of immediate and accurate determination by resort to a source 'whose accuracy cannot reasonably be questioned'" and (b) "must also *supply the court with the source material needed to determine whether the request is justified.*" *In re Tyrone F. Conner Corp.*, 140 B.R. 771, 781 (Bankr.E.D. Cal. 1992) (emphasis in original; internal citations omitted).

The materials Plaintiffs request the Court take judicial notice of are all proper under Rule 201. First, Exhibit A is printed report of the official county records for St. Louis County, Missouri. This information is publicly available and not subject to dispute. Furthermore, this information is highly relevant because it demonstrates conclusively that at least one fee charged to and paid by the Plaintiffs was false and improper. Accordingly, the Court may properly take judicial notice of Exhibit A.

Likewise, Exhibits B through D are all part of an official court record from the New York Court of Appeals. The relevant portions of that record also meet the requirements of Rule 201. In particular, the deposition transcripts of MERS' President and CEO, Mr. Arnold, as well as that of Mr. Fleming, a former MERS director, are directly relevant to allegations made in the Amended Complaint relating to piercing the corporate veil liability and arguments advanced by certain of the defendants opposing liability on that basis. The accuracy of the testimony cannot reasonably be questioned since: (a) it was made by a senior officer and a director of MERS who had direct knowledge of MERS' relationship with the Control Defendants; (b) the testimony was sworn to

- 3 -

under the penalty of perjury; and (c) to Plaintiffs' counsel's knowledge there are no objections or correcting errata to the relevant portions cited. Likewise, the transcript portions relied upon consist of a dialogue between MERS' counsel and a New York Supreme Court Justice wherein MERS' counsel describes the formation, purpose, and operation of MERS. Mr. Martorana's representations to the court are directly relevant to the issue of whether Plaintiffs may pierce the corporate veil to hold the Control Defendants liable. Accordingly, the Court may take judicial notice of the relevant portions of Exhibits A through D.

Finally, the Court may take judicial notice of Exhibits E and F. Exhibit E consists of MERS' Rules of Membership. The relevant portions of this document relate directly to MERS' operation and purpose and are directly relevant to Plaintiffs' allegations concerning piercing the corporate veil liability. Exhibit F is a MERS press release, drafted and published by MERS. Again, the accuracy of these documents cannot be questioned since they were created by MERS and are readily available on MERS' website. Accordingly, it is proper for the Court to take judicial notice of Exhibits E and F.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court take judicial notice of facts relied upon and contained in the attached exhibits.

Dated: April 28, 2008

Respectfully submitted,

**Of Counsel:**

**HARWOOD FEFFER LLP**
Robert I. Harwood, Esq.
Jeffrey M. Norton, Esq. (*pro hac vice*)
Roy Shimon, Esq.
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
rharwood@hfesq.com
jnorton@hfesq.com
rshimon@hfesq.com

**THE CHASE LAW FIRM, PC**
Matthew S. Chase, Esq.
8123 Delmar Boulevard
University City, MO 63130-3729
Tel: (314) 726-4040
Fax: (314) 726-6543
matthew@chaselawpc.com

**ROSENTHAL, MONHAIT & GODDESS, P.A.**

By:_____*/s/ Carmella P. Keener*_____
Carmella P. Keener (#2810)
Citzens Bank Center, Suite 1401
Wilmington, DE  19899-1070
Tel: (302) 656-4433
Fax : (302) 658-7567
ckeener@rmgglaw.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on April 28, 2008, I electronically filed

with the Clerk of Court the foregoing document using CM/ECF which will send

notification of such filing to the following:

Kevin F. Brady, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899

Kenneth J. Nachbar, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

Richard D. Kirk, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130

John T. Dorsey, Esquire
Erin Edwards, Esquire
Young Conaway Stargatt
  & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

David J. Baldwin, Esquire
Potter, Anderson & Corroon LLP
350 Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899-0951

Katharine V. Jackson, Esquire
Reed Smith LLP
1201 N. Market Street, Suite 1500
Wilmington, DE 19801-1163

Stephen E. Herrmann, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801

David S. Eagle, Esquire
Kelly A. Green, Esquire
Klehr Harrison Harvey
  Branzburg & Ellers LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801

*/s/ Carmella P. Keener*
Carmella P. Keener (Del. Bar No. 2810)
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
ckeener@rmgglaw.com
*Attorneys for Plaintiffs*
*Jose Trevino and Lorry S. Trevino*

# Exhibit A





# Deed Search Results

Back To Search

To view more information click anywhere in a record row.

**13 Records Found**

**Search By:**   Grantor or Grantee

**Search Criteria: Last Name: trevino jose. ◆ Granting Type: All ◆ Verified Status: All**

| Line Number | Grantor Name | Grantee Name | Date, Document Number | Affected Book, Page | Book, Page | Locator - Lien Number | Instrur Typ |
|---|---|---|---|---|---|---|---|
| 1 | **Trevino Jose A** | Trevino Lorry | 06/04/2007 1029 | | 17568 3019 | | P/A |
| 2 | **Trevino Jose A et ux**, Trevino Lorrie S et con | Mortgage Electronic Re..., Nbank N A et al, Veterans Home Loans et al | 06/12/2003 186 | | 14957 611 | | D1 |
| 3 | **Trevino Jose A et ux**, Trevino Lorry S et con | Delmar Financial Co | 02/16/2000 1050 | | 12450 255 | | D1 |
| 4 | Delmar Financial Company | **Trevino Jose A et ux**, Trevino Lorry S et con | 07/01/2003 253 | 13010 8 | 15021 1258 | | RE |
| 5 | **Trevino Jose A et ux**, Trevino Lorry S et con | Sukhodolsky Albina et con, Sukhodolsky Yury et ux | 06/04/2007 1030 | | 17568 3023 | 17K320511 - | WI |
| 6 | **Trevino Jose A et ux**, Trevino Lorry S et con | Delmar Financial Co | 05/02/2001 852 | | 13010 8 | | D1 |
| 7 | Delmar Financial Company | **Trevino Jose A et ux**, Trevino Lorry S et con | 06/19/2001 1733 | 12450 255 | 13109 697 | | RE |
| 8 | Mortgage Electronic Re... | **Trevino Jose A et ux**, Trevino Lorrie S et con | 06/29/2007 612 | 14957 611 | 17598 300 | | RE |

| 9 | | Trevino Joseph M & B I... | 00/00/00000 | | 8604 786 | 15P231113 - | UNKN |
| 10 | Trevino Joseph M & B I... | Illini Service Corp | 09/11/1989 143 | | 8604 788 | | DT |
| 11 | Trevino Joseph M & B I..., Vallarino B Ileana & J... | Wartick Steven L & Mar... | 06/25/1991 629 | | 9020 924 | 15P231113 - | WD |
| 12 | Illini Service Corp | Trevino Joseph M & Ile... | 03/07/1991 409 | 8604 788 | 8942 2237 | | RE |
| 13 | Boatmens Natl Bk Of St L | Trevino Joseph M & Ile..., Vallarino B Ileana Fmy... | 06/25/1991 312 | 8835 2183 | 9019 2301 | | RE |

Back To Search

© St. Louis County Government  |  41 South Central, Clayton, Missouri 63105  |  Terms of Use  |  Privacy Policy

# Exhibit B

Appellate Division – Second Department Case No. 2004-04735
Supreme Court, Suffolk County Clerk's Index No. 01-9688

# Court of Appeals

### STATE OF NEW YORK

➤➤◄◄

MERSCORP, INC. and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,

*Petitioners-Respondents,*

*against*

EDWARD P. ROMAINE, as Clerk of the County of Suffolk, State of New York
and COUNTY OF SUFFOLK, STATE OF NEW YORK,

*Respondents-Appellants.*

## RECORD ON APPEAL
## VOLUME I OF III
## Pages 1 to 470

ELIOT SPITZER
*Attorney General of the*
*State of New York*
300 Motor Parkway, Suite 205
Hauppauge, New York 11788
631-231-2191

CAHN & CAHN, LLP
*Attorneys for Respondents-Appellants*
445 Broadhollow Road, Suite 332
Melville, New York 11747
631-752-1600

HISCOCK & BARCLAY, LLP
*Attorneys for Petitioners-Respondents*
1100 M&T Center, 3 Fountain Plaza
Buffalo, New York 14203
716-856-5400

571

**EXHIBIT R: EXCERPTS FROM THE DEPOSITION OF R.K. ARNOLD, PRESIDENT OF THE PETITIONERS' CORPORATIONS [571-683]**

COPY

1

1

2  SUPREME COURT OF THE STATE OF NEW YORK
            COUNTY OF SUFFOLK

3  ----------------------------------------X

4  MERSCORP, INC. and MORTGAGE
   ELECTRONIC REGISTRATION SYSTEMS, INC.,

5                         Petitioners,

6        - against -                Index No.
7                                   01-9688
   EDWARD P. ROMAINE, as Clerk of
8  the County of Suffolk, State of
   New York, COUNTY OF SUFFOLK,
9  STATE OF NEW YORK,

10                      Respondents.

11 ----------------------------------------X

12                         425 Broadhollow Road
                           Melville, New York
13
                           April 23, 2002
14                         10:15 a.m.

15

16

17

18            EXAMINATION BEFORE TRIAL of

19 MERSCORP, INC. and MORTGAGE ELECTRONIC

20 REGISTRATION SYSTEMS, INC., the petitioners herein,

21 by R. K. ARNOLD, taken by the respondents, held at

22 the above-mentioned time and place, pursuant to

23 Article 31 of the Civil Practice Law and Rules and

24 notice, before Agata Przepiorowski, a Notary Public

25 of the State of New York.

572

10

```
 1                    Arnold
 2          Are these New York, Illinois
 3    corporations or what jurisdiction are they
 4    incorporated in?
 5          A      Delaware companies.
 6          Q      Okay.
 7                 How many directors are there on each
 8    board?
 9          A      13 directors from Merscorp, Inc., five
10    directors from Mortgage Electronic Registration
11    Systems, Inc.
12          Q      Okay.
13                 Now, if we call -- most of the
14    questions today will be directed to Mortgage
15    Electronic Registration Systems, Inc.  So for
16    shorthand purposes I will be referring to that
17    petitioner as MERS.
18          A      I'm fine as long as you understand,
19    which I believe you do, the relationship between the
20    two companies.
21          Q      Okay.  Well, I'm going to ask you a
22    couple more questions to clarify that for the
23    record.
24                 You indicated that MERS is a
25    sole-purpose or single-purpose subsidiary of
```

573

11

1                    Arnold

2     Merscorp, Inc.

3          A        Yes, sir.

4          Q        And what is that single purpose?

5          A        To hold the mortgagee interest in the

6     county land records.

7          Q        And does MERS do business and perform

8     those functions in all jurisdictions in the United

9     States?

10         A        Yes, sir.

11         Q        Okay.

12                  Does Merscorp, Inc., the parent

13    corporation, own any assets, other than the stock in

14    MERS?

15         A        Well, the corporation owns the assets

16    that a normal corporation would own to do its

17    business.

18         Q        Okay.

19         A        As far as other subsidiaries are

20    concerned, the answer is no.

21         Q        Okay.

22                  So is there any business or trade or

23    activity of the parent, Merscorp, Inc., other than

24    simply to hold the ownership of MERS?  Is there any

25    separate function that it performs?

574

12

1                          Arnold

2          A        The -- I believe the answer would be

3      no.  The two corporations operate synchronized, but

4      the operating company is Merscorp, Inc.

5          Q        Okay.

6                   Now, I believe you said that Merscorp

7      has 13 directors --

8          A        Yes, sir.

9          Q        -- and MERS has five.

10         A        Yes, sir.

11         Q        Can you tell me the names of the five

12     directors of MERS?

13         A        Yes, sir.  Rick Amatucci, Mark

14     Flemming, Don Lange, R. K. Arnold and Rick Scogg.

15         Q        Now, Mr. Amatucci and Mr. Flemming are

16     representatives of Freddie Mac and Fannie Mae --

17         A        Yes, sir.

18         Q        -- are they not?

19                  And is it the organization to which

20     they belong that are board members and they simply

21     occupy the board seat for their employer or is it

22     them individually who are the directors?

23         A        They individually.

24         Q        All right.

25                  And do you have any affiliation that's

575

13

```
 1                          Arnold
 2     relevant to your service as a member of the board of
 3     directors, other than as president of MERS and
 4     Merscorp?
 5          A       No, sir.
 6          Q       All right.
 7                  Who is Don Lange?
 8          A       He is a former president of the
 9     Mortgage Bankers Association of America.
10          Q       And is he presently, to your
11     knowledge, affiliated with any financial or other
12     institution or other corporation?
13          A       I believe he is.
14          Q       Do you know the identity of that
15     financial institution or other entity?
16          A       I'm not certain.  I believe it is a
17     company called OptiFI.
18          Q       Do you know anything about the
19     business of that company?
20          A       No, sir, except that they're a service
21     business for the mortgage industry.
22          Q       And who's Rick Scogg?
23          A       Rick Scogg is president of Aurora Loan
24     Services.
25          Q       And where is that located?
```

576

14

```
 1                      Arnold

 2         A       In Colorado.

 3         Q       And does that perform services in

 4   connection with the mortgage industry?

 5         A       That's more of a traditional servicing

 6   company to service the mortgages themselves.

 7         Q       The five individuals that you have

 8   named including yourself who serve on the MERS

 9   board, do they also serve on the Merscorp board?

10         A       With the exception of Rick Scogg, the

11   answer is yes.

12         Q       Okay.

13                 So there are an additional nine

14   individuals who serve on the Merscorp board that you

15   have not named just by --

16         A       Yes, sir.

17         Q       -- subtracting four from 13?

18         A       Yes, sir.

19         Q       If I leave a blank space, would you

20   provide the names of those other nine members of the

21   board of directors of Merscorp upon return of this

22   transcript?

23         A       More than happy to.

24   (INSERT:)

25
```

577

15

1                       Arnold

2    BY RICHARD CAHN:

3        Q        When were Merscorp, Inc. and MERS

4    originally incorporated?

5        A        When you say "MERS," do you intend to

6    refer to the subsidiary?

7        Q        I do.

8        A        The subsidiary was incorporated in

9    1995.

10       Q        And how about the parent?

11       A        The parent was incorporated in 1998.

12       Q        During that interval between the

13   incorporation of MERS in 1995 and its acquisition by

14   Merscorp in 1998, who owned the stock, if you know,

15   in MERS?

16       A        The same companies that now own the

17   stock in Merscorp, Inc.

18       Q        And can you name those companies?

19       A        I'd be happy to provide that

20   information.

21       Q        How many such companies are there?

22       A        27.

23       Q        Okay.

24                Are those companies mostly in the

25   mortgage or financial services industry?

578

16

|     |   |                                                    |
|-----|---|----------------------------------------------------|
| 1   |   | Arnold                                             |
| 2   | A | Yes, sir.                                          |
| 3   | Q | Okay.                                              |
| 4   |   | And you'll provide those names to me?              |
| 5   | A | Yes, sir.                                          |
| 6   | Q | All right.                                         |
| 7   |   | Now, these last several questions were             |
| 8   |   | directed to the ownership of these two corporations, |
| 9   |   | and it's been implicit, but let's make it explicit. |
| 10  |   | Both of these are stock corporations; is that right? |
| 11  | A | Yes, sir.                                          |
| 12  | Q | So the 26 or so entities that you                  |
| 13  |   | mentioned, those are shareholders; is that right?  |
| 14  | A | Yes, sir.                                          |
| 15  | Q | And being a shareholder is different               |
| 16  |   | than becoming a member of MERS?                    |
| 17  | A | Yes, sir.                                          |
| 18  | Q | Okay.                                              |
| 19  | A | And just to make it clear, those 27                |
| 20  |   | owners became 30, and so 30 companies owned        |
| 21  |   | Merscorp, Inc., and Merscorp, Inc. owns Mortgage   |
| 22  |   | Electronic Registration Systems, Inc.              |
| 23  | Q | And you'll give me those 30 names and              |
| 24  |   | addresses?                                         |
| 25  | A | Yes, sir.                                          |

579

33

1                           Arnold

2    ~~could go to to find out who the servicer was.  So~~

3    these discussions were done in the context of a

4    great deal of support and interest and, in fact, the

5    land -- the American Land Title Association

6    ~~ultimately became a shareholder.~~

7         Q       Did any of the county recorders that

8    you talked to raise concerns or questions regarding

9    the record of title that would be available in their

10   office to members of the public?

11        A       Well, I spoke to thousands of county

12   recorders and --

13        Q       Literally?

14        A       Literally.

15               And while there were questions raised,

16   that was the whole purpose of talking to them.  And

17   the answers that they were given, I took care of the

18   questions as far as chain of title is concerned.

19   No, I do not recall that county recorders had

20   concerns in that regard.

21        Q       So although you spoke to thousands of

22   county recorders, no one ever raised any issues

23   about chains of title; that's your testimony?

24        A       Well, would you ask the question again

25   or play it back?

580

34

1                           Arnold

2          (Last question was read back by the reporter.)

3          A        There were lots of questions raised as

4    there were lots of questions raised with all of the

5    entities that we sought advice and counsel from.

6          Q        Did some of those questions involve

7    the clarity and the public availability of

8    information relating to the chain of title?

9          A        The public availability of information

10   was a question.

11         Q        Okay.

12                  Was --

13         A        The chain of title is grounded in the

14   county land records, so the chain of title is in the

15   county land records.  Speaking of a chain of title

16   outside the county land records is not possible.

17   The county land recorders are aware of where the

18   chain of title is located.  So if you're asking me

19   if county recorders were concerned about the chain

20   of title, they keep the chain of title, so any

21   question like that of us doesn't really have

22   anything to do with what we do as a company.

23         Q        All right.

24                  What did you tell the county recorders

25   that you spoke to about public accessibility of the

PRATT REPORTING, INC.  -  (631) 351-6033

581

35

```
 1                        Arnold
 2      records?
 3           A      Well, that was one of the suggestions
 4      that came from county recorders, which we
 5      incorporated into the MERS system.
 6           Q      And what was that, specifically?
 7           A      That was the creation of a 1(800)
 8      number with a fax back capability, so that to the
 9      extent that someone did want to access the current
10      servicer on our system, which is fundamentally what
11      our system does, that could be accessed by consumers
12      or the public, if you will.
13           Q      Okay.
14           A      So that was one of the benefits of
15      having the dialogue with the county recorders,
16      because they did make a suggestion that we
17      ultimately put a good deal of resource and effort
18      behind it to try to address. And I will say further
19      that that did an awful lot of good to cause county
20      recorders to believe that MERS was sensitive to
21      their questions.
22           Q      In your discussions with these
23      thousands of county recorders, did you speak with
24      any county recorder registrars or county clerks in
25      the State of New York?
```

582

44

1                           Arnold

2    getting money for, you know, some good act in the

3    community.  That's basically the --

4              Q         You mean, like a --

5              A         -- thought process.

6              Q         You mean, like a charity?

7              A         Well, it was not a charity, of course.

8    It was do you think it's a good idea to have a

9    company like this in the mortgage industry so that

10   you, being the shareholder, can have your company

11   utilize the services of that entity to lower the

12   cost of home ownership of the whole country.  And so

13   the money that was put in from a shareholder's

14   standpoint was largely done out of their wants to be

15   a citizen in the mortgage industry, not unlike their

16   membership in the Mortgage Bankers Association or

17   sponsorship of something else.

18             Q         They were going to get something for

19   being members of MERS in terms of access to

20   information?  That, in some fashion, was going to

21   reduce their operating costs; isn't that true?

22             A         Except it would not be limited to

23   them.  It would be available to everyone in the

24   industry.  They were being asked to invest capital

25   because they had capital to invest, because they

583

45

1                        Arnold

2      were well healed companies that we felt might want

3      to help something like this get started, because it

4      takes money to get something started.

5            Q       In all the meetings that you had with

6      potential shareholders, did any of them raise the

7      topic or discuss the topic with you of prospective

8      returns on their investments, financial returns,

9      monetary returns or profits from their investment in

10     MERS?

11           A       I would say that the answer is no,

12     because originally --

13           Q       All right.  Never mind.  You've

14     answered the question.

15           A       -- they were going to have -- their

16     ownership interest was just to begin the concept of

17     MERS so that MERS had some capital to start with.

18     As we went forward and we became an operating

19     company, then we ran into the reality that our

20     owners are also our chief users, and so to maximize

21     the income MERS would, of course, bring more money

22     out of their pocket.  And that's the opposite

23     direction of the way the corporation was founded.

24     We're supposed to drive down the costs.  So extra

25     profits in MERS are not what these companies are

584

46

```
1                      Arnold
2     after, they're after lower costs in their own
3     operations so they would want to pay MERS less.
4          Q        So I take it the answer to the
5     question that I asked you several minutes ago is
6     yes, there was some discussion at some point along
7     the way that by making an investment in MERS these
8     investors, shareholders ultimately would be lowering
9     their own operating costs and would therefore
10    benefit financially from that?  Can you answer that
11    question or no?
12         A        Yes, sir.
13         Q        And the answer is yes?
14         A        Yes, sir.
15         Q        All right.
16                  Now, MERS ultimately became a stock
17    corporation rather than a membership corporation and
18    had these shareholders.  Is MERS a for-profit
19    corporation?
20         A        Yes, sir.
21         Q        And --
22         A        It's a general business corporation.
23         Q        Yeah.
24                  And Merscorp, the parent corporation,
25    is also a for-profit corporation; is that right?
```

585

47

```
 1                        Arnold
 2        A        The holding company, Merscorp, Inc.,
 3   is a general business corporation.
 4        Q        And MERS itself, the subsidiary, is --
 5        A        The subsidiary is a single-purpose
 6   corporation that only holds title.
 7        Q        But it is a general corporation in
 8   form as well, is it not?
 9        A        I believe so.
10        Q        All right.
11                 Now, in this --
12                 RICHARD CAHN:  Withdrawn.
13        Q        During the period of time 1995 to 1998
14   or thereafter, other than discussions that took
15   place after MERS commenced this litigation, did you
16   or anybody else at MERS, to your knowledge, discuss
17   any of the issues pertaining to MERS and its
18   activities with Mr. Romaine or with any other county
19   clerk in the County of Suffolk or with Mr. Romaine?
20        A        Personally?
21        Q        Yeah.
22        A        No, sir.
23        Q        Did any representative of MERS do so,
24   to your knowledge?
25        A        Well, again, to the extent that they
```

586

50

```
 1                       Arnold
 2    Inc. Rules of Membership" encompassing Bates numbers
 3    105510 to 105547, and I have marked as Exhibit G a
 4    document produced as "MERS Procedures Manual," which
 5    is marked Bates numbers 105548 to 105729.  That one
 6    we have not gotten copies of, but I assume that you
 7    have a copy with you.  Do you?
 8              MR. MARTORANA:  No.
 9              DANIEL CAHN:  We'll have a copy made.
10              (Daniel Cahn left the room.)
11              RICHARD CAHN:  You want to give us a
12    second though, because I'm going to ask you some
13    questions about those.  A quick break.
14              (A recess was taken.)
15              (Mr. Romaine and Daniel Cahn returned
16    to the room.)
17         A     During the break I had an opportunity
18    to refresh my recollection on two answers.  One,
19    when it comes to Merscorp, Inc. and its
20    subsidiaries, actually, Merscorp, Inc. is a
21    successor in interest to Mortgage Electronic
22    Registration Systems, Inc., and the new corporation
23    is Mortgage Electronic Registration Systems, Inc.,
24    which took the old name.  Now, that's very
25    technical, but it corrects my answer.
```

587

51

```
 1                    Arnold
 2               And then the second thing is, there
 3      are actually six directors of the subsidiary, the
 4      additional director being Gary Meeks, who is
 5      chairman of both boards.
 6          Q        Chairman of --
 7          A        Both boards.
 8          Q        And what is Mr. Meek's affiliation
 9      outside of MERS?
10          A        He's CEO of Alliance Mortgage in
11      Jacksonville, Florida.
12               RICHARD CAHN:  I've provided for
13      Mr. Martorana copies of Exhibits A through G.
14               In our first notice to produce
15      Mr. Arnold, item 1A, to paraphrase, called for
16      documents that contained any designation of MERS to
17      act as nominee, attorney-in-fact or otherwise with
18      respect to any specifically identified instrument.
19      And item B called for any writings that the
20      petitioners claim authorize MERS to act generally
21      for a lending institution.
22          Q        In your responses -- your responses
23      have been marked as Exhibits B and C, at least the
24      pleading that was served upon us together with the
25      Bates stamped documents you produced -- your
```

588

52

1                            Arnold

2       companies produced membership applications from

3       current and resigned members and electronic tracking

4       agreements, brokerage agreements and sample

5       instruments.

6                    Now, would you please look at the

7       several membership applications that we have marked

8       as Exhibit D, which I believe your attorney is

9       showing you now, and let me ask you, once you've had

10      an opportunity to review those, are the membership

11      applications that we have marked as Exhibit D

12      representative of all of the membership

13      applications?

14           A       Yes, sir.

15           Q       Do the membership applications -- and

16      I'd ask you to please refer to those that we've

17      marked as Exhibit D.  Do those membership

18      applications contain any language that designates

19      MERS to act as nominee, attorney-in-fact or

20      otherwise on behalf of the member?

21           A       Well, it incorporates that by

22      reference on the signature point of the application.

23           Q       Could you read into the record the

24      language in the membership application that you say

25      incorporates by reference that designation?

589

53

1                          Arnold

2        A        "By completing, signing and submitting

3    this application, the applicant is agreeing to be a

4    MERS member.  The applicant hereby agrees to pay all

5    fees and expenses set forth in the MERS fee schedule

6    which may change from time to time, abide by all

7    existing MERS rules and procedures, which are

8.   incorporated herein by reference and may be amended

9    from time to time, and comply with the terms and

10   conditions set forth in the attached addendum

11   entitled 'Terms and Conditions'."

12       Q        Now, is there any other language in

13   the membership application itself that provides for

14   the designation of MERS to act as nominee or

15   attorney-in-fact for a lender or for a member or is

16   it only via the incorporation, via reference of

17   these other documents?

18       A        Well, other than the fact that it is a

19   membership application for membership in MERS, I

20   believe that would be correct.

21                        RICHARD CAHN.  All right.

22                        Now, there is a reference in Exhibit D

23   to an attached addendum entitled "Terms and

24   Conditions".  I don't recall ever seeing such a

25   document produced by counsel.  Do you by any chance

PRATT REPORTING, INC. - (631) 351-6063

590

54

1                          Arnold

2      have such a document with you? If not, would you be

3      good enough to provide it in the future?

4                          MR. MARTORANA:  I thought we had

5      provided it.  If we had not, we certainly will.

6                          THE WITNESS:  The terms and conditions

7      are on our website, by the way.

8           Q          There are membership applications

9      here.  If somebody wants to go through and see if

10     there's an addendum attached to any of them, I can

11     ask you some questions about it, but that'll be

12     fine.

13                         Mr. Hultman, by the way, who is

14     present is a senior vice president, is an officer of

15     MERS; is that right?

16          A          Yes, sir.

17                         RICHARD CAHN:  All right.

18                         Mr. Hultman is now looking through

19     some of those documents to see if he can identify

20     that.

21          Q          If I were to ask you whether there is

22     any language in the membership applications that

23     authorizes MERS to act in any way on behalf of a

24     lending institution, would your answer be the same?

25     You would refer me to the same paragraph of the

591

55

```
 1                          Arnold
 2    document that you read into the record?
 3         A       I would say yes, it's in that
 4    paragraph.
 5         Q       All right.
 6                 I'd like you to please look at
 7    Exhibit E.  First of all, there were a large number
 8    of electronic tracking agreements produced by
 9    counsel, and just to be a little bit more efficient
10    and manageable, we just selected several to mark as
11    Exhibit E.  Can you look through Exhibit E and tell
12    me whether the agreements that form part of that
13    exhibit are representative of all of the electronic
14    tracking agreements that MERS uses (handing)?  Take
15    your time.
16                 MR. HULTMAN:  It looks like when we
17    did it, we stripped them out.  In other words, when
18    they sent the applications, they sent the
19    applications and didn't attach the terms and
20    conditions.
21                 MR. MARTORANA:  We'll provide that to
22    you.
23                 RICHARD CAHN:  This particular
24    document, did you provide it?
25                 DANIEL CAHN:  It came out of here and
```

592

59

```
1                         Arnold

2           Q       All right.

3                   And then in this case Republic

4    Mortgage Home Loans is listed as the borrower.  So

5    would it be fair to conclude from this that every

6    electronic tracking agreement will be executed on

7    behalf of both of the petitioners in this action as

8    well as a lender, as well as a borrower; is that

9    correct?

10          A       I believe that that is generally what

11   would be intended.

12          Q       Now, can you describe, in your own

13   words, the purpose of an electronic tracking

14   agreement, such as is evidenced by the two that are

15   attached and marked as Exhibit E?

16          A       Well, the purpose is so that the

17   warehouse lenders, who are money providers in a

18   purchase and sale transaction, can provide the money

19   so that the loans can be funded.  So the money then

20   goes back down to the lender so that they can make

21   another loan to the borrower, to the consumer.

22          Q       To another borrower?

23          A       To another consumer, yeah.

24          Q       To another consumer.

25          A       And it has to do with the velocity,
```

593

60

```
 1                       Arnold
 2      the liquidity of the money.  And warehouse lenders
 3      play a role in providing money into the transaction
 4      so that it shoots back down to the mortgage company,
 5      which can then loan the money again to a new
 6      consumer.  And this agreement facilitates that and
 7      makes it clear that during that process, MERS is
 8      playing a role at any particular instance on behalf
 9      of all these companies.
10          Q       And what is the role that is, in your
11      words, described by these agreements for MERS to
12      perform?
13          A       The role that the subsidiary plays --
14      Mortgage Electronic Registration Systems, Inc. is
15      purely to remain in the county land records.  But to
16      make it clear, who were in the county land records
17      at any particular point in time, the purpose for
18      Merscorp, Inc., which is the holding company and the
19      operating company, is because we provide certain
20      services in the form of reports and, you know, it's
21      our system that the companies are using.
22          Q       And can you tell me what you
23      understand the term "electronic agent" to mean as
24      applied in this agreement to Merscorp, Inc.?
25          A       It just means that we will remain in
```

594

61

Arnold

1                          Arnold

2    the county land records regardless of which one of

3    our members steps in and actually holds the

4    promissory note, which is a fundamental thing that

5    MERS does.  We actually do what the county recorder

6    cannot do, which is keep track of promissory notes

7    and servicing riders.  And we rely upon the county

8    recorder, the county clerk, in the case of New York

9    to maintain the legal title --

10        Q        Well --

11        A        -- where MERS would occupy that role.

12        Q        So MERS, the subsidiary, has a single

13   function that you see as being embodied in this

14   agreement, namely, it is listed in agreements, in

15   instruments that are to be recorded in the county

16   clerk's office in New York, say, as typically

17   nominee for the mortgagee?

18        A        Yes, sir.  And that is its single

19   purpose.

20        Q        Okay.

21                 And it is Merscorp, Inc., the parent

22   corporation, which you described as the operating

23   corporation, right?

24        A        Yes, sir.

25        Q        And it is Merscorp, Inc. that operates

595

63

```
 1                        Arnold
 2                 RICHARD CAHN:   Let me withdraw the
 3     question.
 4     BY RICHARD CAHN:
 5         Q        Mr. Arnold, it is the parent
 6     corporation, Merscorp, Inc., that maintains the
 7     electronic registration system?
 8         A        Yes, sir --
 9         Q        Okay.
10         A        -- as opposed to a recording system,
11     which is what the county clerks do --
12         Q        I understand.
13         A        -- and which has been -- the words
14     have been crossed back and forth, particularly in
15     some of the correspondence from the county
16     recorders.
17                 RICHARD CAHN:   Okay.
18                 I move to strike the latter part of
19     the answer that's not responsive.
20         Q        Are you able to tell me what the
21     purpose of an electronic tracking agreement is, in
22     your mind, the type that's represented by Exhibit E?
23         A        Yes, sir.  It is so that the warehouse
24     lender, which is typically a very well healed
25     company, that has cash that it invests in mortgage
```

596

64

                              Arnold

1

2    transactions.  It's to facilitate the warehouse

3    lender providing that substantial cash into the

4    transaction so that the mortgage lender, which in

5    probably half of the situations is really a very

6    small outfit that doesn't have those sorts of cash

7    reserves.

8                    Remember, a mortgage company cannot

9    take deposits, so they have to get their money

10   somewhere.  And one of the places where they get the

11   money is from a warehouse lender who would take an

12   Article IX security interest, personal property

13   security interest, in the transaction by taking

14   control of the promissory notes.  And under

15   Article IX of the UCC, that is how you perfect your

16   security interest in promissory notes.  So for them

17   to do that, they get control of the promissory note

18   typically through a custodian or in some other

19   manner.

20                    And I also want it made clear on the

21   MERS system that while we are acting in our sole

22   purpose of occupying the county land records, the

23   MERS system and the subsidiary, Mortgage Electronic

24   Registration Systems, is aware that under certain

25   circumstances it would become acting for the

597

65

1                          Arnold

2     warehouse lender if the money is not paid properly.

3          Q       Okay.

4                  So the documents that have been marked

5     as Exhibit E are documents that, in your view,

6     constitute some of the documents or instruments that

7     authorized MERS to act for a lender?

8          A       Yes, sir.  This would be a supplement

9     to that because that matter is already covered in

10    the terms and conditions, specifically in paragraph

11    two of the ETA.

12         Q       Of the what?

13         A       The electronic tracking agreement.

14                 So this is -- this document clarifies

15    the relationship between the warehouse lender and

16    the mortgage company lender.

17         Q       Okay.

18                 Now, paragraph two of the first

19    exhibit that's part of Exhibit E is entitled

20    "Appointment of the Electronic Agent".  Is that the

21    paragraph that you meant to refer to?

22         A       Yes, sir.

23         Q       All right.

24                 So if I can just direct your attention

25    to page 106398, which is the second page of Exhibit

598

66

```
 1                          Arnold
 2      E, paragraph A has the lender and borrower
 3      appointing Merscorp, Inc. as the electronic agent,
 4      and paragraph B has Merscorp agreeing to perform the
 5      services set forth in the agreement.
 6           A      Yes, sir.
 7           Q      Okay.
 8                  And the obligations of MERS as the
 9      electronic agent are set forth in paragraph four,
10      page 106399.
11           A      Well, whatever obligations are
12      described in the agreement are our obligations.
13           Q      Okay.
14                  Well, now, thus far I've taken you
15      through the member applications, two representative
16      electronic tracking agreements in order to identify
17      through your testimony language that you say
18      authorizes the MERS entity to act for a lender.  So
19      have you fully identified the language in the
20      electronic tracking agreements that are responsive
21      to that question?
22           A      Well, there are two other major
23      categories of authority.
24           Q      Please tell me what they are.
25           A      Well, one is the terms and conditions,
```

599

67

1                          Arnold

2    which apparently we don't have a copy of the terms

3    and conditions.  They are on our website.  But

4    they're referred to by reference in the application

5    that every member signs.

6              RICHARD CAHN:  Well, maybe during the

7    lunch hour we'll try to get it off the website and

8    then we can mark it after lunch.

9              MR. MARTORANA:  That would be fine,

10   because they do exist.

11             RICHARD CAHN:  And if that's the case,

12   he's here.  He can identify it.

13        A        They're fundamental.

14             The second thing is the mortgage

15   document itself by the consumer -- signed by the

16   consumer makes MERS the mortgagee of record and is

17   specific about what types of authority we have.

18             (Daniel Cahn left the room.)

19        Q        Okay.

20        A        So both the consumer and the lender

21   make MERS the mortgagee of record.

22        Q        Okay.

23             Now, the consumer is not a party to

24   the electronic tracking agreement typically, is it?

25        A        No, sir.

600

68

1          Arnold

2          Q          And the consumer is not a party to the

3    member agreement or application?

4          A          No, sir.

5          Q          Okay.

6          A          The electronic tracking agreement is

7    actually the way a new consumer gets the money.  It

8    becomes available because the warehouse lender

9    entered a previous transaction which frees up the

10   that money so that it can be now thrown to a new

11   consumer for a new home.

12         Q          Okay.

13                    Did you furnish documents or someone

14   under your supervision and control furnish documents

15   to counsel that are responsive to our notice to

16   produce?

17         A          To the best of our ability, we did

18   that.

19         Q          All right.

20                    And I'm not going to mark the next

21   series of Bates numbered documents, but if you'll

22   look at our notice to produce, which is Exhibit A,

23   item 1C, you'll see we call for documents evidencing

24   the incorporation of MERS.  And if you then look at

25   your response to Exhibit A, to the question 1C,

601

72

1                        Arnold

2    ~~included this, if I had it.~~

3                 MR. MARTORANA:  The only comment I

4    would have is that these applications are past.

5    This is from the current statement.

6                 RICHARD CAHN:  Well, then, let's do

7    this --

8                 MR. MARTORANA:  They're going to be

9    the same, more or less.

10                MR. COLOSI:  Why don't we just put

11   the -- just add -- we'll do it together.  We can add

12   the Bates number at the bottom with an A, B or C or

13   something just because those documents are numbered.

14   They're Bates stamped.

15                RICHARD CAHN:  So instead of using

16   Bates numbers, why don't I do this:  Why don't I

17   take a modification of your suggestion.  How about

18   if we'll just mark this particular document as

19   Exhibit D-1?

20                MR. COLOSI:  That's fine.

21                MR. MARTORANA:  This is the one that

22   ~~Mr. Arnold has approved of.~~

23                (Photocopy of undated document

24   entitled "Terms and Conditions," consisting of three

25   pages, was marked Respondents' Exhibit D-1 for

602

73

1                        Arnold

2          identification.)

3          BY RICHARD CAHN:

4              Q        Mr. Arnold, does this document, which

5          has now been marked as Exhibit D-1, contain language

6          authorizing MERS to act as a nominee or

7          attorney-in-fact or agent or otherwise for a lending

8          institution?

9                          (Daniel Cahn returned to the room.)

10             A        It authorizes MERS to act as nominee,

11         as mortgagee of record.

12             Q        And typically, will the members of

13         MERS who sign onto these terms and conditions be

14         lending institutions or will they be some other

15         participant in the mortgage industry?

16             A        Well, these members that we serve are

17         mortgage companies.  They are in the business of

18         loaning and servicing loans.

19             Q        And some of those members are banks,

20         are they?

21             A        Yes, sir.

22             Q        And there are some banks in the

23         country that do not belong to MERS that are lenders

24         in the residential mortgage industry?

25             A        There are a few.

PRATT REPORTING, INC.  -  (631) 351-6033

603

75

1              Arnold

2       Q       How many lending institutions or

3    lending organizations, lenders of any kind are

4    members of MERS, to the best of your knowledge, as

5    we speak today?

6       A       The companies that utilize the MERS

7    system to register loans at this point is about 550.

8       Q       Okay.

9               Your total number of members is

10   greater than that because you have other

11   organizations, other than lending institutions, that

12   are members as well; is that right?

13      A       Yes, sir.

14      Q       All right.

15              And you say there are thousands of

16   lenders in America --

17      A       Well, some might say 1,000, some may

18   say a bit more than that.

19      Q       Okay.

20              This may seem obvious, but let me ask

21   it anyway:  Thus far we have talked about the

22   membership application, Exhibit D, the terms and

23   conditions, which are attached to the membership

24   applications, that we've marked as D-1, and the

25   electronic tracking agreements.  None of those

604

76

1                           Arnold

2       documents are typically executed by a residential

3       borrower, are they?

4            A       The residential borrower would execute

5       the mortgage.

6            Q       And that's basically the only document

7       that the residential borrower, the consumer would

8       execute, is that right, that would name MERS or

9       designate MERS for any purpose?

10           A       Yes, sir.

11           Q       Now, there are two other documents

12      that you produced, as I indicated.  They've been

13      marked as Exhibits F and G.

14                   RICHARD CAHN:  Let me withdraw that,

15      please.

16           Q       Let me go back to D-1 before I leave

17      it.

18                   In the terms and conditions, paragraph

19      two, the second sentence reads as follows, and I

20      quote:  "MERS shall serve as mortgagee of record

21      with respect to all such mortgage loans solely as a

22      nominee, in an administrative capacity, for the

23      beneficial owner or owners thereof from time to

24      time."

25                   Continuing, "MERS shall have no rights

PRATT REPORTING, INC.  -  (631) 351-6033

605

77

1                              Arnold

2      whatsoever for any payments made on account of such

3      mortgage loans, to any servicing rights related to

4      such mortgage loans, or to any mortgaged properties

5      securing such mortgage loans.  MERS agrees not to

6      assert any rights (other than rights specified in

7      the governing documents) with respect to such

8      mortgage loans or mortgaged properties."

9                  Has that consistently been MERS's

10     position throughout the period of its existence,

11     i.e., that it acts solely as a nominee in an

12     administrative capacity and has no rights, as I've

13     read into the record?  Has that position been the

14     constant and continuous position of MERS throughout

15     its existence?

16          A       Yes, sir.

17          Q       So at no time has MERS ever asserted

18     or stated that it asserts an interest in a

19     residential loan?

20          A       Well, we have the legal interest in

21     the county land records.

22          Q       Okay.

23                  But there's no ownership in interest?

24          A       Well, that one item of the interest

25     appearing in the county land records is the sole

606

78

|    |                                                    |
|----|----------------------------------------------------|
| 1  | Arnold                                             |
| 2  | interest that we would have.  We do not own the    |
| 3  | mortgage, per se.  We serve on behalf of the       |
| 4  | companies that do own it, and our sole right is to |
| 5  | reflect the legal interest in the county land      |
| 6  | records.                                           |
| 7  | Q        Are you describing MERS as a device or    |
| 8  | a place marker in the county land records without  |
| 9  | any substance to it?                               |
| 10 | A        Well, we have plenty of substance.        |
| 11 | We've been put there by the borrower.  We've been  |
| 12 | put there by the lender.  And as you've pointed out, |
| 13 | we've been put there by other companies involved in |
| 14 | the transaction as well.  We're in an administrative |
| 15 | capacity to serve the sole purpose of appearing in |
| 16 | the county land records as the nominee for the     |
| 17 | mortgagee of record.  So when it comes to substance, |
| 18 | we play a very vital role.                          |
| 19 | Q        By the way, is there any document that    |
| 20 | you know of that authorizes MERS to act as the     |
| 21 | nominee for an original lender's successors and    |
| 22 | assigns?                                           |
| 23 | A        To the extent that they are members of    |
| 24 | MERS, we have the application.  We have the terms  |
| 25 | and conditions.  We also have the electronic       |

PRATT REPORTING, INC.  -  (631) 351-6033

607

79

1                    Arnold

2      tracking agreement.  We have the mortgage itself,

3      which is where the borrower makes MERS the mortgagee

4      of record.  The county land records are filled with

5      companies that play the same role that we play,

6      particularly in New York where the whole concept was

7      hatched years and years and years ago in the form of

8      participation agreements.  The concept that one

9      company would serve in the county land records on

10     behalf of other companies, which gives it permission

11     to do that, I could probably trace that all the way

12     back to 1066 and the Battle of Hastings.  I know I

13     could.  So it came to the United States from Great

14     Britain, and before that it was part of the Italian

15     law merchant.

16          Q        What you're referring to, I think it

17     should be clear, relates to --

18          A        Well, that's the answer to my

19     question.

20          Q        -- the securities industry where you

21     have some like depository trust company?

22          A        No, sir.  It has to do with real

23     property.  And the idea that a nominee will appear

24     in the county land records has been part of not only

25     the United States, but the law previous to that for

608

80

1                            Arnold

2      centuries.

3                     So what MERS does is serve the same

4      role that a number of companies are serving today,

5      except a mortgage industry hasn't determined that

6      that is inefficient, and they should have just one

7      company serve that role through the electronic

8      registry.  So the electronic registry basically is a

9      tracking system to make sure that MERS knows who it

10     is acting for in the county land records.  The

11     mortgages and assignments naming MERS as mortgagee

12     of record are always and must be recorded in the

13     county clerk's office, as does the release, as does

14     any consolidation and extension and merger agreement

15     that goes along with it when it comes to New York.

16                    So any document that actually moves

17     the legal interest, which is reflected in the county

18     land records, not only must be recorded in the

19     county land records from a legal standpoint, because

20     it's the only place designated under state law where

21     it must go to be official, but also the MERS's terms

22     and conditions and rules of governance require that

23     the member record those documents with the county

24     land records.

25                    So, again, MERS does keep track of two

**609**

• • • • • • • • •

81

1        Arnold

2    things that the county clerks have never kept track

3    of.  One is where the promissory note is, and the

4    other is the servicing rights as far as the company

5    that's responsible for doing all the heavy lifting

6    when it comes to servicing the borrower.  The legal

7    interest has always been in the county land records,

8    will always continue to be in the county land

9    records, and our rules require that.

10        Q        Okay.

11                 Are you finished?

12        A        Yes, sir.

13        Q        Okay.

14                 Let me take you into a hypothetical

15    situation.  I buy a house and I finance my purchase

16    by taking a mortgage in the amount of $100,000 with

17    the Chase Manhattan Bank, which we'll say is a

18    residential lender, whether it is or isn't.

19        A        They're a huge residential lender.

20        Q        Right.

21                 And I execute a mortgage in which I

22    designate MERS as a mortgagee, as nominee only, I

23    believe.  That's your language, right?

24        A        Something like that.

25        Q        All right.

610

82

Arnold

1                           Arnold

2              And the designation of MERS in that

3       mortgage that I executed as mortgager, as borrower,

4       residential borrower, names MERS as the nominee for

5       the lender, which is described as Chase Manhattan

6       Bank, and for the lenders, successors and assigns.

7       So far is there anything in this hypothetical that

8       doesn't accord with reality?

9              A      No, sir.

10             Q      All right.

11                    Now, is Chase Manhattan a member of

12      MERS?

13             A      Yes, sir.

14             Q      Now, in what way does Chase

15      Manhattan -- let me ask it a different way.

16                    Let's suppose that after I take my

17      mortgage Chase Manhattan sells the mortgage to

18      whoever.  Who would be a candidate for them to sell

19      the mortgage to in real life, a warehouse lender,

20      Fannie Mae, Freddie Mac?

21             A      Fannie Mae or Freddie Mac.

22             Q      All right.

23                    And if they sell the mortgage, the

24      loan -- I should have said "loan" rather than

25      "mortgage".  If they sell the loan to Freddie Mac,

611

83

1                          Arnold

2      they transfer ownership of the loan by endorsing the

3      mortgage note that I signed at the closing and

4      delivering it physically to Freddie Mac; is that

5      right?

6          A        The promissory note?

7          Q        Yeah.

8                   Mortgage note, promissory note, same

9      thing.

10         A        Under Article III of the UCC?

11         Q        You got it.

12                  Now, at that point Chase Manhattan was

13     the original lender but no longer has an interest in

14     the mortgage.  They've been taken out by Freddie

15     Mac, haven't they?

16         A        Well, the beneficial interest is now

17     with Fannie or Freddie.

18         Q        Right.

19         A        They typically in that hypothetical

20     would continue to service the loan.

21         Q        All right.

22                  Now, by participating in the initial

23     transaction with me, the homeowner, Chase Manhattan

24     Bank has, let's say, acquiesced at least in the

25     designation of MERS as, not only Chase Manhattan's

612

84

1                          Arnold

2    nominee but also the nominee of Chase's successors

3    and assigns, right?

4         A      Well, I don't know about acquiesce.

5    The rules of membership give them the right to

6    designate us to perform those services.  We have an

7    obligation to perform that role.

8         Q      All right.

9                It's conceivable that at the time of

10   my mortgage closing, in the hypothetical, Chase

11   Manhattan would not know yet whether it was going to

12   sell that loan or retain it in its own portfolio;

13   isn't that true?

14        A      Yes, sir, that is true.  But because

15   of that, they and all other mortgage companies

16   utilize standard documents so that they can be

17   liquid no matter which direction they go.  All

18   mortgages are closed on standard documents.

19               (Mr. Romaine left the room.)

20        Q      Okay.

21               If Chase assigns the beneficial

22   interest in the loan to Freddie Mac, where is the

23   document or where are the documents that you say

24   authorize Freddie Mac as the successor and assign of

25   Chase -- no, that authorize MERS to act as the

613

85

```
 1                         Arnold
 2      nominee for Freddie Mac as the successor to the
 3      ownership interest in this or the beneficial
 4      interest in this loan?
 5            A       Well, you said assigned, and in that
 6      hypothetical there's no assignment.
 7            Q       All right.
 8            A       The note was endorsed under Article
 9      III of the UCC.
10            Q       And delivered?
11            A       And Fannie or Freddie became a holder
12      in due course.  And that note was actually moved out
13      of Chase Manhattan's control and became either held
14      by Fannie and Freddie or in a custodian that works
15      for them.
16            Q       Okay.
17            A       So there was no assignment.
18            Q       Okay.  All right.
19                    Let's call them the successor.
20            A       That transaction has never been
21      recorded in the county land records, by the way.
22                    RICHARD CAHN:  I move to strike the
23      answer as not responsive to any question.
24            Q       If Chase doesn't know at the time of
25      the closing whether or not it would transfer its
```

614

1                         Arnold

2    interest in my loan to Freddie Mac, there was as of

3    the time of the closing when I executed my mortgage

4    no assignee or successor of Chase Manhattan Bank in

5    existence insofar as that loan is concerned; isn't

6    that right?

7         A      Well, the loan has language in it.

8    The promissory note has language in it that makes it

9    transferable, and --

10        Q      I understand.

11        A      -- under Article III of the UCC the

12   way that is transferred and the only way that can be

13   transferred is to be endorsed on the back to a

14   holder in due course.

15        Q      Right.

16        A      There are no other options.

17        Q      What I'm asking you is, it's one thing

18   for MERS to be designated as the nominee for Chase,

19   which has a present interest in this mortgage.   I

20   want to know where MERS gets its authority to act as

21   nominee for Chase's successor, owners of that loan.

22        A      Well, in the case of Fannie and

23   Freddie, which is in your hypothetical --

24        Q      Right.

25        A      -- both Fannie and Freddie have signed

PRATT REPORTING, INC.  -  (631) 351-6033

615

87

1                              Arnold

2      membership agreements, so they would be -- they

3      would give MERS permission not only through their

4      terms and conditions, but also in the fact that they

5      are part of the governance of MERS.  They're two of

6      the largest investors in the United States.

7           Q       Most of the secondary mortgage market

8      is basically controlled by those two entities; isn't

9      that correct?

10          A       Well, I wouldn't say "controlled".  I

11     would say that they perform a vital function, which

12     is very much like warehouse lenders in that they

13     provide the money into the system so that that money

14     can be driven down to a new consumer.  It's all

15     about making more home loans, keeping the costs down

16     and trying to drive up home ownership.  To the

17     extent that we would not have permission to act for

18     a subsequent player, then that has to go off the

19     MERS system.

20          Q       Got it.

21                  So it's the MERS membership

22     application, the rules of membership and procedures

23     documents that we've talked about?

24          A       And the mortgage.

25          Q       And the mortgage itself.

616

88

1            Arnold
2            Those basically are the documents that
3    you say give MERS the right to act as a nominee for
4    any successor interest holder in the this particular
5    mortgage loan, assuming that the party holding the
6    beneficial interest is a member of MERS?
7        A        Yes, sir.
8        Q        Okay.
9            So that in the hypothetical example,
10   there is no special instrument that is executed by
11   Freddie Mac when it acquires ownership of my loan
12   from Chase?  There's no special instrument that
13   Freddie executes to designate MERS as its nominee
14   for the purposes of the Richard Cahn loan?
15       A        Well, the special document is the
16   promissory note under Article III of the UCC.
17       Q        Which it receives from Chase?
18       A        Which it receives from Chase.  So
19   Chase is the one that executes that document.
20       Q        Well, I understand that.
21            But --
22       A        But there's never been anything that
23   can be recorded in the county land records.  The
24   promissory note is the only evidence of that.
25       Q        I understand that.  All right.

617

89

1                        Arnold

2                And all through this transaction, from

3        Chase to Freddie Mac and perhaps subsequent

4        transfers, there are no changes of record in the

5        county clerk's office if we're dealing with a New

6        York State mortgage until and unless the owner steps

7        up in the beneficial ownership of some entity that

8        is not in the MERS system?  That's one situation

9        where something would have to be recorded, right?

10                       (Mr. Romaine returned to the room.)

11        A        Yes, sir.  Which does happen.

12        Q        Or if there is a satisfaction in the

13        mortgage, I pay it off?

14        A        Yes, sir.

15        Q        Or if somebody's got to do a

16        satisfaction?

17        A        Yes, sir.

18        Q        Or if there is a foreclosure in which

19        case some papers have to be filed with regard to a

20        foreclosure?

21        A        Yes, sir, and the other is the CEMA.

22        Q        The what?

23        A        CEMA, the Consolidation Extension and

24        Merger Agreement, which may not be unique to New

25        York but it is identifiable with New York.

618

90

```
 1                      Arnold
 2              RICHARD CAHN:  Okay.
 3              Let me just ask a few more questions.
 4    I don't know what time you guys want to go. All
 5    right?
 6                    THE WITNESS:  Yes, sir.
 7                    MR. MARTORANA:  Keep going.
 8    BY RICHARD CAHN:
 9         Q      Now, I asked you about three sets of
10    documents specifically, and I did ask you whether
11    you produced Exhibits F and G, which are the rules
12    of membership and MERS procedures manual.  If we
13    include those latter two exhibits are there any
14    other documents, other than the ones you've
15    described in your testimony, that authorize MERS to
16    act for whoever happens to be the owner of a loan at
17    a particular time?
18         A      As far as --
19                    MR. MARTORANA:  I think he's answered
20    that question.
21                    RICHARD CAHN:  I just want to nail it
22    down to make sure there's no other document I'm
23    overlooking.
24         A      There may be.  If so, we'll be happy
25    to produce that.
```

619

91

1                       Arnold

2          Q       If you, on reflection, think of

3     another document that I haven't asked you about and

4     you haven't volunteered the answer, would you please

5     advise me of it and give me a sample of such

6     document upon the return of the transcript?

7          A       Yes, sir.

8                  To that I would add that just by

9     virtue of the fact that a member is part of what

10    MERS does, that has some value as far as our

11    authority to act, being in the MERS system.  That's

12    what we do.  So these are companies that have

13    applied to be a member of MERS for the purpose of

14    taking advantage of our service.  And fundamental to

15    our service is that we would appear in the county

16    land records.

17                 RICHARD CAHN:  I move to strike the

18    answer as not responsive.

19         Q       In response to our demand for

20    documents evidencing the fees charged by MERS, you

21    provided a fee schedule and what is called "MERS

22    prepaid loan registration subscription agreements,"

23    which in the aggregate are numbered 200000 to

24    200192.  I've not made copies of these, but I'd like

25    you to take a look at that and tell me whether there

620

92

1          Arnold

2     are any other documents, other than Exhibit H, that

3     you know of that would show what fees were charged

4     by MERS or are charged by MERS (handing).

5          A     Well, these were the fees charged by

6     MERS.  As far as where those appear, they may appear

7     many places.

8          Q     Okay.

9          A     But these are the fees charged by

10    MERS.

11         Q     All right.  That's all I need to ask

12    you about that one.

13               Item number 3 in our notice to

14    produce -- you can put those back, Mr. Arnold.

15               In our notice to produce, in item 3 we

16    asked you to produce documents evidencing the

17    procedures to be followed by MERS with respect to

18    performing services for nonmembers, and in Exhibit

19    B, page 2 -- sorry, it's page 3, paragraph three,

20    you state, "MERS does not perform services for

21    nonmembers.  To the extent MERS is required to

22    interact with a nonmember, such relationships are

23    encompassed within certain provisions of the MERS

24    policy and procedures manual, version 7.0 previously

25    identified," and we've marked that, as you know, as

621

93

1                        Arnold

2     Exhibit G.

3                    So just to nail it down through your

4     testimony here, you performed no services for

5     nonmembers of MERS at all?

6          A        Have we?

7          Q        Do you?

8          A        Do we?  That would be on an ad hoc

9     basis according to the procedures, as you've

10    described.

11                   (Daniel Cahn returned to the room.)

12         Q        Can you think of any services that

13    MERS performed for nonmembers?

14         A        We hold the 1(800) number, which is

15    available for nonmembers as well as members --

16         Q        We'll get to that.

17         A        -- and we also a have a help desk,

18    which is specialized in answering questions about

19    the MERS system.  So if you were to contact the

20    1(800) number and wanted additional services, then

21    you could punch out and go to the help desk, which

22    is a panel of people that are very knowledgeable

23    about the MERS system, and that is utilized

24    potentially by nonmembers.  And then, of course, we

25    have our front desk at our corporate headquarters,

622

94

1                        Arnold

2     which might get calls from time to time from

3     nonmembers.

4          Q         How many members does MERS have at the

5     present?

6          A         As far as companies that register

7     loans and use the electronic system, roughly 550.

8          Q         Are there members, other than that

9     category?

10          A         Yes, sir.

11          Q         And what other members are there?

12          A         Well, a patron member would be someone

13     who would want to be involved in the MERS's

14     communications and would join solely for that

15     purpose.  Then there is another category of people

16     that would be able to get that communication without

17     actually being a member, and that would include the

18     category of county recorders, county clerks or some

19     other governmental entity that would want to, for

20     example, have our newsletter.

21          Q         Well, can you tell me how many members

22     you have all together in all categories?

23          A         It might be 750.

24          Q         Exhibit I has been produced by you.

25     It's Bates numbers 400046 through 400049.  That

623

95

1                        Arnold

2    doesn't seem right.  Hold on -- yeah, that's right.

3    And this was labeled in someone's handwriting when

4    it came to me, "MERS membership lists member

5    prepayment schedule and historical payments."  The

6    part that's in this package is the member prepayment

7    schedule, 400046 to 400049.  Would you look at this

8    exhibit, please, and tell me what prepayments are

9    (handing)?

10        A        Well, prepayments are not that novel a

11    concept.  It's basically --

12        Q        I didn't ask you that, I asked you

13    what they were.

14        A        Well, prepayments are not that novel a

15    concept.

16        Q        I know.  You said that.  Could you

17    just answer my question?

18                 I just want to know what the

19    prepayments are.  What do they represent?

20        A        They're prepayments.

21        Q        For what?

22        A        Well, they're not that novel a

23    concept.  They're basically just paying ahead on

24    registrations that you will use in the future.

25        Q        So they are servicing fees or

624

96

Arnold

2 registration fees that are charged by MERS to its

3 members?

4     A     These are prepaid registration fees.

5     Q     And those registration fees are

6 charged by MERS to its members on a per loan basis;

7 is that right?

8     A     Yes, sir.

9     Q     All right.

10     And what are those registration fees

11 in the amount of?

12     A     $3.95 per registration.  Although, for

13 a prepaid amount they are somewhat less than that.

14     Q     You give them a discount for

15 prepayment?

16     A     Yes, sir.

17     Q     And I take it some of your largest

18 user members prepay a large number of registrations

19 in advance?

20     A     There is probably a relationship

21 there, but the companies that we see take the most

22 advantage of it are more the mid-tier companies.

23     Q     The what kind of companies?

24     A     The mid-tier companies, say, below the

25 top ten.  That category of maybe top ten down to top

625

97

1                          Arnold

2        100.

3            Q.        Well, if you look on page 400046,

4        you'll see that First Nationwide Mortgage prepaid

5        $412,500.  Look up from that.  Lehman Brothers made

6        two payments; one of them was 275,000, the other was

7        46,000.  First Nationwide Mortgage was 275,000.

8        Going up three, the top, Wells Fargo paid 550,000.

9        And you go through this whole document and see

10        substantial sums of money prepaid by various

11        entities.  Is this money representing basically the

12        prepayment for a lot of three-and-a-half-dollar

13        registrations in advance?

14            A        Yes, sir.

15            Q        When does MERS charge a registration

16        fee for a service or a servicing fee? .Is it when a

17        loan is first placed in the MERS name, so to speak,

18        when MERS is first named as nominee, either in the

19        initial closing when it documents that it's recorded

20        in the recorder's office or the county clerk's

21        office or when MERS first becomes a party to a

22        transaction through an assignment of an existing

23        mortgage?  Is that when you charge the registration

24        fee?

25            A        When the loan goes onto the system.

626

102

1                    Arnold

2      pull reports and know exactly what their portfolio

3      looks like.

4         Q      I still need to have an answer to my

5      question as to whether any fees of any kind

6      whatsoever are charged by MERS at any point in the

7      process after my hypothetical $100,000 loan to Chase

8      has been registered on your system within hopefully

9      30 days of closing.  Is there any other fee that

10     MERS charges anyone with regard to that particular

11     loan in any particular --

12        A      In your hypothetical?

13        Q      Yes.

14        A      The hypothetical has no other fees

15     associated with it.

16        Q      Are there any other circumstances

17     under which other fees would be charged?

18        A      Well, we might charge a fee for a

19     servicing transfer.

20        Q      Meaning that if Chase Manhattan was

21     its own servicer, which is unlikely, and decided to

22     transfer the servicing rights to someone else and

23     you had to make a new entry on your system about

24     that, you would charge another fee for that?

25        A      Well, we don't make the entries on the

627

110

1              Arnold

2    ~~for the release.~~

3         Q        I haven't marked for identification

4    the documents that your counsel provided to me in

5    response to my request for historical payment

6    records, but if we were to look at those, those

7    would represent registration fees --

8              RICHARD CAHN: One minute. Let me

9    make sure I'm right about that.

10             Let me withdraw that question.

11        Q        If you look, please, Mr. Arnold, at

12   Exhibit B, that's your first response to our notice

13   to produce. Look at page 3, paragraph four. Do you

14   see that?

15   ~~         A        Yes, sir.~~

16        Q        All right.

17             If you look at the third bullet point

18   there, the Bates numbers are 400050 to 400627, it's

19   described as a computer printout showing historical

20   payments received from MERS members and excluding

21   prepayments as of October 22, 2001. I don't have

22   those documents here to show you, but I assume

23   you're familiar with this type of computer printout.

24        A        Yes, sir.

25        Q        All right.

111

Arnold

2        If it excludes prepayments, what would

3   be on such a printout?  Would it be -- would it

4   consist of -- would it contain records of

5   registration fees that were paid as loans were being

6   registered on the system, in other words, that were

7   not the subject of a prepayment but which were the

8   subject of a registration fee that had to be paid

9   contemporaneously or relatively contemporaneously

10  with putting the loan on the system?

11      A      Yes, sir.

12      Q      Would it include those?

13      A      Yes, sir.

14      Q      Would it include membership dues?

15      A      Without having the documents in front

16  of me I wouldn't be able to say one way or the other

17  on that.  I can say that membership dues are a

18  source of revenue for the corporation.

19      Q      Okay.

20             Other than prepayments, registrations

21  and membership dues, are there other sources of

22  income of the corporation?

23      A      I think I've identified all of them.

24      Q      Actually, I misspoke.

25             Exhibit J, which I have not looked at,

629

112

1          Arnold
2    consists of almost 600 pages of historical payment
3    records.  Do you want to look at a few pages of this
4    exhibit just to see if there's any other character
5    of payment that's included in there, other than what
6    you just described?
7        A        Well, I know that there are no other
8    forms of revenue that we receive, other than what we
9    discussed.
10       Q        Okay.
11                So --
12       A        And the reason the prepayments, of
13   course, are not shown is because those are not
14   revenue until they're earned.
15       Q        What do you do with prepayments, put
16   them into an escrow account or --
17       A        They become a prepaid asset for the
18   corporation --
19       Q        Okay.
20       A        -- deferred asset.
21       Q        But that Exhibit J that you just
22   looked at, that is the list of historical payments.
23       A        Yes, sir.
24       Q        Okay.
25                We also asked you to produce financial

630

1                       Arnold

2     statements, and you produced documents 500000

3     through 500033.  I marked that as Exhibit K.  And I

4     take it that these are the financial documents that

5     were produced.

6                 RICHARD CAHN:  Let's just see what

7     I've got here. I'll show them to you.

8          Q     Give a copy to counsel.

9          A     All right.

10         Q     Do those fairly represent the

11    financial conditions of the company as of the dates

12    depicted on there?

13         A     I think they fairly do.  These have

14    been ultimately audited.

15         Q     If you look at the first substantive

16    page, page 500000, I believe you'll see cash and

17    cash equivalents 1,261,190 as of September 30, 2001.

18         A     Yes, sir.

19         Q     And receivables of another 1,298,347,

20    right?

21         A     Yes, sir.

22         Q     Do you show in current assets or in

23    any other place on this financial statement the

24    total amounts of the prepayments where the

25    prepayments have not yet been earned?

631

114

```
 1                          Arnold
 2          A        They would appear in the liabilities
 3     section under current liabilities titled "deferred
 4     income".
 5          Q        So that's $3,000,847 as of
 6     September 30, 2001, right?
 7          A        And that number is greatly reduced at
 8     this day.
 9          Q        Okay.
10              Well, that's the prepaid deposits that
11     I was questioning you about before that you show as
12     a liability until you've performed the services by
13     registering loans and then you pay yourself out of
14     that fund.
15          A        Prepaid registrations?  Yes, sir.
16          Q        And it becomes less of a deferred
17     income and it moves up into cash and cash
18     equivalents, I suppose?
19          A        And goes to the income statements.
20          Q        Okay.
21              And finally, on the stockholders'
22     equity portion of this statement you show paid in
23     capital of 9,668,909 as of September 30, 2001.  And
24     I take it that that is the amount of money that has
25     been paid by the shareholders?
```

632

| | | |
|---|---|---|
| 1 | | Arnold |
| 2 | A | Yes, sir. |
| 3 | Q | Okay. |
| 4 | | The membership dues are not shown |
| 5 | separately on this statement, are they? |
| 6 | A | No, sir. |
| 7 | Q | So to the extent that they were paid, |
| 8 | they would be in cash and in cash equivalents, and |
| 9 | to the extent that they're owed but not yet paid, |
| 10 | they may be called accounts receivable or may not be |
| 11 | called anything? |
| 12 | A | Well, if they're billed, they show up |
| 13 | as accounts receivable. |
| 14 | Q | Okay. |
| 15 | | What -- |
| 16 | A | They would also appear on the income |
| 17 | statement. |
| 18 | Q | What is the total amount of dues that |
| 19 | is collected each year by MERS? |
| 20 | A | I would have to refer to the year-end |
| 21 | financial statements. |
| 22 | Q | Well, they're apparently included |
| 23 | here, so maybe you can tell me. |
| 24 | A | Well, I don't think we have the year |
| 25 | end.  This is third quarter. |

633

116

```
1                          Arnold
2           Q        All right.
3                    Well, do you have any --
4           A        As of the third quarter it was
5      $365,000.
6           Q        Were the annual dues essentially four
7      times that?
8           A        Oh, no.
9           Q        Is that just -- that's just the
10     receivables for --
11          A        That's annual.  That's a year-to-date
12     number.
13          Q        Where are you looking?
14          A        Page 500003.  The very top number's
15     365,000.
16          Q        Annual member dues, so that's your
17     dues?
18          A        That's nine months of dues.
19          Q        Yeah.
20                   Now, you also show technology
21     outsourcing as operating revenue, registration is
22     2,435,808.  Is that the revenue derived from
23     registrations where your members actually register
24     the loans on your system?
25          A        No, sir.  That is a number that is
```

634

117

Arnold

1

2    paid to EDS, which is the company that we outsource

3    a lot of the hardware and operational aspects of the

4    system.

5         Q        Why is it called -- why is it

6    classified as operating revenue?

7         A        Because it actually subtracts from --

8    it's that category -- it's actually counter revenue

9    in a similar way that the prepaid registrations are

10   counter assets.

11        Q        So what you're showing is $8,898,606?

12        A        Those are gross receipts.

13        Q        And then you're showing $3,358,000 as

14   the total that you have to pay out to EDS and others

15   for outsource services.

16        A        Yes, sir.

17        Q        And that leaves a net operating

18   revenue of $5,540,439?

19        A        Yes, sir.

20        Q        That's for what year?  It looks like

21   year-to-date September 30, 2001.

22        A        Yes, sir.

23        Q        So that's a nine-month statement?

24        A        Right.

25        Q        So would it be fair to say that

635

118

1                        Arnold

2        probably a 12-month statement would be about a third

3        more than this?

4            A        So your operating revenue for the full

5        year might be close to 7 million, operating revenue

6        net of outsourcing.  Well, if you want to

7        interpolate, that might be what you get.

8            Q        That would be extrapolate.

9                     Just finishing up this document

10       production here, in item 6 of our demand we called

11       for documents evidencing the way in which MERS has

12       kept a record of all intermediate assignments of

13       recorded instruments.  And your answer here through

14       counsel is MERS does not have a record of documents,

15       that they do not exist.  There are no intermediate

16       assignments once MERS is the recorded mortgagee

17       either through a MOM mortgage or an assignment of

18       the mortgage to MERS.

19                     Would your answer be the same if I had

20       asked you -- we had asked you for documents

21       evidencing the way MERS kept a record of all

22       assignments of mortgage loans or of servicing

23       rights?

24           A        Well, we don't have any assignments.

25       There are no assignments.  Once we are in the county

636

119

1                   Arnold

2   land records, if there are assignments then those

3   get recorded in the county land records.  So all

4   assignments would be recorded in the county land

5   records.

6         Q     I'm not using assignment as a term of

7   art in the way you interpreted my question.

8         A     That's part of the misunderstanding,

9   by the way.

10        Q     Let me substitute the word transfer.

11           If I had asked you instead for

12   documents showing how you kept track of intermediate

13   transfers of loans, mortgage loans, your answer

14   would have been different, wouldn't it?

15        A     We don't have documents that show

16   transfers.

17        Q     You have a computer entry, electronic

18   data that shows that?

19        A     We have an electronic registry that

20   our members utilize to keep their records.

21        Q     And --

22        A     So the companies might have records

23   showing their purchase and sale agreements and

24   things of that sort.  But what we do is provide a

25   system where the loan is registered.  Our name goes

637

120

1                    Arnold

2    on the mortgage as mortgagee of record and is

3    recorded in the county land records with no

4    exceptions.  And then at that point that number is

5    the way that the members of MERS can pull reports or

6    go into the system and see who the current servicer

7    is.

8         Q        Okay.

9         A        The services come and go.  Whoever is

10   servicing the loan may get out of the business.

11   They might be fired by the investor.

12        Q        Okay.

13        A        So one of the values of MERS -- and

14   earlier when we were talking about the way that MERS

15   will lower the cost of home ownership and you

16   mentioned the electronic registry, I took your

17   question and I think that you were asking the

18   question whether or not I was told what the

19   electronic registry was going to be.  And when I

20   said that we came on board to create the electronic

21   registry, it was done in a way that permits the

22   members to utilize the system to identify who the

23   current servicer is.

24                 That was the need that we identified

25   as being missing in the current lending world,

638

121

Arnold

1
2    because the current servicer is the company that all
3    these players needs to talk to.  It is not possible
4    to deal with a loan without knowing who the current
5    servicer is.  And our system fundamentally is a
6    real-time record of who the current servicer is as
7    far as tracking who has legal interest.  That's how
8    we rely on county clerks, because we are in the
9    county land records, so our system, for example,
10   would tell our members -- and this is fundamental to
11   the value that we bring.  Our system tells our
12   members which county clerk's office the mortgage is
13   recorded in.  So when it comes to Mr. Romaine in
14   Suffolk County, our members have superior access to
15   his services because they are able to know that his
16   county is the county which holds the legal record of
17   the mortgage, and that permits title companies and
18   consumers and whoever else wants to deal with that
19   loan, that permits them to talk to the two sources
20   in the transaction, and that is the current servicer
21   who's the one that knows how to pay it off.  And the
22   one who knows what the consumer has done as far as
23   payment history and all those sorts of things is
24   Mr. Romaine, the county clerk, who is the only
25   person that keeps track of the legal interest.

639

122

1        Arnold

2            So again, our rules drive our members

3    always to the county clerk's office.  In fact, our

4    whole system is premised upon county clerks being

5    there because then we are able to track the other

6    things that county clerks don't track, who the

7    current servicer is and who has the beneficial

8    interest so that when a new consumer walks in the

9    door and wants to borrow money, the lenders in the

10   industry can drive money in that direction.  And in

11   a way that money is driven in that direction.

12           In the old days, back during the 20th

13   century, mid-20th century, you could only borrow

14   money that your neighbor saved.  And that's one of

15   the reasons The Great Depression was so severe.  And

16   since that time these entities have been created,

17   GOCs, Fannie and Freddie.  Warehouse lenders have

18   come along to make sure that there are other sources

19   of money to go into the system so that new

20   homeowners can buy homes, can get a loan.

21           RICHARD CAHN:  Okay.  All right.

22           I move respectfully to strike the

23   answer as not responsive.

24      Q      Now, Fannie Mae and Freddie Mac were

25   in this industry before MERS, were they not?

640

123

```
 1                        Arnold
 2        A        Yes, sir.
 3        Q        And they were warehouse lenders in the
 4   industry before MERS, were they not?
 5        A        Yes, sir.
 6        Q        And they performed the services that
 7   you were describing to get money into the mortgage
 8   lending industry so it would be available to more
 9   consumers.  They did all that before MERS, didn't
10   they?
11        A        Yes, sir.
12        Q        Now, when members have access to the
13   system, you've testified, I think, that they could
14   get the name of the servicer.  They can get the name
15   of the county, the identity of the county clerk's
16   office where the loan is and where the mortgage is
17   recorded.  Can they also get from the system, from
18   the computer system, the identity of the owner of
19   the loan at the particular time that some member
20   goes into the computer to access it?
21        A        The investor?
22        Q        Whoever is accessing the system.
23        A        You're talking about a member?
24        Q        Yes, sir.
25        A        If a member has a relationship to that
```

641

124

1                           Arnold
2      loan then they would be able to view that
3      information.
4           Q       The member?
5           A       Another member that does not have a
6      relationship with that loan would not be able to
7      view that information.
8           Q       So a member that did not have a
9      relationship to the loan could only get the servicer
10     of the loan from the computer?
11          A       They could only get the same
12     information that the general public could get.
13          Q       Got it.
14                  And the general public could only get
15     the identity of the servicer and the county clerk's
16     office?
17          A       Well, they would get the servicer and
18     they would get the telephone number to contact the
19     servicer, so they would be talking to the entity
20     that has all that information at their disposal.
21          Q       And that would be through the 1(800)
22     number?
23          A       Yes, sir.
24          Q       And through the 1(800) number then a
25     member of the public could only get the name of the

642

125

Arnold

1

2    servicer and the telephone number for the servicer?

3        A        Yes, sir.

4        Q        And that's it?

5        A        Yes, sir.

6        Q        All right.

7                 And would a member of the public in

8    order to get that information have to have the

9    mortgage number identification that is assigned to

10   the loan by MERS?

11       A        No, sir.

12                RICHARD CAHN:   All right.   Give me a

13   moment.

14           (A discussion was held off the record.)

15               (A luncheon recess was taken.)

16                 AFTERNOON SESSION

17   BY RICHARD CAHN:

18       Q        Mr. Arnold, I understand that you

19   would like to spell out for the record what the two

20   names that you gave as acronyms in your testimony

21   this morning were.

22       A        One was -- and these are the two

23   national organizations for county recorders.  One is

24   NACRC, N-A-C-R-C, which stands for National

25   Association of County Recorders and Clerks.  And the

643

147

```
 1                     Arnold
 2    be fair to say that the topics covered in this
 3    memorandum are topics that were of interest to you
 4    as the general counsel of MERS, I guess, at the time
 5    that this memorandum was prepared?
 6        A       Yes, sir, that would be fair.  And it
 7    was done pursuant to an engagement of outside
 8    counsel to get their best advice on whether or not
 9    the MERS system --- MERS concept can be pursued.
10        Q       You've heard the terms tracking system
11    and book entry system?
12        A       Yes, sir.
13        Q       All right.
14                And I take it from all I've heard and
15    learned about this case that MERS is not a book
16    entry system, it is a tracking system.
17        A       Yes, sir.
18        Q       And was there a time when it was
19    contemplated that MERS would become a book entry
20    system?
21        A       Well, this goes and is eminently
22    related to your question about what I was told and
23    asked when I was hired.  And there are references to
24    a book entry system in kind of the idea phase where
25    the mortgage industry was kicking around ways that
```

644

148

1                          Arnold

2        the costs could be reduced in the industry to

3        increase home ownership.  And book entry was one of

4        the nomenclatures used to describe one of the terms.

5            Q        That term comes out of the securities

6        where you buy a bond or security and you don't

7        physically get the certificate in your hands but

8        some broker holds it in a street name and they --

9        basically there's a book entry that indicates that

10       you're the official owner?  That's what a book entry

11       is, isn't it?

12           A        That may be the source of the

13       nomenclature and -- it might very well be the source

14       of the nomenclature.  That's a good example that was

15       in existence at the time.

16           Q        But MERS never -- there was a decision

17       not to make MERS into a book entry system?

18           A        Well, this is what I meant when I was

19       saying that we were not -- the management team was

20       not told to do book entry systems.  This was an idea

21       that we were to look at and determine whether or not

22       it was advisable to proceed in that way.  And that

23       particular theme that you mean when you say "book

24       entry system," the decision was made to not go

25       forward with that idea.

645

149

1                              Arnold

2          Q        When was that decision made,

3     approximately?

4          A        It was made within the first 90 days

5     of me becoming general counsel.

6          Q        So it was made in '95, early '96?

7          A        Early '96.

8          Q        Okay.

9                   From your prior answers I take it that

10    the system, which is the tracking system, is

11    servicing rights?

12         A        Yes, sir.

13         Q        All right.

14                  Now, when Mark Flemming of Freddie Mac

15    testified in this case in his deposition, he

16    testified that there is a field in the MERS database

17    that keeps track of the beneficial interest in the

18    mortgage; is that true?

19         A        Yes, sir.

20         Q        Okay.

21                  Is there some reason that both he and

22    you so far in your testimony have, if I may say,

23    emphasized that this is a system that tracks

24    servicing rights when apparently it also -- the

25    computer system contains not only the identity of

646

150

1          Arnold

2     the servicer but also contains information as to the

3     identity of the lender or the current owner of the

4     loan?  I don't want to characterize your testimony,

5     but it just seems to me that you're characterizing

6     it as a system that tracks servicing rights, but you

7     don't say that it tracks both servicing rights and

8     ownership of loans.

9          A          Actually, I did say that in my earlier

10    testimony.  So a thorough answer to your question

11    would be that we track the two things that were not

12    currently being tracked by county clerks or any

13    other companies and that the servicing rights, which

14    are defined in Article IX under the UCC, a piece of

15    personal property, and the promissory note, which is

16    the beneficial interest, which is also defined under

17    Article IX as a piece of personal property but moves

18    under Article III of the UCC.

19               So while we are the formal record of

20    the servicing rights, the investors might also be

21    shown on there or have representatives that are

22    shown on the system.

23               So in other words, when the MERS

24    system tells you the servicer, we are correct, that

25    is the servicer, and that might have changed the

647

151

1          Arnold

2     night before, but you will have the accurate answer.

3     And there's no other place in the industry that that

4     type of accuracy can be shown, other than the MERS

5     system.

6               On the investors' side, that is the

7     company that has the beneficial interest.  But that

8     might be a trustee who in turn is holding that

9     beneficial interest for millions of Americans that

10    have invested in the American housing industry

11    because, as you may know, Fannie and Freddie

12    securities are held by virtually every 401K in the

13    United States.  The industry is about $5 trillion,

14    and it is far and away the most solid investment on

15    the globe.

16               RICHARD CAHN:  Okay.

17               I move to strike so much of the answer

18    as not responsive.

19          Q     In the deposition of Richard Amatucci,

20    which is the vice president of Fannie Mae, he was

21    asked this question and gave this answer:

22               "Question:  Would a member of the

23    general public under any circumstances be able to go

24    into the MERS system and learn that Fannie Mae was

25    the owner of that loan?

648

152

1          Arnold
2          "Answer:  Because the beneficial
3     ownership rights have never been recorded, I don't
4     know whether when the public accesses the MERS
5     system whether that says Fannie Mae is the
6     beneficial owner because that's never been in public
7     records before."
8               Let me ask you the same question.
9     Would a member of the general public through access
10    to the 1(800) number be able to learn that Fannie
11    Mae was the owner of a loan?
12         A     Well, first, that answer shows that
13    Rick as a director is very engaged in the business.
14              RICHARD CAHN:  Okay.
15              That's not responsive to the question,
16    and I move to strike it.
17         A     The knowledge that Fannie and Freddie
18    might own the beneficial interest of a loan has
19    never been in the county land records and is not
20    available on the MERS system to the general public
21    or to a member who does not have a relationship to
22    that loan.
23         Q     Okay.
24         A     If the member has a relationship to
25    that loan then that beneficial interest is viewable

649

153

1                        Arnold

2       on the system.

3              Q       Now, is it your testimony that once

4       Freddie Mac and Fannie Mae purchase a loan that

5       their interest as the owner of that loan never

6       becomes a matter of public record in the county

7       clerk's office?

8              A       Virtually never.

9              Q       Okay.

10                     What happens when the loan is

11      satisfied?

12             A       When the loan is satisfied the

13      servicer knows about the fact that the loan has been

14      satisfied because the servicer is the company that's

15      responsible for accepting payments and keeping track

16      of the balance of the loan.

17             Q       And who would execute the satisfaction

18      of mortgage?

19             A       That would be the company in the

20      county land records, which in the case of MERS would

21      be MERS.

22             Q       Before MERS did Fannie Mae and Freddie

23      Mac, to your knowledge, ever execute and have

24      recorded satisfactions of mortgage?

25             A       No, sir, they did not.

650

157

Arnold

2    respect to a loan given by a servicer who is a MERS

3    member rather than comply with instructions from the

4    owner of the loan if the owner is a nonmember as

5    long as there are no contrary instructions; is that

6    right?

7         A        Yes, sir.

8         Q        All right.

9                  Now, suppose a nonmember of MERS owned

10    the loan and gave one set of instructions and the

11    servicer of the loan, which was a MERS member, gave

12    contrary instructions, which instructions would MERS

13    comply with?

14         A        We would comply with the instructions

15    from the servicer on the system.

16         Q        And you would disregard the

17    instructions from the nonmember owner of that loan?

18         A        Not if they had the promissory note.

19         Q        Well, that would be the way they would

20    become the owner, wouldn't it?

21         A        If they have the promissory note, then

22    we have a situation that we have to sort through.

23         Q        What do you do with that situation?

24                  (Daniel Cahn returned to the room.)

25         A        Well, ultimately the holder of the

**651**

158

1                              Arnold

2      promissory note is going to be the ultimate

3      authority.  These situations are bound to exist.

4            Q       Yeah.  I'm just not sure how that

5      would arise.

6                    If there is a servicer on the system

7      of a loan that's held by a nonmember of the system,

8      your system would reflect that, wouldn't it?

9            A       Our system would reflect who the

10     current servicer is.

11           Q       Would it also reflect at some level

12     who the owner of the loan was?

13           A       Not necessarily.  That is the basis of

14     Mark Flemming's answer earlier.

15           Q       So that if it's --

16                   RICHARD CAHN:  Withdrawn.

17           Q       So it's only if the owner of the loan

18     is a member of MERS that the system will reflect the

19     identity of the owner of the loan as well as the

20     servicer?

21           A       Not necessarily.  They're really

22     apples and oranges.  Whether the beneficial owner is

23     shown on the system has nothing to do with whether

24     or not the servicer has put in the owner of the

25     system.

PRATT REPORTING, INC.  -  (631) 351-6033

652

159

1                        Arnold

2        Q        That's up to the servicer?

3        A        The servicer before.  That doesn't

4    mean necessarily that the servicer is a member or

5    nonmember.

6        Q        The servicer has to be a member in

7    order to put something in the system?

8        A        Yes, sir.

9        Q        And your testimony is that the

10   servicer can put loans on the system that it is

11   servicing regardless of whether those loans are

12   owned by a member of MERS or a nonmember?

13       A        Yes, sir.

14       Q        And does that servicer have any

15   options if it is the servicer of a loan held by a

16   fellow member of MERS about whether to list that

17   fellow member of MERS as the owner of the loan?

18       A        They do have that option.  They are

19   the keeper of the record.

20       Q        So the owner -- the lender or the

21   owner of the loan doesn't have any direct way of

22   changing the record or of entering -- making entries

23   into the system even if they're --

24       A        If they're a member.

25       Q        -- a member?

653

160

1                          Arnold

2         A       If they are a member they would have

3    certain access to the loan record.  If they're not a

4    member, and many companies would not want to be a

5    member because that's essentially what they pay the

6    servicer to do, to make sure that these sorts of

7    things are taken care of, then no member has access

8    to information like that on the system.  So the

9    servicer must always be a member in good standing.

10   And the servicer is responsible for updating the

11   beneficial owner's field.

12        Q       What did you mean when you said that

13   would be a situation you'd have to sort through if

14   you had contrary instructions from a nonmember owner

15   and a member servicer?

16        A       What we would most likely have under

17   that circumstance is there had been some error or

18   something that would need to be looked at, so I

19   would -- to give you the actual answer to your

20   question, that would require MERS to get involved in

21   exactly what information all the players had.  So if

22   a company has the promissory note then they

23   definitely have certain rights having to do with the

24   loan.  And if the servicer is a current member and

25   active on the system, then the fact that they are

654

161

1                         Arnold

2    telling us something about the loan has importance

3    and we would have to consider that as well.

4         Q       So you would make a judgment as to

5    whose instructions you would want to carry out?

6         A       Well, if we could not resolve it in a

7    way that fit with the facts, then ultimately we

8    might even interplead that.

9         Q       You might have to go to court to

10   resolve it?

11        A       If need be.

12        Q       Okay.

13                Do you ever require any kind of proof

14   from a servicer that the servicer validly speaks for

15   a beneficial owner of a loan?

16        A       There is an electronic handshake that

17   takes place on the system from one servicer to

18   another.  We also have the electronic tracking

19   agreement, which you referred to earlier in your

20   questioning, which has to do with these beneficial

21   owners.  So the servicer of the loan again is the

22   company that is receiving the payments from the

23   consumer on behalf of the borrower or on behalf of

24   the investor, the beneficial owner of the loan.

25        Q       Are there differing levels of access

655

162

1                           Arnold

2       to the information on the MERS system?  I think your

3       answer was yes from your prior testimony.

4              A       Yes, sir.

5              Q       And does the access that a particular

6       member has to the system -- we're talking about

7       member access now. A particular member has to --

8              A       Although there is a nonmember level of

9       access.

10             Q       That's through the 1(800) number

11      exclusively, right?

12             A       Yes, sir.

13             Q       Does the level of access enjoyed by a

14      member to the system vary depending upon the

15      membership dues or fees that that member pays?

16             A       No, sir.

17             Q       What is it that determines the level

18      of access that a particular member will have?

19             A       It's largely their relationship to the

20      loan.  And to clarify my statement just a second

21      ago, if you were a patron member and wanted to

22      achieve certain access on the system, then that

23      would throw you up into a different membership

24      category.  So if you are a general member, then you

25      have the same kinds of access to your loans as other

656

163

1                              Arnold

2       general members.

3              Q       What category of member has the

4       greatest level of access; highest level?

5              A       A general member.

6              Q       A general member.

7                      Is each member assigned a unique org

8       ID, user ID and password?

9              A       Yes, sir.

10             Q       And I briefly mentioned -- made

11      reference earlier to a mortgage identification

12      number or a MIN.

13             A       Yes, sir.

14             Q       What is a MIN?

15                     (Mr. Romaine left the room.)

16             A       It's an 18-digit number, the first

17      seven of which is someone's work ID, the next ten of

18      which are random numbers, and the 18th digit, the

19      last one, is a check digit to make sure there aren't

20      book entry errors in the first 17.

21             Q       Can a person access the information

22      from the MERS system without entering an org ID,

23      user ID, password and MIN number?

24             A       Other than the nonmember access that

25      we spoke of with the MIN number where you learn the

657

164

                              Arnold
1
2    servicer and the servicer's phone number --

3         Q         Only --

4         A         -- you cannot get into the MERS system

5    without using the proper access.

6         Q         Okay. And I think that your answers

7    before may have covered this subject, but let me

8    just nail it down.

9              When a MERS member enters the user ID,

10   the org ID, password and MIN number, I take it he

11   does not have unlimited or unrestricted access to

12   the system but some of the information that he may

13   want about a particular loan he will only have

14   access to if he has a beneficial interest in that

15   loan?

16        A         Some interest in that loan.  It might

17   be that he's the servicer.

18        Q         Okay.

19        A         But without a relationship to that

20   loan that the system knows about, then the user ID

21   and org ID would not permit that user to access

22   information on the MERS system.

23        Q         Well, could a member having no

24   relationship to a loan access that loan on the

25   system and find out who the servicer was?

658

165

Arnold

1

2      A      Yes, sir.

3      Q      Could that member access the system to

4    find out who the beneficial owner of that loan was?

5      A      No, sir.

6      Q      Okay.

7             So what you're saying is that MERS

8    members, even with all these IDs and MIN numbers, if

9    they don't have a relationship to a particular loan,

10   they have no greater access than the public has to

11   it.

12     A      That's correct.

13     Q      All they can get is the servicer?

14     A      Yes, sir.

15     Q      When the public calls that 1(800)

16   number, by the way, is there any charge for giving

17   the information as to the servicer?

18     A      No, sir.

19     Q      And that's the only information the

20   public can get?

21     A      The servicer and the servicer's

22   telephone number.

23     Q      Okay.

24            And that's information that's given

25   out for free?

659

166

1                    Arnold

2          A       Yes, sir.  And then they can also

3    punch out to the help desk if they need additional

4    hand-holding.

5          Q       But that's just hand-holding and

6    telling them who to call to get the information that

7    they're looking for?

8          A       Yes, sir.

9          Q       All right.

10                  Now, if you're not a MERS member you

11   can't get an org ID, a user ID or a password, right?

12         A       That's correct.

13         Q.      And other than getting the identity

14   and telephone number of the servicer, the public has

15   no access to the MERS system?

16         A       Well, they have access to the

17   central -- the purpose that the MERS system was set

18   up for is to identify the accurate current servicer.

19   So I would characterize it as the public has access

20   to the centerpiece information that the MERS system

21   is all about.

22                  (Mr. Romaine returned to the room.)

23         Q       Meaning the identity and the telephone

24   number of the servicer?

25         A       Yes, sir, which is the single most

664

188

Arnold

    1

    2        Q       State laws or regulations that apply

    3   to mortgage servicers and how long they have to keep

    4   their records?

    5        A       There are typically record retention

    6   rules that apply to that somewhere.

    7        Q       Would it not be a fact that those

    8   rules would be complied by a servicer or other MERS

    9   member simply by saying look, we're maintaining our

  10   record on the MERS system electronically in

  11   Sacramento and Plano?

  12       A       That would just be speculation.  I

  13   don't know that that's the case.

  14       Q      And some of these servicers -- as I

  15   think you previously testified when I was showing

  16   you those mortgage satisfactions, some of those

  17   servicers go out of business from time to time or do

  18   something and they get their business yanked from

  19   them, right?

  20       A       Yes, sir, which is one of the major

  21   benefits of the MERS system, because better document

  22   control and accuracy of the information is probably

  23   the most valuable piece of what we do, which even

  24   goes beyond the fact that we're eliminating

  25   unnecessary paper because time is money.  Paper is

665

189

1                         Arnold

2    expensive.  So those are all benefits that we bring

3    to the mortgage process, better control of the

4    documents and accuracy of the information.

5         Q       Do you have any information about how

6    you would know if a hacker had broken into your

7    system and changed information on it?

8         A       Well, that's a matter of our security

9    system, and you're more than welcome to take a look

10   at those sorts of things and I'll amplify my answer.

11        Q       Fine.

12               Let me show you a document that I've

13   marked as Exhibit N, and it comes out of your record

14   on appeal in the appellate division.  I just would

15   like you to identify this as a representative or

16   sample MERS mortgage.

17        A       When you say "MERS mortgage," there's

18   not really a MERS mortgage.

19        Q       Well, that's what it says in the

20   caption on the page of your record on appeal.

21        A       Well, this is a mortgage naming MERS

22   as mortgagee of record.  It's a uniform instrument

23   produced by VMP Mortgage Forms.

24        Q       And that's the form that you use?

25        A       Well, our members use this.  The

666

190

1                    Arnold

2     borrower signs this.  Our members use this.  This is

3     actually promulgated by Fannie Mae and Freddie Mac,

4     and VMP Mortgage Forms is a document provider --

5         Q       Okay.

6         A       -- which has followed the Fannie Mae

7     rules.  The Fannie Mae rules say that this is an

8     acceptable mortgage to record in the county land

9     records.

10         Q      And this is the mortgage form that is

11    used for the purpose of designating MERS as the

12    mortgagee of record?

13        A      Yes, sir.  This is -- I believe this

14    is a New York version of that.  And even though we

15    say that they're uniform instruments, the

16    instruments do apply on a state-by-state basis.  So

17    there are differences among the states with these

18    documents.

19        Q      Do you know whether there was a New

20    York law firm that was consulted with respect to the

21    language of this version of the MERS mortgage?

22        A      Well, this was generated by Fannie Mae

23    and Freddie Mac in a team of lawyers, and I know for

24    a fact that there were New York lawyers involved in

25    that dialogue.

PRATT REPORTING, INC.  -  (631) 351-6033

667

193

1                              Arnold

2          Q        So MERS has effected no changes

3    whatsoever in the procedures applicable to the

4    transfer of ownership in loans; is that a fair

5    conclusion?

6          A        The beneficial ownership?

7          Q        Yes, sir.

8          A        Yes, sir.

9          Q        All right.

10                   Now, before the MERS system came into

11   existence how were the servicing rights transferred

12   with respect to a loan, if you know?

13         A        Well, they've always been a

14   contractual right.  They could be bought and sold

15   among servicers.  Servicers get paid to service the

16   loan, so the whole notion of a servicing company

17   that is not also the investor in the loan is that

18   they don't have the actual funds lent, but they do

19   the work and they receive payments out of that

20   stream of payments for their operations.

21         Q        And when one servicer transfers to

22   another the servicing rights, do you know how that

23   was done before MERS?

24         A        That's just simply a transfer of a

25   contract.

668

196

1              Arnold

2              RICHARD CAHN:  I understand.

3    BY RICHARD CAHN:

4         Q      So with those caveats and conditions,

5    can you answer my question?

6         A      What is your question?

7         Q      My question is, was it customary and a

8    usual thing for the mortgagee in conveying its

9    interest in a mortgage to execute an instrument

10   called an assignment of mortgage?

11        A      That's the only way that it can be

12   done, to my knowledge.

13        Q      And that would have to be acknowledged

14   before a notary public, right, in New York, as far

15   as you know?

16        A      Yes, sir.

17        Q      And then that assignment at some point

18   would be recorded in the county clerk's office?

19        A      That's not a requirement under New

20   York law.

21        Q      Well, I understand that that's your

22   position.

23              But at some point, from your

24   familiarity with the state of the industry before

25   you got into this business, would that be your

PRATT REPORTING, INC.  -  (631) 351-6033

669

197

1              Arnold

2    impression, that before MERS came into existence at

3    some point these intermediate assignments of

4    mortgages would be recorded, whether they would be

5    recorded contemporaneously with the assignment or

6    whether they would be recorded later on or whether

7    they would be recorded in a bunch at the time that

8    the satisfaction of the mortgage was recorded?

9    Isn't it true that the custom and practice in New

10   York was traditionally, up until MERS, that

11   assignments would at some point up to the

12   satisfaction, before the satisfaction of the

13   mortgage be recorded.

14          A       I would not agree with that.

15          Q       You would not?

16          A       I would say you referred specifically

17   to the last 20 or 30 years, and I think that during

18   that specific time, 20 and 30 years, the mortgage

19   industry has literally exploded to the point where

20.  home ownership is now -- more than two-thirds of all

21   Americans own a home.

22          Q       I'm talking about New York now.

23          A       Yeah, and more than two-thirds of New

24   Yorkers own their home.

25          Q       Well --

670

198

1                                   Arnold

2           A        So --

3           Q        -- that may be, but I'm asking you a

4     very narrow question.

5                    I'm asking you if, to your knowledge,

6     it came to your knowledge that there was a custom

7     and practice in New York of recording assignments of

8     mortgage, whether or not it was required.

9           A        There is no requirement in New York

10    that the assignments be recorded.  And my -- I know

11    from my own professional training that whether or

12    not those get recorded with the county clerk has to

13    do with whether the parties determined that they

14    want the third parties to be able to look in the

15    county land records and see that the mortgage

16    interest, the legal interest, has moved from one

17    company to another.  And I'm saying that that is not

18    in all cases.  There are plenty of situations going

19    back for decades, specifically the last 20 or 30

20    years, and companies would agree not to record those

21    assignments.

22          Q        In those instances, how would they

23    handle the satisfaction of the mortgage?

24                   (Mr. Hultman returned to the room.)

25          A        Well, the satisfaction of the mortgage

PRATT REPORTING, INC.  -  (631) 351-6033

671

201

1          Arnold

2    ~~at 68 percent, but it's also twice of what the other~~

3    closest industrialized country is.

4              So our system in the United States is

5    a whole system that has been created to reliquify a

6    loan.  In other words, when you have a closing here

7    in this table, which I'm sure you do, one borrower

8    borrows the money and leaves, and the system is so

9    fast that, in theory, the next borrower is able to

10   borrow from the same company with the same money

11   that it got replenished with almost instantaneously,

12   and that information is what MERS was created for,

13   to have a single source that companies can access.

14   It really has nothing to do with the county land

15   records because we are in the county land records so

16   that the world knows it's a secured loan.

17             MR. CAHN:  I move to strike the answer

18   ~~as nonresponsive.~~

19             Q    Now, your testimony, I believe, was

20   that it was a common occurrence that satisfactions

21   of mortgage would be executed by the original

22   mortgagee and recorded years later notwithstanding

23   the fact that that original mortgagee had assumed

24   its interest in the mortgage perhaps many years

25   before, and there may have been many subsequent

672

202

1                          Arnold

2    assignments of a mortgage so that the original

3    mortgagee no longer had an interest in the original

4    mortgage that was satisfied.  I believe your

5    testimony was that it was a common occurrence that

6    the original mortgagee that no longer had any

7    interest in the loan, in the mortgage, was the one

8    who would execute the satisfaction; is that your

9    testimony?

10        A       Well, there's too much in your

11   question.  The mortgagee has an interest just purely

12   and simply because they are in the county land

13   records.  They have the legal interest.  That is a

14   fact.

15        Q       They have --

16        A       They are the ones --

17        Q       They have it at the beginning, no

18   question?

19        A       If they're in the county land records.

20        Q       But what happens if they sell their

21   interest in the loan?

22        A       They do it every day.

23        Q       If they sell the interest in their

24   loan they don't own it anymore, do they?

25        A       They have the interest of being in the

673

203

1                        Arnold

2      county land records, and that is a piece of -- just

3      like they taught you in law school, it's a bunching

4      of sticks.

5            Q        And they still have enough sticks in

6      the transaction to execute a transaction in the

7      mortgage years later, even though ten years before

8      they had assigned out their ownership interest in

9      the loan?

10           A        Yes, sir.  And that's one of the roles

11     that title attorneys play, because they ensure that

12     a situation like that is covered.  They're the

13     experts in researching it and insuring over it so

14     that again, the money can be lent as quickly as

15     possible and you don't run into a problem like that.

16     Because without title insurers, then we'd have a

17     bunch of bankers and lenders and homeowners trying

18     to determine whether or not they've got good title.

19     Title attorneys are the experts at insuring over

20     that so that the financial parties don't have to

21     worry about it.  And then they dig into it and make

22     sure it's not being released prematurely and that

23     all interest holders have been properly taken out.

24                    RICHARD CAHN:  I move to strike some

25     of the answer as not responsive.

674

204

1              Arnold

2        Q      Would you look at page 85 of the

3   procedures manual.  I don't know if that's the right

4   page number.  It's your own page 85.

5              MR. MARTORANA:  You mean the Bates

6   number or the printed page?

7              RICHARD CAHN:  Let me see here.

8              DANIEL CAHN:  Printed page.

9              RICHARD CAHN:  It's Bates 105630.

10       Q      Do you see the paragraph marked

11  "Overview" on that page?

12       A      Yes, sir.

13       Q      And the third paragraph under that

14  caption reads as follows:  "Once MERS is named as

15  mortgagee, no further recorded or unrecorded

16  assignments are necessary as long as the servicing

17  rights are sold to another MERS member and remain on

18  MERS and the investor requirements have been met."

19             Do you know whose idea it was to put

20  that language in the procedures manual?

21       A      Well, that's a collective idea from

22  all of our expertise.

23       Q      And you contributed to that?

24       A      Yes, sir.

25       Q      And was that language placed in the

675

207

1                              Arnold

2       ~~think that the purpose~~

3          Q        You've answered the question.

4          A        The purpose of the paragraph is so our

5       members don't make a mistake and generate an

6       assignment from us or any assignment regarding the

7       account, because we're the mortgagee of record and

8       we would not want to have that messed up because

9       MERS's remains would be messed up.  And one of the

10      values of MERS is that we correct errors that the

11      servicers have made.  So this is just very clear

12      guidance to our members, that they're not to fool

13      with the legal title if it's on the MERS system.

14         Q        Without that guidance in the

15      procedures manual, did you believe -- you and the

16      other folks who contributed to this language, did

17      you believe that servicers would be more likely than

18      not to prepare and deliver assignments?

19         A        I wouldn't say that.  I would say that

20      in our judgment, since we are taking on the

21      responsibility of being in the county land records,

22      we also have the concomitant responsibility to make

23      sure that our members don't do something that causes

24      our responsibilities in that regard to be more

25      difficult.

676

208

1                          Arnold

2          Q        Okay.

3                   Were the roles of Freddie Mac and

4    Fannie Mae changed by their joining MERS from what

5    they had been, what their roles had been in the

6    industry before MERS, if you know?

7          A        No, sir.

8          Q        So there's been no real change in what

9    they do and how they do it, as far as you know?

10         A        No, sir.  They did reduce the amount

11   of paperwork that was necessary for a loan.

12         Q        In what way?

13         A        Well, they eliminated -- and this ties

14   in with your earlier question about assignments

15   being recorded.  Prior to MERS they had a

16   requirement that an unrecorded assignment in

17   recordable form be generated by the existing

18   servicer in case they had to yank servicing, and

19   because of MERS -- since the likelihood that yanking

20   servicing goes to zero, because of MERS there's no

21   longer a need for the unrecorded assignment, which

22   drives down the cost associated with the transaction

23   and drives down the costs of home ownership, which

24   increases the number of homes that people can buy.

25         Q        So notwithstanding your earlier

677

209

1                          Arnold

2      testimony about many mortgages being assigned

3      without assignments with the original mortgagee

4      eventually executing a satisfaction of mortgage, the

5      mortgages that came into the portfolios of Freddie

6      Mac and Fannie Mae were the subject of unrecorded

7      assignments under their rules before MERS?

8          A        Well, I think your question is trying

9      to put words in my mouth from earlier testimony.  It

10     is a fact that historically companies have not

11     recorded assignments unless they wanted to.  That is

12     just a fact.  And that's based upon their legal

13     counsel and the particulars of the transaction.  So

14     I don't consider it to be disputable that there are

15     situations under New York law that companies do not

16     record assignments, because I know that New York law

17     does not require the recording of assignments.

18         Q        My question from your earlier

19     answers -- I was not trying to put words in your

20     mouth -- was that you were saying that many, many,

21     many mortgages were transferred without assignments

22     being taken or ever recorded.

23         A        All it requires is an agreement

24     between the parties.

25         Q        Well, whatever it required or didn't

678

210

1                              Arnold

2      require, whatever was legal or not legal, I think

3      your testimony was that there was a great number of

4      assignments of mortgages that were not accompanied

5      by the execution of assignment instruments.

6           A      Well, there are plenty of situations

7      like that, and I took from your question that you

8      meant that it had to.  It does not have to.

9           Q      You made that point.

10                 MR. MARTORANA:  This is an objection

11     because he's answered the question.

12                 You're trying to go back.

13                 RICHARD CAHN:  I want to see if he's

14     changed his answer.

15          Q      Now you say plenty of instances.  Are

16     you saying that there were plenty of instances where

17     no assignments were made before MERS, no assignments

18     were executed before MERS but that you recognize

19     that the great majority of mortgage assignments

20     before MERS were accompanied by executed assignment

21     instruments?

22          A      You're trying to testify.  That's not

23     true at all.

24          Q      I'm trying to understand what you're

25     saying.

PRATT REPORTING, INC.  -  (631) 351-6033

679

212

1                          Arnold

2                 MR. MARTORANA: Well, your question

3     and his answer.

4          A          Well, look at the situation where you

5     got two subsidiaries --

6                 MR. MARTORANA: Wait. Let's just take

7     a break for a moment. I just need to speak to R. K.

8                 (A recess was taken.)

9     BY RICHARD CAHN:

10         Q          Would you please clarify your answer

11    with respect to the extent to which assignments were

12    effected in New York during that 20 or 30 years

13    before MERS without an assignment of mortgage being

14    executed?

15         A          Well, my answer was in response to

16    your question regarding custom and usage, and my

17    answer was meant to address the point that custom

18    and usage is determined by the attorneys involved in

19    the transaction and the parties and that there are

20    plenty of situations where the attorneys and the

21    parties would determine that they do not need to

22    record the assignments, because in New York there is

23    no statutory requirement that they be assigned.

24         Q          You mean be recorded?

25         A          That they be recorded, excuse me. And

680

216

1                              Arnold

2       custom and practice was in the industry where those

3       two specific examples were not present.

4              A       Well, I said that I base my judgments

5       on that.  As for my opinion about New York law, I

6       don't consider myself to be qualified.

7              Q       I was asking about whether you had an

8       opinion as to the custom and practice.

9              A       I am confident that there are

10      situations where companies have agreed amongst

11      themselves that they would not record assignments.

12             Q       Okay.

13             A       And there's no requirement under New

14      York law --

15             Q       You've made that statement.

16             A       -- that they would be recorded.

17                     RICHARD CAHN:  I move to strike so

18      much of the answer as not responsive.

19             Q       Now, is there any difference in how a

20      mortgage foreclosure proceeding takes place now with

21      a mortgage naming MERS as the mortgagee nominee and

22      the way mortgage foreclosure proceedings took place

23      before MERS in New York?

24             A       The only -- I believe the general

25      answer to your question is no, there's no change.

681

217

```
1                          Arnold
2       There are -- from a procedural standpoint there's
3       some understandings that the members need to have.
4       And what are those understandings, that they will
5       have to continue to be in the name of MERS much in
6       the same way as the earlier clause in the procedures
7       that you pointed out where we would not want our
8       name to be taken out of the county land records
9       because that messes up the chain of title.  So it's
10      the same as you should not assign loans that MERS is
11      the mortgagee of record unless you are assigning
12      them from MERS out of the MERS system.  The same
13      goes for foreclosure where you should leave MERS in
14      the county land records until the foreclosure is
15      complete.  And then there's a document that winds up
16      taking the legal interest into whatever company
17      winds up with the interest.
18          Q        Before MERS, if there was a mortgage
19      closing, a mortgagee in existence whose interest was
20      recorded with a mortgage, several assignments of the
21      mortgage, a default and a mortgage foreclosure
22      proceeding, are you aware of whether there was a
23      custom and practice as to whether or not that first
24      recorded mortgagee would be the plaintiff in the
25      foreclosure proceeding or whether the last assignee
```

682

224

1                           Arnold

2       And we are talking about on the margin because

3            Q       I understand.

4            A       -- when we're talking about a

5       68-percent home ownership, pushing that to percent

6       71 is the margin.

7            Q       Mr. Arnold, you're repeating yourself,

8       and your answer, for the most part, is not

9       responsive.  You got off into your --

10              MR. MARTORANA:  Let's move on.  You

11      have other questions?

12              RICHARD CAHN:  I do.  I'd like to get

13      you guys out of here at a reasonable hour.

14           Q       Has anybody done a time and motion

15      study or any other kind of efficiency study to

16      quantify the amount of money that the MERS system

17      saves; yes or no?

18           A       Well, one excellent source of that

19      type of information are the customers who we have to

20      convince.

21           Q       I'm not asking you about convincing

22      customers.

23           A       Well, you're asking me about costs.

24           Q       My question was, has there ever been a

25      study done by anyone that's been reduced to writing

683

225

```
 1                    Arnold

 2      that I could look at that would show me how much

 3      money MERS saves the consumers.

 4           A       Well, there have been many estimates

 5      of that.

 6           Q       Well, do you have that in writing?

 7           A       Well, they typically are in the minds

 8      of our customers.

 9           Q       So you don't have writings?

10           A       I wouldn't say that.  I would say that

11      our customers find the system to be very valuable.

12           Q       You've made that point.  I'm asking

13      you about writings.  That's my specific question.

14      That's what I'm asking you.

15                   And I just want to know, are there any

16      writings, any studies in writing that I could look

17      at that you have or have access to that would

18      quantify the savings that you say the MERS system

19      produces?

20           A       I'm not aware of any --

21           Q       Thank you.

22           A       -- study that we can provide to you.

23           Q       All right.

24                   Tell me, what role does Sharon

25      Horstkamp play in the company?
```

PRATT REPORTING  INC

684

**EXHIBIT S: EXCERPTS FROM THE DEPOSITION OF SHARON HORSTKAMP, LEGAL COUNSEL TO THE PETITIONERS [684-694]**

# COPY

1                                                                    1

2  SUPREME COURT OF THE STATE OF NEW YORK

3  COUNTY OF SUFFOLK

4  ----------------------------------------x

5  MERSCORP, INC. and MORTGAGE ELECTRONIC
   REGISTRATION SYSTEMS, INC.,

6

7                          Petitioners,

   - against -                          Index No.
8                                       01-9688
   EDWARD P. ROMAINE, as Clerk of the
9  County of Suffolk, State of New York and
   COUNTY OF SUFFOLK, STATE OF NEW YORK,

10

11                       Respondents.

   ----------------------------------------x

12
                          1600 Stewart Avenue
13                        Westbury, New York

14                        May 9, 2002
                          10:00 a.m.
15

16

17         EXAMINATION BEFORE TRIAL of MERSCORP, INC.

18  and MORTGAGE ELECTRONICS REGISTRATIONS SYSTEMS,

19  INC. (BY: SHARON McGANN HORSTKAMP), the

20  Petitioners in the above-entitled action,

21  conducted via video conference connection at the

22  above-mentioned place, before Joan Scalia, a

23  Notary Public of the State of New York, taken

24  pursuant to Article 31, Section 3101 et seq. of

25  the C.P.L.R., and stipulations between Counsel.

RADAZO REPORTING, INC.     (516) 433-1020

# Exhibit C

*Appellate Division – Second Department Case No. 2004-04735*
*Supreme Court, Suffolk County Clerk's Index No. 01-9688*

# Court of Appeals

STATE OF NEW YORK

————— ▶▶◀◀ —————

MERSCORP, INC. and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,

*Petitioners-Respondents,*

*against*

EDWARD P. ROMAINE, as Clerk of the County of Suffolk, State of New York
and COUNTY OF SUFFOLK, STATE OF NEW YORK,

*Respondents-Appellants.*

## RECORD ON APPEAL
## VOLUME I OF III
## Pages 1 to 470

ELIOT SPITZER
*Attorney General of the*
  *State of New York*
300 Motor Parkway, Suite 205
Hauppauge, New York 11788
631-231-2191

CAHN & CAHN, LLP
*Attorneys for Respondents-Appellants*
445 Broadhollow Road, Suite 332
Melville, New York 11747
631-752-1600

HISCOCK & BARCLAY, LLP
*Attorneys for Petitioners-Respondents*
1100 M&T Center, 3 Fountain Plaza
Buffalo, New York 14203
716-856-5400

711

**EXHIBIT U: EXCERPTS FROM THE DEPOSITION OF MARK FLEMING, VICE PRESIDENT OF THE FEDERAL HOME LOAN MORTGAGE CORPORATION**
[711-725]

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

- - - - - - - - - - - - - - - - - -x

MERS CORP., INC., and MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC.,

                          Petitioners,        ORIGINAL

          -against-

EDWARD P. ROMAINE, as County Clerk of
Suffolk County, and the COUNTY OF SUFFOLK,
STATE OF NEW YORK,

                          Respondents.

- - - - - - - - - - - - - - - - - -x

                    Held via teleconferencing at
                    three different locations:
                    Friday, February 15, 2002
                    12:20 o'clock, p.m.


        EXAMINATION BEFORE TRIAL OF MARK FLEMING,

a Witness, in the above-entitled action, held

at the abovementioned time via

teleconferencing, before Valerie Cole and

George C. Trovato, Notary Publics of the State

of New York.



              SUPREME COURT REPORTERS, INC.
                Freelance Court Reporters
                      P.O. Box 88
                  Mineola, New York 11501
                      (516) 541-8023

712

20

1        M. FLEMING - Exam by Mr. Cahn

2    ~~was set up to solve.~~

3        Q    Okay.  All right.  But I think you did

4    answer, your counsel indicated you answered the

5    question and I think you answered that as an

6    informational item, the owner of the beneficial

7    interest in a mortgage would be on the system; is

8    that right?

9        A    Yes.  Yes, that's absolutely right.  Yes.

10       Q    Yes.  All right.  Now --

11       A    But that doesn't have anything to do with

12   the point of Mers.

13       Q    I understand.

14            Who, today, has access to the Mers' data

15   base?

16       A    Again, that's a question that you should

17   address to management.

18       Q    Okay.  You are a director --

19       A    If you own the mortgage -- I'm sorry.

20       Q    I say you are a director --

21       A    I mean,  I --

22       Q    I assume you have some general knowledge?

23       A    I can tell you that -- yes, and --

24            (Pause in proceedings.)

25       Q    Mr. Fleming, let's go back a little bit.

SUPREME COURT REPORTERS, INC. (800) 765-0089

713

21

M. FLEMING - Exam by Mr. Cahn

I was asking you what you generally knew as a
director of Mers as to access to the Mers data
base and you had started to say that the staff at
Mers would know, but I would like to know, if I
may, what -- to what extent you know about access
to the system?

A    If you own the servicing rights, you have
access to that record -- to that mortgage, to the
record of that mortgage.  But if you don't own it,
then you have no access.

Q    All right.  So, a member of the general
public has no access to the data base at all?

A    To my knowledge, absolutely not.

Q    Now, you stated -- do you remember you
made an affidavit in the Appellate Division in May
of last year?  I don't know if you remember that.

But, in that affidavit you state, and I
quote, "Through the Mers' centralized system,
specifically through a 1-800 number on the face of
the recorded mortgage, a borrower or a third party
may obtain quick and easy access to information
about the mortgage the servicer of the mortgage
and the owner of the mortgage."  I'll close
quotes.

714

22

M. FLEMING - Exam by Mr. Cahn

1
2      Do you remember signing an affidavit that
3  contained that language?
4      A    Yes.
5      Q    And, tell me, please, what kind of access
6  a member of the general public would have through
7  that 1-800 number?
8      A    Again, you should address that to Mers,
9  but my sense of it is, those pieces of information
10 that are public information that one could find at
11 the county land records.
12     Q    In other words, the servicer of a
13 mortgage, the owner of the mortgage, that
14 information would be accessible to me --
15     A    I don't know.  Again, this is something
16 you're going to have to ask Mers.
17     Q    All right.  So you don't personally know
18 whether that information would be available to a
19 non-Mers' member, through the 1-800 number or --
20     A    No.  No, I don't know that detail.
21     Q    All right.  During the time that you met
22 with the MBA work group and during the years that
23 you have been a director of Mers, what discussions
24 have taken place, if any, with respect to the
25 prospect of saving recording fees by not being

23

M. FLEMING - Exam by Mr. Cahn

1  required to record intermediate assignments of

2  mortgages?

3      A    We've had discussions about servicing

4  transfer recordations.

5      Q    Are you there?

6      A    Yes.  Did you hear my answer?

7      Q    You said servicing transfers, that's the

8  last word that I heard.  Recordations.  I see.

9          All right, and what were those

10 discussions?  These are discussions both with the

11 work group and in the board of directors?

12     A    Yeah, I'm sure that those discussions took

13 place in both arenas.

14     Q    I see.

15     A    Again, our focus in both arenas was

16 attempting to make the process more efficient as

17 I've described before.

18     Q    And was part of the desire of both groups

19 to make the process less costly to the consumer?

20     A    We were attempting to drive out

21 inefficiencies from the process which we believe

22 would ultimately benefit the consumer.

23     Q    Was part of the discussion concerned with

24 eliminating recording fees that would otherwise

716

25

M. FLEMING - Exam by Mr. Cahn

1

2    Q   And that was --

3    A  -- that may have been part of that

4 discussion.

5    Q   All right.  Are you familiar with an

6 opinion that was rendered by the Washington law

7 firm of Covington and Burling on or about

8 September 1, 1997 to R.K. Arnold?

9    A  I'm aware of it.  I'm not familiar with

10 it.

11    Q   Had you ever read that opinion, that

12 document?

13    A  No, I have not read it.

14    Q   All right.  Did anybody ever tell  you

15 that that memorandum to R.K. Arnold --

16    THE COURT REPORTER:   I'm sorry, did

17    anybody ever, is all I heard.

18    MR. CAHN:  Okay.

19    Q   Did anyone ever advise you or did you

20 learn that the Covington and Burling legal

21 memorandum contained in words or substance this

22 passage:  Quotes, "By designating Mers as the

23 original mortgagee of record, the holders will

24 avoid recording assignments of the mortgage."

25 Close quotes.

717

26

M. FLEMING - Exam by Mr. Cahn

A    I don't, you know, again, I'm not familiar
with the document, but, as a general concept, yes,
I'm familiar with that.

Q    There was produced to me a number of
documents that were apparently created by Mers and
essentially these documents came out periodically
and I'm looking at one right now.  It's identified
by base numbers MER 0177.  I don't think that your
counsel produced it.  I think it was Fannie Mae
that produced it.  But I want to ask you if you're
familiar with it.

This is a document entitled "Authorized
changes to security instruments," and then it goes
down with a listing of changes that are necessary
for various states; Alabama, South Carolina.
Modify the instrument for Alaska, Arkansas and
Arizona, and so forth, including New York.

In other words, these documents appeared
to be a work in progress giving instructions about
how various Mers' instruments should be modified
from time to time to conform to the laws of the
various states.

Were you aware -- my question is, were you
aware, as a director of Mers, that there was this

718

27

M. FLEMING - Exam by Mr. Cahn

1
2    work in progress that somebody was trying to
3    identify the legal issues in each state and
4    resolve them?
5        A    Yes.  You've made a misstatement.
6        Q    Okay.  Correct it, please.
7        A    You called them "Mers' instruments."  I'm
8    not -- I don't believe they're anything -- I don't
9    believe there is such a thing as Mers'
10   instruments.
11       THE COURT REPORTER:  I don't believe
12       they're anything.  I don't believe -- I didn't
13       get the rest of that.
14       MR. CAHN:  What he said is that my use of
15       the term "Mers' instruments" was inaccurate.
16       I think that was his point.
17       A    Yes, Richard, that's correct.
18       Q    Yes.  I stand corrected, Mark.
19           In this particular document it says
20   "Authorized changes to security instruments" and
21   it's the individual paragraph that describe or
22   relate to Mers so you are absolutely correct.
23       You were aware ---
24       MR. MARTORANA:  Richard, this is Charlie
25       Martorana.

SUPREME COURT REPORTERS, INC. (800) 765-0089

719

28

M. FLEMING - Exam by Mr. Cahn

1

2    MR. CAHN:  Yes.

3    MR. MARTORANA:  Richard, it's important

4    for us, if you would, please, identify the

5    document that you're referring to.  We don't

6    understand what document it is.

7    MR. CAHN:  I did.

8    MR. MARTORANA:  You called it a work in

9    progress but we don't know what it is.

10    MR. CAHN:  All right.  I thought that I

11    had said that the document that I was

12    referring to starts -- the legal memorandum

13    from Covington and Burling starts at MER 0147

14    and continues to MER 0174.

15    The random document, what I call a part of

16    a work in progress that relates to changes in

17    security interests for the various states,

18    begins at page MER 0177 and ends at MER 0187.

19    Okay?

20    MR. MARTORANA:  Does the document have a

21    title that you just referred to beginning at

22    0177?

23    MR. CAHN:  It's called authorized

24    changes --

25    MR. MARTORANA:  Would you please give

720

29

1      M. FLEMING - Exam by Mr. Cahn

2      us the title?

3          MR. CAHN:  Authorized changes to security

4      instruments.

5          MR. MARTORANA:  Is it a Freddie Mac

6      document, or part of the Covington and Burling

7      memorandum?

8          MR. CAHN:  No, I said before it was

9      provided to me by Fannie Mae.  It's not one of

10     your documents.  It's not one of Freddie Mac's

11     documents.  It was a Fannie Mae production.

12     So I don't expect that this witness can --

13         MR. MARTORANA:  All right.

14         MR. CAHN:  All right.

15     Q   Did anybody -- Mr. Fleming, let's go back

16     to you.

17         Did anybody ever identify for you any

18     specific legal issues that might arise or had

19     arisen in New York State?

20         THE COURT REPORTER:  I'm sorry.  Anybody

21     ever identify for you any specific  -- that's

22     what I had.

23     Q   Any legal issues that had arisen or might

24     arise in New York State?

25     A   No.

721

30

M. FLEMING - Exam by Mr. Cahn

1

2      Q    Did anybody ever discuss with you the form

3    of the Mers' mortgage and how Mers should be

4    designated in that mortgage?

5      A    There is no Mers' mortgage.  To answer

6    your question, no.

7      Q    Okay.  Do you recall any discussions,

8    either in the MBA work group or on the board of

9    directors, regarding the decision to name Mers as

10   nominee for a mortgagee, that specific topic?

11     A    And the question was, was there

12   discussion?

13     Q    About that specific topic, yes.

14     A    Yes, yes, there was.

15     Q    In both the MBA group and the board of

16   directors?

17     A    No, simply in the board of directors.

18     Q    Tell me what the discussion was that

19   related to that in the board of directors?

20     A    Again, it dealt specifically with the

21   transfer of mortgage servicing rights and allowing

22   Mers to become the original mortgagee would

23   provide us another step up in efficiencies.  In

24   other words, would make the process more efficient

25   if we could allow Mers to become the original

SUPREME COURT REPORTERS, INC. (800) 765-0089

722

31

M. FLEMING - Exam by Mr. Cahn

1  

2   mortgagee, as a nominee for administrative

3   purposes, I think, is the way it's phrased.

4        MR. CAHN:  That's right.

5        Give me a moment, please.

6   Q   Do you recall any discussions about

7   whether -- withdrawn.

8        Do you recall any discussions about a

9   stage one and then a stage two plan for the

10  development of Mers as part of the Mers' business

11  plan?

12       THE WITNESS:  We had some transmission

13       problems.  Repeat the question.

14       MR. CAHN:  Yes.

15  Q   I wondered whether there were any

16  discussions of a so-called stage one, a tracking

17  system, and a stage two, a true book entry system?

18  Do you recall discussions about that?

19  A   Yes, I do.

20  Q   Tell me what you recall with those

21  discussions, please?

22  A   There was a possibility for Mers to become

23  a true book entry system, but that was dispensed

24  with very quickly.  It was not part of the

25  original mission, that was not part of the

SUPREME COURT REPORTERS, INC. (800) 765-0089

723

M. FLEMING - Exam by Mr. Cahn                    32

2    original idea from the MBA work group so that was

3    not anything that we pursued.

4        Q   So Mers never became, as far as you know,

5    a true book entry system?

6        A   I know for sure as ~~the~~ a director that Mers

7    did not and will not become a book entry system.

8        Q   What would be -- what would have been the

9    change had it become a book entry system, if you

10   know?

11       A   I'd have to recall.  Again, it was

12   something that we dispensed with.

13           It would, in very general terms, change

14   the way in which the note was handled and so

15   forth, and at this point in Mers' operations there

16   is no change to the way the note is handled,

17   before Mers or post Mers.

18       Q   So, Mers always remained as a tracking

19   system?

20       A   Yes, sir.

21       Q   Do you recall any discussions about any

22   issues relating to mortgage foreclosures in the

23   name of Mers being discussed in the board of

24   directors?

25       A   Yes, I recall, in general, some

724

33

M. FLEMING - Exam by Mr. Cahn

discussions about that.

Q    And what do you recall about those discussions, board of directors' discussions I assume?

A    Yes.  Yes.  And again, because it was board of director discussions, it was a high level discussion to make sure that foreclosures could proceed properly.

Q    Do you know, as a director of Mers, how much money Mers takes in through membership and servicing fees every year?

A    I could consult the audited financial statements and let you know.

MR. CAHN: All right.  Let me leave a blank space in this transcript for you to do that.

SPACE:  *The membership revenue for 2001 was approximately $502,000.00. There are no servicing fees charged or collected by MERS.*

Q    Do you have any general recollection of how much money is paid to Mers in servicing fees each year?

A    I'd be guessing.  I'd rather give you a very specific accurate answer.

Q    Is Mers today a profit-making corporation?

725

34

M. FLEMING - Exam by Mr. Cahn

1    Does it operate in the black, in other words?

2

3        A    On a monthly -- yes, on a monthly basis,

4    absolutely, yes.

5        Q    Okay.  And, has there been any discussion

6    about paying dividends to its members or

7    shareholders?

8        A    There was discussion a long time ago in

9    principle, but, in practice there has been no

10   discussion of that.

11       Q    Has that been ruled out or is that

12   something that you just haven't done yet?

13       A    That -- you know, let's put it this way:

14   The members of Mers joined Mers and have invested

15   in Mers for reason of the efficiencies that Mers

16   will provide them, and that doesn't directly apply

17   to Freddie Mac, it applies to the servicing

18   community.  It is, after all, a servicing problem.

19   So, that's what the members of Mers are interested

20   in, so, no, this discussion of dividends is

21   not something that has come up, nor do I really

22   anticipate it coming up.

23       Q    Let me ask you a couple of basic

24   questions.

25           Today, we're engaged in litigation, as you

726

## EXHIBIT V: REPRINT OF THE MERS WEBSITE AS OF OCTOBER 19, 2002

MERS Home Page

Page 1 of 1

# What's New

### Welcome to 

### What is MERS?

MERS was created by the real estate finance industry to eliminate the need to prepare and record assignments when trading mortgage loans.

### How does MERS work?

Our members record MERS as mortgagee as nominee for the lender in the county land records and electronically track changes in servicing and beneficial ownership rights over the life of the loan on the MERS® System.

### What is the MERS mission?

Our mission is to register every mortgage loan in the United States on the MERS® System.

Copyright© 2002 by MERSCORP, Inc. 1-800-646-MERS (6377)
Other products or company names are or may be trademarks
or registered trademarks and are the property of their respective holders.

# Exhibit D

*Appellate Division — Second Department Case No. 2004-04735*
*Supreme Court, Suffolk County Clerk's Index No. 01-9688*

# Court of Appeals

STATE OF NEW YORK



MERSCORP, INC. and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,

*Petitioners-Respondents,*

*against*

EDWARD P. ROMAINE, as Clerk of the County of Suffolk, State of New York and COUNTY OF SUFFOLK, STATE OF NEW YORK,

*Respondents-Appellants.*

## RECORD ON APPEAL
## VOLUME I OF III
## Pages 1 to 470

ELIOT SPITZER
*Attorney General of the*
*    State of New York*
300 Motor Parkway, Suite 205
Hauppauge, New York 11788
631-231-2191

CAHN & CAHN, LLP
*Attorneys for Respondents-Appellants*
445 Broadhollow Road, Suite 332
Melville, New York 11747
631-752-1600

HISCOCK & BARCLAY, LLP
*Attorneys for Petitioners-Respondents*
1100 M&T Center, 3 Fountain Plaza
Buffalo, New York 14203
716-856-5400

84

1   SUPREME COURT  :  STATE OF NEW YORK
    COUNTY OF SUFFOLK  :  TRIAL TERM PART 38
2   ----------------------------------------X
    MERSCORP, INC. and  MORTGAGE ELECTRONIC
3   REGISTRATION SYSTEMS, INC.,

4                          Petitioners

5                    -against-

6   EDWARD P. ROMAINE, as Clerk of the County    IND#01-9688
    of Suffolk, State of New York and
7   COUNTY OF SUFFOLK, STATE OF NEW YORK,

8                          Respondents.        Argument
    ----------------------------------------X
9                      May 15, 2001

10

11  B E F O R E:

12                     HON. JAMES M. CATTERSON, JUSTICE

13

14  A P P E A R A N C E S:

15

16               HISCOCK & BARCLAY
                    Attorney for petitioner
17                  50 Fountain Plaza
                    Buffalo, NY   14202-2291
18               BY:  CHARLES C. MARTORANA

19               CAHN WISHOD & KNAUER
                    Attorney for respondents
20                  425 Broad Hollow Rd.   Suite 315
                    Melville, NY   11747
21               BY:  RICHARD C. CAHN

22                        Diane Zegel
                          Official Court Reporter
23

24

25

85

2

```
 1
 2          THE COURT:  Good morning, gentlemen.  Mr.
 3    Martorana, how does MERSCORP make money?
 4          MR. MARTORANA:  Your Honor, MERSCORP is a
 5    company that is a stock company and it is held by
 6    stockholders, Federal National Mortgage
 7    Association--
 8          THE COURT:  I know what it is, that's not my
 9    question.  How does it make money?
10          MR. MARTORANA:  It makes money in several
11    ways.  One way, it has member lenders.  The
12    member lenders that participate in MERS, there
13    are approximately 240 and they pay a fee to MERS
14    to be a member.
15          In addition there is a transaction cost
16    where transactions are mortgages--residential
17    mortgage lending occurs and for those
18    transactions MERS is paid a fee of approximately
19    $3.00 for every one of those transactions.  As
20    part of that that then engages the registration
21    system which we have shown in our documents your
22    Honor, where there is a mortgage identification
23    number that is assigned by MERS.  It's sort of
24    like our social security numbers attached to each
25    one and then MERS does a registration from
```

86

3

1    there.

2        THE COURT:  They charge $3.00 per

3    transaction.  What's the sign up fee?

4        MR. MARTORANA:  The sign up fee to be a

5    member of MERS?

6        THE COURT:  Yes.

7        MR. MARTORANA:  I'm sorry, I don't know that

8    answer, your Honor.

9        THE COURT:  So what you're telling me is,

10   let me get this straight.  MERSCORP makes all of

11   its money based upon the $3.00 fee.

12       MR. MARTORANA:  There is a sign up fee.  I

13   could find that answer.

14       THE COURT:  Is it insignificant?

15       MR. MARTORANA:  I don't believe so.

16       THE COURT:  You don't believe it's

17   insignificant.  You believe it's substantial.

18       MR. MARTORANA:  No, I'm sorry.  I don't

19   believe it's a significant amount to sign up for

20   MERS.

21       If I may your Honor, MERS is a--where I was

22   going before, a form of utility.  Just like we

23   have electric utility, gas utility, but a form of

24   utility in the sense that it performs a service

25   for the mortgage lending industry and as such, it

87

4

1    is not designed to make big profits, it is there

2    to provide a service to the mortgage lending

3    industry.

4         THE COURT:  I appreciate that.  Of course

5    your definition of big profits and mine are

6    probably slightly different.  How many

7    transactions are done through MERSCORP on a

8    weekly basis let's say?

9         MR. MARTORANA:  MERSCORP operates on a

10   nation-wide basis and I'm sorry--

11        THE COURT:  They work on the same clock that

12   I do I think.  In any given week how many

13   transactions do they do?

14        MR. MARTORANA:  I know in for example

15   Suffolk County or New York County, New York

16   County would be a better one, where you have a

17   lot more.

18        THE COURT:  Let's do Suffolk County.  It's

19   the twelfth largest county in the United States.

20   It's bigger than probably a third of the states

21   in the union too.  So how many transactions do

22   you do a week in Suffolk County?

23        MR. MARTORANA:  It can vary anywhere between

24   20 and 30 a week.

25        THE COURT:  Why don't you explain to me how

88

5

1    this complies with the real property law in the

2    State of New York.

3         MR. MARTORANA:  Certainly, your Honor.  We

4    have a mortgage document.  The mortgage document

5    just like we've already been used to, is a

6    security instrument.  We also have a promissory

7    note which is the IOU that the borrower has when

8    he's buying a home or a refinancing a loan.  In

9    those situations the borrower signs the

10   promissory note and is making a pledge to the

11   lender that he will repay that note.

12        In addition, the borrower is making a

13   mortgage granting a security interest in the

14   borrower's property, usually the home and at that

15   time the borrower is granting certain rights to

16   the lender and in this case to MERS as well.  We

17   have a different situation than perhaps the

18   traditional mortgage.  In the MERS--

19        THE COURT:  I'm familiar with how mortgages

20   work.  I learned that in real property 101 in law

21   school.  That was quite some time ago now.  How

22   does it comply with New York law?

23        MR. MARTORANA:  Well your Honor, where I was

24   leading to if I may, is simply that in order to

25   get to the compliance point we have in essence a

89

6

1    conveyance, we have a conveyance of an interest

2    in real property.  So the borrower when he signs

3    that mortgage is conveying a security in his or

4    her property.  At the same time of that

5    conveyance there is identified two parties in the

6    mortgage as opposed to the traditional mortgage

7    that we both learned perhaps in law school and

8    earlier on and where the borrower is making the

9    conveyance, it is putting down in a document that

10   I if I may, as the borrower grant to MERSCORP and

11   to the lender certain rights in my property.  I'm

12   granting a security interest, the right to title

13   interest in the event that I should default.  I'm

14   granting the right to foreclose on me if I should

15   default and there are other remedies that are

16   available.

17        Those are given to both the lender and to

18   MERS as the mortgagee of record and MERS as the

19   nominee.  When that document is signed your

20   Honor, I submit to you and acknowledged by a

21   notary public with the property description, that

22   document when tendered with legal fees is a

23   conveyance no different than any other and is

24   entitled to be recorded in the county clerk's

25   office and that is occurring if I may your Honor,

90

7

1    in over 3,000 counties all across this country.

2        THE COURT:  That's largely irrelevant to me

3    what they do, let's just say in Orange County,

4    California or any other county other than those

5    in the State of New York.  I will again ask the

6    same question that I asked you before.  Tell me

7    how it complies with the real property law.

8    Simple question.  I haven't heard you mention the

9    real property law or one section of it yet.

10       In fact when I read your papers I didn't see

11   a single case cited with regard to the New York

12   State Real Property Law unless I missed it.

13       MR. MARTORANA:  Your Honor, we cited the

14   statute and in the statute of real property law--

15       THE COURT:  Tell me which one.  Surely this

16   can't come as a surprise.

17       MR. MARTORANA:  One moment, your Honor.

18       THE COURT:  Mr. Cahn, why don't you talk to

19   me about New York law.

20       MR. CAHN:  Well, we're dealing with sections

21   254, 316, 316-a and 321 of the real property law,

22   judge.  Each one of those sections deals with a

23   traditional century old definition of mortgagee

24   and the petitioner is trying to change that

25   definition unilaterally without benefit of

91

8

1   legislative endorsement to convert somebody into

2   a mortgagee who really expressly in these

3   documents has absolutely no interest in the loan

4   or in the property.

5        They are described every where as a mere

6   nominee to the lender and that is not something

7   that can be done consistent with the recording

8   and indexing statutes that require a Suffolk

9   County Clerk and all of the other county clerks

10  in New York State to record against the

11  mortgagees, not nominees for the mortgagees.

12       That's one of the main problems with this

13  whole system.  It conceals from the public record

14  if MERS has their way, the name of the actual

15  lender, the actual party having an interest, the

16  actual party whom the public and county clerks

17  and the courts for over 100 years have relied

18  upon as fitting the definition of mortgagee

19  because they have an interest in the property.

20       That's the problem.  That's one of the

21  problems with this.  Aside from the problem that

22  now if we get into satisfaction, we get into

23  foreclosure actions, we have a situation where

24  there has been a transparent attempt to separate

25  out the mortgage, some interest in the mortgage

92

9

1    for purposes of satisfaction, for purposes of

2    foreclosure, from an interest in the underlying

3    debt.  For 100 years the courts have said that

4    can't be done.  An attempt to transfer an

5    interest in the security without an interest in

6    the underlying obligation is a nullity and the

7    Attorney General of the State of New York, four

8    county attorneys so far now including our own

9    here in Suffolk County have opined that county

10   clerks may not accept these instruments for

11   recording or indexing and that's exactly what

12   this respondent has done.

13        He's followed the opinion of the attorney

14   general and the opinion of his own county

15   attorney and he's informed by the traditional

16   experience and custom and practice of all of the

17   county clerks in the State of New York who assume

18   that when a document says mortgagee, names a

19   party as a mortgagee, that that party is a real

20   mortgagee, not a party who says in the document

21   call me a mortgagee for purposes of the recording

22   statutes but I'm not really a mortgagee, I'm just

23   a lender.

24        Then of course we get into the other

25   problems of being a nominee not only for this

93

10

1    existing known lender but for that lender's

2    future unknown assigns and successors who aren't

3    in existence yet.  That can't be done either

4    because we have then a nominee that stands there

5    for all time acting not only for a disclosed

6    principal but for a whole succession of later

7    assignees as successor principals whose

8    identities are not disclosed to the public under

9    these recording statutes.

10        In fact, section 316 which is the key

11    statute in New York requires that there not only

12    be an index of mortgagors and mortgagees but also

13    that there be an index of assignees.  How can you

14    have an index of assignees when the assignments

15    are deliberately withheld from recording?

16    That's basically my answer to your Honor's

17    question.

18        MR. MARTORANA:  Your Honor, if I may.

19    Counsel has brought up the matter of the attorney

20    general opinion and the other counsels that have

21    reviewed that opinion.  This is a

22    misunderstanding from the very beginning.  The

23    attorney general's opinion does not say and I

24    challenge counsel to show where does it say, do

25    not record the mortgage with MERS as the

94

11

1    mortgagee.  The attorney general's opinion talks

2    about indexing.  That's what it's talking about

3    and I checked with counsel in various other

4    counties in New York, they have all concluded the

5    same thing except here in this county.  Even

6    Dutchess County which counsel for the respondents

7    have cited in his papers says very clearly record

8    the mortgages that MERS has presented.  That's

9    abundantly clear. When we talked with Jim Cole

10   the solicitor general for the attorney general he

11   had no problems with recording the mortgages.

12   His great concern and evidenced in the opinion,

13   was with regard to indexing.

14        If I may go back to my point your Honor

15   before, when I was talking before about

16   conveyance.  This is section 290, 291 of the real

17   property law.  Section 316 and 316-a that counsel

18   is citing we've also referred to.  316 your

19   Honor, speaks about indexing and indexing

20   mortgagors and mortgagees.  It doesn't talk about

21   indexing lenders.  It talks about mortgagees.  It

22   doesn't--

23        THE COURT:  How is your company a

24   mortgagee?

25        MR. MARTORANA:  These are rights your Honor,

95

12

1   that are accorded in a contractual document.  In

2   a mortgage--

3       THE COURT:  How does that make it a

4   mortgage?

5       MR. MARTORANA:  A borrower is granting a

6   security interest.  That's the fundamental

7   aspect--

8       THE COURT:  I'm familiar with what a

9   mortgage is.  My question to you is very simple.

10  How is MERSCORP a mortgagee?

11      MR. MARTORANA:  Your Honor, I'll extend back

12  to the statute which you asked me to reference

13  before in real property actions and proceedings

14  law which talks about discharges and actions

15  related to real property actions related to

16  mortgages in section 1921.  There is one of the

17  few statutory definitions of mortgagee and in

18  that definition your Honor if I may, means the

19  current holder of the mortgage of record or the

20  current holder of the mortgage or any person to

21  whom payments are required to be made or their

22  personal representatives, agents, successors or

23  assigns.  Agents is in there.  The conception of

24  a nominee is a very elastic concept, your Honor

25  and one which has been used throughout this

96

13

country.  We cited cases from various

jurisdictions including, your Honor--

THE COURT:  Mr. Martorana, I can only say

this one more time at the risk of sounding

parochial.  Don't tell me about case law in

Wyoming.  I don't care.

MR. MARTORANA:  I was about to cite case law

right here in New York State.

THE COURT:  Tell me about it.

MR. MARTORANA:  Dealing with the case of In

Re Cushman, citing a variety of cases around New

York State, in that case we have reference to in

contrast to counsel's opinion, counsel's papers

he talks about In Re Cushman Bakery does not

refer to mortgages, he talks about it being only

UCC type of documents and again I challenge him

because that case talks about mortgages in which

nominees were being identified as the lenders or

as the holders of that mortgage instrument.  That

was perfectly legitimate said the court.  That

went up to appeal to the Supreme Court of the

United States and was denied certiorari.

In that case your Honor, there were

citations to Amherst Factor v. Cockenberger, a

1958 case right here in New York State where

97

14

1   nominees were recognized as legitimate parties

2   who had an interest in lending instruments.

3   These are cases that do have a root in New York

4   State.

5       In addition your Honor, there is Stockbridge

6   Funding Corporation which is a 1992 bankruptcy

7   case right here from the Southern District of New

8   York in which the court was talking about not

9   recording assignments of mortgage, although the

10  document may be recordable, the fact is it

11  doesn't need to be recorded and once you have

12  established the mortgage on record, nobody is

13  challenging that.  We followed that all the way.

14  We put the mortgage on record, it establishes the

15  lien or encumbrance to the property.

16      We know the secondary mortgage market

17  operates in a very fast method and the mortgages,

18  really the note and mortgage is a building block

19  or unit within the secondary mortgage market.

20  They are bought and sold from all over the

21  country and we also know that there are

22  situations where the mortgage lender may hold the

23  document but sell the servicing rights to a

24  different company.  So I could receive a notice

25  that is not recorded in the county clerk's which

98

15

1   tells me to make my payments to some entity in

2   California and that's where my payments are

3   supposed to go.  There may not be an assignment

4   on record in the county clerk's office.  If I

5   don't make my payments, I will receive notices

6   that I'm in default and if I continue not to, I

7   will receive--

8       THE COURT:  Who commences the foreclosure?

9       MR. MARTORANA:  If you have MERS as the

10  mortgagee, MERS has commenced foreclosure actions

11  as the nominee for a given lender and that has

12  not been challenged in New York State, your

13  Honor.  We have done this on numerous occasions.

14  When a member lender, one of those 240 that I

15  mentioned decides that's not going to--the loan

16  will be assigned to a lender that is outside of

17  the MERS system, that then will involve an

18  assignment out of that MERS system to that given

19  mortgage and then we'll record it in the county

20  clerk's office but in the interim for those

21  member lenders there is no obligation to record

22  that assignment in the county clerk's office.

23      Again your Honor, I return to the attorney

24  general's opinion which begins with a faulty

25  legal conclusion.  It goes from there to the

99

16

1    point of saying that indexing is what it's

2    concerned about but the faulty legal conclusion

3    is that there is no legitimate interest in the

4    mortgage and that's nonsense, your Honor.  Right

5    in the document, in the mortgage instrument there

6    are rights that are granted by the borrower and

7    we have had mortgages as you know where the

8    borrower is the only person that signs that

9    document.  When the lender accepts that document

10   and records it that constitutes the security

11   interest.

12        Title insurance companies all across the

13   country have been insuring that as a valid lien.

14   If I may, what this county clerk has done is

15   thrown that entire process which has been working

16   fine into chaos by using a name that says MERS is

17   designating itself as the mortgagee.  MERS is now

18   infusing itself.  That's not the case at all.

19   The lender is the one that is saying I want you

20   to have MERS identified on that mortgage.

21        This document has been accepted by Fannie

22   Mae and Freddie Mac as a uniform instrument in

23   New York State as well as all the other states.

24        THE COURT:  Of course it's not Fannie Mae or

25   Freddie Mac or any of your lenders'

100

17

1    responsibility to keep the records in the County

2    of Suffolk, is it.  They don't care.

3          MR. MARTORANA:  They do care, your Honor.

4          THE COURT:  This has been troubling me since

5    I looked at your Web site.  The internet is a

6    wonderful thing by the way.  If you look around

7    you'll see art work mostly dealing with the civil

8    war.  Goes back to the 1860s.  How long has the

9    Suffolk County Clerk been in existence, Mr. Cahn?

10         MR. CAHN:  Since I think 1803.

11         THE COURT:  All right.  I currently have in

12   front of me a case involving the town of

13   Huntington in six separate civil actions that go

14   back to 1960 involving title to 100 some odd

15   acres which is now probably worth ten to 40

16   million dollars.  It involves an examination of

17   title to those properties that go all the way

18   back to the Donlon patent, the Fletcher patent

19   and the indian deeds.  What troubles me is what

20   possible guarantee is there in the security and

21   permanency of your record keeping system?  When I

22   look around me I know that if I walk into the

23   Suffolk County Clerk's office I can pull out

24   deeds to property that predate any of the people

25   in this room with no trouble whatsoever.  They

**101**

18

1    don't charge me either, but I can walk across the

2    river and look at any single document and analyze

3    a chain of title for any piece of property in the

4    County of Suffolk, although that has proven

5    somewhat troublesome in my town of Huntington

6    case.   I wish it was that clear sometimes, but

7    what guarantee of permanency is there in your

8    private recording system?

9         MR. MARTORANA:  Your Honor, first of all, I

10   would say it is not a private recording system.

11   Counsel for respondents have tried to

12   characterize it as such and I--

13        THE COURT:  Let's clear that up first.  I

14   asked you at the beginning who makes money on

15   this?  I asked that for a reason.  I didn't have

16   a general interest and I don't own any stock, I'm

17   not playing it in the market this morning, I'm

18   not doing any day trading on MERSCORP I assure

19   you.  I asked that question for a reason.

20   MERSCORP makes money, does it not?

21        MR. MARTORANA:  Like any business, yes, your

22   Honor.

23        THE COURT:  I don't own it.

24        MR. MARTORANA:  As does the county clerk who

25   receives fees for what he does.

102

19

1    THE COURT:  Don't you think that's a bit

2    disingenuous to suggest that the county clerk is

3    a profit-making institution and MERSCORP is not?

4        MR. MARTORANA:  I'm not suggesting that.

5        THE COURT:  That analogy was let's just say

6    useless.

7        MR. MARTORANA:  Your Honor, the county

8    clerk--

9        THE COURT:  If I could just finish.

10        MR. MARTORANA:  He receives fees.

11        THE COURT:  Somebody has to pay all those

12    good people who maintain records, somebody has to

13    turn on the lights, pay the heating bill,

14    somebody has to maintain the buildings to put the

15    records in.  Sometimes they don't and the records

16    go to hell but the bottom line is the money is

17    not profit making, the money is part of the

18    legislature's taxation scheme to make the

19    government run.  Your commenting on that doesn't

20    help this discussion.

21        My question to you is what happens, what is

22    the guarantee of your private recording system?

23    Because the only thing that's recorded over in

24    the clerk's office is MERSCORP and some number

25    and your response, at least you put in your

103

20

1    papers a good 15 to 20 times, you can pick up the

2    phone and call the toll free number. What happens

3    when you call the toll free number and nobody

4    answers?

5         MR. MARTORANA:   MERS has an address, it is

6    laid out in the mortgage.

7         THE COURT:  What is the guarantee of

8    permanence?

9         MR. MARTORANA:  The guarantee of permanence

10   your Honor is--

11        THE COURT:  Profit.

12        MR. MARTORANA:  Your Honor, MERSCORP is a

13   stock corporation.  I am not saying otherwise.

14   It is there in business and it serves the

15   mortgage lending industry.  The mortgage lending

16   industry has investigators to make sure that MERS

17   stays in business and provides this service to it

18   and we have found the title insurance companies,

19   the mortgage industry and a variety of

20   situations, Fannie Mae, Freddie Mac, major large

21   corporations in this country that all have a

22   strong interest in MERS staying in business.  We

23   have created it as well by way of the electronic

24   registration system in a bankruptcy, a remote

25   situation where there is virtually no chance that

104

21

1    that company will go bankrupt.

2         If I may your Honor, I appreciate what

3    you're asking but permanence is always something

4    that we seek.  The United States is a little over

5    200 years old but you know Rome was around for a

6    thousand years and it went out of business

7    so-to-speak.

8         THE COURT:  Mr. Martorana, my concerns are

9    far more plebeian than the Roman empire.  I have

10   around me over 200 years of history.  I'm asking

11   you a simple question.  What's the guarantee of

12   permanence in your private recording system?  All

13   I'm getting is we spend a lot of money so we can

14   make money.

15        MR. MARTORANA:  In addition your Honor, we

16   not only just spend a lot of money but go to

17   great pains to establish just like any other

18   business entity recording systems, maintenance of

19   documents, computerization of records that are

20   then backlogged and set up so that they're

21   preserved in discs and safeguarded for the next

22   day and so if there are computer crashes or

23   problems with the computer system it always has a

24   backup.  It always has security.  We've submitted

25   your Honor, an affidavit from the person in

22

1    charge of security in the company.  In that

2    affidavit he details the security measures that

3    they have taken including a variety of spots

4    around the country.

5        THE COURT:  I'm sure your records are far

6    more secure than the county clerk's.  My question

7    is permanency.

8        MR. MARTORANA:  Your Honor, MERS is a

9    corporation like other corporations.  It is

10    there.  It can be--it can last forever.  It has

11    perpetual duration.  It can also be merged and

12    modified just like any other.  Similarly your

13    Honor, there are municipalities that contemplate

14    mergers with each other.

15        THE COURT:  That of course is why we have a

16    legislature and the people are entitled to vote

17    on that.  I get no vote in MERS's business.

18    Neither does anybody else in this courtroom.

19        MR. MARTORANA:  The member lenders your

20    Honor, are not insignificant parties, they are

21    over 240 and growing.  We are talking Citibank,

22    Chase, we're talking about Key Bank. Major

23    lenders all across the country.

24        THE COURT:  You suggest that such weighty

25    issues of safeguarding the records in the County

106

23

1    of Suffolk should be entrusted to your not

2    insignificant parties, the banks.

3        MR. MARTORANA:  May I respond your Honor,

4    about the accuracy and safety of the records that

5    you're referring to.

6        THE COURT:  I accept the fact that you have

7    good record keeping.

8        MR. MARTORANA:  I'm not talking about us,

9    I'm talking about the county clerk.  At the time

10   that a conveyance is booked, again we have the

11   note, we have the mortgage.  The mortgage gets

12   recorded.  There is absolutely no question about

13   the recording of that mortgage.  That--

14       THE COURT:  Of the original mortgage.

15       MR. MARTORANA:  Yes, sir.  That goes into

16   the county clerk's records, the fee is paid and

17   it is part of the loan transaction.  The title

18   insurance company industry issues a policy to

19   insure the priority of that lien, identifies MERS

20   as the mortgagee of record and we then have a

21   document that stays on the system.  That is no

22   different your Honor than a lender coming on and

23   saying I am, for example Key Bank and I put a

24   mortgage on record.  What happens if Key Bank

25   merges or goes out of business.

107

24

1      Several years ago your Honor I worked on

2   behalf of the Federal Deposit Insurance

3   Corporation where a major lender in New York

4   State was undone and liquidated its assets.  All

5   of the assets were spread around.  They held

6   millions of notes and mortgages.  They had to be

7   transferred, boxed--

8      THE COURT:  And such assignments and

9   transfers were recorded in the respective county

10  clerks, were they not?

11     MR. MARTORANA:  That's correct, your Honor,

12  however that was pre MERS as far as what happened

13  with that particular situation.  What I'm getting

14  to is that we have, you're asking about the

15  permanence of these records.  The record keeping

16  is there.  MERS has an excellent system.  The

17  mortgage identification number has been

18  acknowledged as a key--

19     THE COURT:  By whom?

20     MR. MARTORANA:  I was getting there, your

21  Honor.  The counsel for the American Land Title

22  Association, James Mar, I have the original

23  affidavit which we faxed to you and we faxed to

24  counsel, in which he talks about the MERS system

25  helping the title insurance industry to be able

108

25

1    to identify who is the current servicer of this

2    mortgage via the mortgage identification number

3    and that 800 number that you talked about.

4         THE COURT:  Mr. Martorana, I have no doubt

5    that your system helps your clients.  I have no

6    doubt about.

7         MR. MARTORANA:  All we are asking is that

8    this system be allowed to stay in place, your

9    Honor, whereas Mr. Romaine is throwing this into

10   chaos.

11        THE COURT:  That's because Mr. Romaine's

12   primary consideration is not the financial

13   well-being of your lenders.  It's just not.  I

14   hate to break the news, I'm sure it's been

15   apparent through Mr. Cahn's papers, it's not his

16   main concern.  His concern is that enunciated by

17   the state legislature in the real property law

18   and has been the same I would suggest, if you

19   back through the annotations, through the field

20   code.

21        MR. MARTORANA:  Your Honor, I understand.

22   What right does Ed Romaine have to tell my client

23   they will not accept your mortgage when this

24   document on its face is a conveyance, a borrower

25   grants a security interest to a lender.  The

109

26

1    lender identifies a nominee to act on its behalf

2    throughout the life of the loan.  The borrower

3    signs it.

4        THE COURT:  I heard you the first three

5    times you went through it.  The right he has is

6    that he is the county clerk.  It's his job to

7    accept instruments for filing that comply with

8    the real property law.  He seeks advice from the

9    county attorney or the state attorney general.

10   He then acts in conformity with that advice.

11   That's his right.

12       MR. MARTORANA:  I appreciate

13   that. Mr. Cimino, the county attorney in his

14   letter cited by counsel for the respondents of

15   April 19, 2000 says the clerk is without

16   authority to refuse for filing documents by a

17   party who in his opinion is not a proper party

18   for purposes of filing.  That's there.  That was

19   an opinion rendered by the county attorney.  Now

20   subsequently they receive an opinion from the

21   attorney general that talks about indexing.

22       THE COURT:  Which you disagree with.

23       MR. MARTORANA:  Not only that we believe it

24   was faulty, had no, there is no reference in the

25   attorney general's opinion your Honor to anything

110

27

1    dealing with the mortgage instrument, the

2    contractual analysis--

3         THE COURT:  Have you convinced them to

4    withdraw their opinion yet?

5         MR. MARTORANA:  We have talked to them and

6    your Honor, they are saying that it's only an

7    informal advisory opinion, county attorneys can

8    do whatever they wish with it.

9         THE COURT:  So the answer then would be no.

10        MR. MARTORANA:  Yes, your Honor.  So far, no

11   and we were advised that from the attorney

12   general's office either you have the county

13   attorney request an amendment or modification and

14   clarification which Mr. Cimino told us he would

15   not do or we go to court and therefore your

16   Honor, that's why we were in court before Judge

17   Bivona to get a temporary restraining order and

18   of necessity Judge Bivona listened to an hour and

19   a half of oral argument with Ted Sklar the county

20   attorney there on notice with the papers engaging

21   in the argument.

22        When we went through it, the judge found

23   that there was a substantial likelihood of

24   success, that our client was being irreparably

25   harmed and as a result of that--and particularly

111

28

1   the judge looked at the fact that--

2       THE COURT: Are you suggesting I'm bound by

3   that?

4       MR. MARTORANA: Your Honor, all I'm saying

5   is that--

6       THE COURT: Simple question, Mr. Martorana.

7       MR. MARTORANA: No, you're not bound, your

8   Honor. This is with regard to the preliminary

9   injunction which we are here respectfully asking

10  that you grant us to maintain the status quo to

11  permit us to work out through the procedure of a

12  declaratory judgment, through the procedure of an

13  Article 78 and possibly get us time to go back to

14  the attorney general to seek some further

15  clarification of his opinion.

16      Your Honor, we have counties all across the

17  State of New York that are accepting every day

18  MERS mortgages. To deny us this preliminary

19  injunction I respectfully submit will put chaos

20  where order currently exists and I don't believe

21  the harm that the respondents have suggested,

22  somehow tainting the record system, that's not

23  there. There is always a mortgage. The lien is

24  established. The only question becomes on the

25  recording of assignments going forward and we can

112

29

1    deal with that.

2        THE COURT:  This is largely sophistry for

3    you to say there is always a mortgage because the

4    only mortgage that's there is MERSCORP as the

5    only recorded reference is MERSCORP.  Should

6    MERSCORP go out of business tomorrow, the records

7    are worthless.

8        MR. MARTORANA:  What do we do if the lender

9    goes out of business, your Honor?

10        THE COURT:  Ultimately it get bought up and

11    somebody else's assignment is put on record.

12        MR. MARTORANA:  In the same situation your

13    Honor, Fannie Mae, Freddie Mac, major

14    institutions that are arranging for the sale and

15    purchase of millions of dollars of mortgage-

16    backed securities in this country, it's

17    interstate commerce, it's the life blood of

18    securities industries, all founded on this little

19    note and mortgage.

20        THE COURT:  But the difference Mr.

21    Martorana, is if the lender goes out of business

22    it's the lender's asset that is at issue.  That

23    being the mortgage.  It's the lender's problem.

24    It's not the consumer's problem, it's not the

25    citizen's problem, it's the lender's assets.

113

30

1    Here you're not talking about assets, you're

2    talking about information.

3        MR. MARTORANA:  Your Honor, I respectfully

4    disagree.  It is the lender's asset and MERS is

5    acting as its agent and nominee to facilitate

6    that lender.

7        THE COURT:  I understand that.

8        MR. MARTORANA:  In the transfer.

9        THE COURT:  I understand that.

10        MR. MARTORANA:  MERS has an interest then.

11        THE COURT:  Mr. Martorana, if MERS goes out

12    of business tomorrow, what happens?

13        MR. MARTORANA:  Fannie Mae, Freddie Mac,

14    Gunnies Mae, Mortgage Banker's Association,

15    American Land Title--

16        THE COURT:  All rush to the county clerk's

17    office.

18        MR. MARTORANA:  They rush to restore the

19    mortgage electronic system because it is so vital

20    for their business going forward.  There is--I

21    just don't foresee your Honor, how MERS is going

22    to go out of business.

23        THE COURT:  That's not my question.

24        MR. MARTORANA:  Why would--you're asking me

25    to give you guarantees that MERS is not going to

114

31

1   go out of business.  We have lenders that stay in

2   business for hundreds of years and then after

3   hundreds of years they are merged, they go out of

4   business.  I've witnessed this myself.  Land gets

5   destroyed, fires occurs, microfiche gets

6   destroyed.

7       THE COURT:  We do our best to not let that

8   happen.

9       MR. MARTORANA:  I can say the same.  MERS

10  does its best and then some of staying in

11  business and preserving its assets and its

12  records and doing everything it can.

13      In addition it has big brothers and sisters

14  so-to-speak by way of Fannie Mae, Freddie Mac,

15  ready to assist to be sure that MERS stays in

16  business.

17      THE COURT:  Mr. Martorana, how long has the

18  New York Stock Exchange been in business?

19      MR. MARTORANA:  I assume over 100 years,

20  your Honor.

21      THE COURT:  If I go back to the first

22  listings of the New York State Stock Exchange and

23  I cross index those with the records of the

24  secretary of state I'm willing to bet you the

25  outcome of this case that a mere fraction of

115

32

1    those businesses originally listed on the New

2    York Stock Exchange or incorporated in the State

3    of New York exist today.  Would you like to take

4    that bet?

5        MR. MARTORANA:  Your Honor, I'm not

6    interested in betting with you.

7        THE COURT:  I didn't think so.

8        MR. MARTORANA:  I understand what you're

9    saying.  When you go back to the mortgage though

10   your Honor, we always have an identification of a

11   lender.  Which is I think one of your concerns.

12       THE COURT:  No, you don't.  All you have is

13   an identification.  MERSCORP.  That's all you

14   have.

15       MR. MARTORANA:  But the document identifies

16   a lender.  It is how it is indexed.

17       THE COURT:  Anything else you wish to add?

18       MR. MARTORANA:  Yes, your Honor if I may.

19       THE COURT:  You may, Mr. Martorana.

20       MR. MARTORANA:  Our client has developed a

21   business which is assisting mortgage lenders

22   around the country.  Mortgage lenders have

23   invested substantially in computer programs,

24   software to develop mortgages that can be used

25   nationwide, not just in one county, not just in

116

33

1    one state, on a nationwide basis.

2        The mortgage lending business is a

3    nationwide business and our client has a variety

4    of relationships with all of these mortgage

5    lenders, servicing company, secondary mortgage

6    market that promotes the purchase and sale of

7    mortgage-backed securities around the country.

8    Consumers depend on the certainty of being able

9    to go to a bank or to a title company to close

10   their deal.

11       THE COURT:  Mr. Martorana, I don't need the

12   speech, I got the speech in your papers.  If you

13   have something else you feel is imperative to add

14   I'll happy to listen.  I don't need the speech

15   all over again.

16       MR. MARTORANA:  Your Honor, I'm not here to

17   make speeches.  I was attempting to make the

18   point simply that the irreparable harm that would

19   befall our client is not just financial.  This is

20   a huge matter for our client to be able to do

21   business in Suffolk County as well as all the

22   counties of New York State and other counties in

23   New York State have had no problem using MERS

24   even though the attorney general has rendered an

25   opinion which you obviously know we think is

117

34

1   faulty.

2        The State of New York Mortgage Agency has

3   willingly signed on to allow MERS to participate

4   in their mortgages.  The State of New York

5   Mortgage Agency and title companies are all

6   depending upon the validity of these MERS

7   mortgages not only prospectively but now if I may

8   your Honor, retroactively, there are thousands of

9   mortgages that have been recorded in the county

10  clerk's office.

11       THE COURT:  I have already encountered them

12  in the context of foreclosures.

13       MR. MARTORANA:  The title insurance

14  companies have issued policies wherein MERS is

15  identified as the mortgagee of record and wherein

16  that lien has been said to be a valid lien and I

17  can't stress enough your Honor, the irreparable

18  harm that would befall our client as well as all

19  of those persons, mortgage lenders, title

20  insurance companies, consumers that are depending

21  on reliable mortgages and your Honor, they are

22  reliable.

23       THE COURT:  Thank you.

24       Mr. Cahn, is there anything you feel

25  compelled to add?

118

35

1          MR. CAHN:  I'll be brief.  I principally

2     wish to take my time in oral argument to ask your

3     Honor to vacate the temporary restraining order.

4     In point one of our brief we point out that if

5     the respondent's duty is ministerial, then the

6     right to have an order in the nature of mandamus

7     to compel can only be granted by this court

8     against the county clerk if there is a clear

9     legal right to the requested relief and if the

10    right that the petitioner seeks is not clouded by

11    reasonable doubt or controversy and that's based

12    upon a New York Court of Appeals case that we

13    cite.

14         In this case there is no clear legal right

15    to relief.  The attorney general, four county

16    attorneys have rendered opinions and Mr. Romaine

17    has followed the attorney general's opinion and

18    the opinion of the Suffolk County Attorney.

19    There is clearly no clear legal right to relief

20    where the petitioners are seeking to change

21    unilaterally without benefit of legislative

22    blessing the century old or more system of land

23    recording under the New York statutes.  They are

24    presenting documents for recording that can be

25    charitably described as clouding title issues to

119

36

1    real property which the recording statutes are

2    intended to clarify.

3        They have inflicted that harm upon

4    themselves by presenting such a document.  These

5    documents could have been presented by lenders,

6    recorded in the traditional fashion, MERS could

7    then have privately taken a nominee and worked

8    out their own system if they had wanted to but

9    they still would have had an appropriate public

10   record and the county clerk would not have been

11   implicated.

12       Their system may be a wonderful system, I

13   don't know.  In the days in the 21st century with

14   electronic filing and so forth in many courts

15   that may be the wave of the future but it is not

16   for a private entity, a profit-making entity as

17   Mr. Martorana has conceded to dictate to the

18   State of New York what its public policy should

19   be or unilaterally change its statutes, its

20   recording statutes.  We feel that if any relief

21   is to be granted here, it should be in the nature

22   of legislative relief.

23       If the petitioners are not satisfied with

24   that, let the Article 78 portion of this hybrid

25   proceeding be dismissed and let the declaratory

120

37

1    judgment action proceed to an orderly

2    determination as to whether these mortgages are

3    appropriate or not appropriate.  That's what

4    should happen here.

5        Parenthetically, since Mr. Martorana has

6    mentioned something that is not really in the

7    record although I must say it is in response to

8    your Honor's question, I also talked to James

9    Cole of the attorney general's office and asked

10   him if he was asked to change his opinion and he

11   confirmed that he was and he confirmed that he

12   had not elected to change his opinion because he

13   felt that the arguments asserted by

14   Mr. Martorana's clients, it's unclear to me

15   whether it was Mr. Martorana himself who had the

16   telephone conversation, were unpersuasive and the

17   attorney general adheres to his opinion as does

18   the Suffolk County Attorney.

19       Under all of these circumstances we think

20   there is no warrant to continue this temporary

21   restraining order, there are other remedies,

22   legislative and even a declaratory judgment

23   action if the petitioners want to proceed with

24   that that can be pursued.  There is no

25   irreparable harm, the balance of the equities

38

1    does not tip toward the petitioners.

2           We've had 150 or 200 years of recording

3    under the statutes.  It's hard to see how

4    something coming in in the last three years by

5    private parties without legislative sanction is

6    going to change the equity so dramatically that

7    the court is justified in continuing a temporary

8    restraining order.  We are very, very concerned

9    about clouding the records.  There is a very

10   comprehensive and very persuasive in my opinion,

11   affidavit by Karen Murphy the County Clerk of

12   Nassau County in which she details the problems

13   that she sees and has experienced as county clerk

14   with MERS mortgages.  Your Honor has stated that

15   you have had a mortgage, some exposure to MERS as

16   a mortgagee.  There are a million hidden problems

17   here that legislative hearings and testimony

18   before our elected legislators might cure some

19   time but not in this court, not on the basis of a

20   submission of affidavits by interested parties

21   who have a fingers interest and who seek to

22   change the established way of doing things.

23          One further comment, judge.  Your Honor

24   quite properly asked Mr. Martorana about the

25   financial permanence of the petitioners.  Some of

122

39

1    the papers which I finally got to read that they

2    attempted to belatedly submit which I still

3    object to--

4         THE COURT:  I haven't read the belated

5    submissions.

6         MR. CAHN:  Fine.  I won't comment on it.  I

7    would say this.  Based upon the records.  If you

8    get a National Bank of North America or a

9    Franklin National Bank going into liquidation you

10   have the FDIC, the of FSLIC, you have a whole

11   host of federal and state regulatory agencies

12   which are there, not private investors, profit

13   making corporations that say that they will be

14   parents looking over the shoulder of this junior

15   corporation and come to its rescue.  We don't

16   know that.  The public is not required to rely

17   upon that.  The public relies upon its government

18   to do the task among others of protecting its

19   records and protecting the rights, the financial

20   interests and the property of its citizens.  That

21   is what the respondent Ed Romaine has done.

22        He has at all stages of this dispute

23   followed the pertinent legal opinions that have

24   been given to him, he has acted fully in good

25   faith to preservative the system under the

123

40

1  recording statutes and I respectfully request

2  that the temporary restraining order which I

3  believe was improvidently granted by the special

4  term part two judge be vacated.  Thank you very

5  much.

6      THE COURT:  Anything you feel compelled to

7  add, Mr. Martorana?

8      MR. MARTORANA:  With respect to the

9  irreparable harm, your Honor in the Carls Manor

10  case we cited in our memo of law, an ordinance

11  issued by a municipality that would have the

12  effect of making it more difficult for patrons to

13  go to a restaurant thereby depriving that owner

14  of his ability to stay in business, was a basis

15  to grant not only the TRO but also the

16  preliminary injunction to restrain.

17      THE COURT:  Mr. Martorana, the Court of

18  Appeals has told me--not to be redundant here but

19  the Court of Appeals has made it plain that you

20  need to establish a clear legal right for me to

21  order the county clerk to do anything that's

22  within his ministerial capacity to do or not do.

23      Now, having read the four inches of paper as

24  well as listen to you all, I can't say that you

25  have a clear legal right to this.  I'm willing to

124

41

1    hold a hearing and I'm willing to listen to

2    whatever you want to put on the record to make a

3    decision on this and to write a decision in an

4    orderly fashion on what I assume ultimately will

5    be your declaratory judgment action and I'm sure

6    I will not have the last word on this either.

7    I'm sure this will be decided by either the

8    Second Department or the Court of Appeals if it's

9    worth that much money to you but as we stand now

10   I see no clear legal right, neither did the

11   attorney general, regardless of whether or not

12   you agree or disagree and neither did four county

13   attorneys.  Again, regardless of whether you

14   agree or disagree.

15       You can point to no single case in the State

16   of New York which will allow your instruments to

17   be recorded that is clearly on point.  You give

18   an awkward construction to the phrase mortgagee

19   that I find largely unsupported in the State of

20   New York.

21       Therefore I am going to vacate the TRO.  I

22   assume that you'd like it converted to a

23   declaratory judgment action and we should set

24   down a schedule and you can work that out with my

25   clerk.  That constitutes my order.  Order a copy

125

42

1   of the transcript of the order and file it with

2   the county clerk.

3          MR. CAHN:  Thank you very much, judge.  Just

4   a ministerial thing on my part.  We discussed

5   some typographical errors in the memorandum of

6   law. May we have the opportunity to just--

7          THE COURT:  Submit an errata.

8          MR. CAHN:  Yes.  We'll do that and we'll

9   send it to Mr. Martorana.

10         MR. MARTORANA:  May I respectfully request

11  in light of your order from the bench, would it

12  be possible to obtain a stay of your order on

13  your own pending our ability to put together an

14  appeal of this order?

15         THE COURT:  Of course the stay of my order

16  would have the same effect as continuing the

17  temporary restraining order.  So if I wanted to

18  do that, I would have continued the TRO.

19         MR. MARTORANA:  We're only asking for a

20  short period.

21         THE COURT:  Until I get a decision done on

22  the declaratory judgment. I would prefer to have

23  a full and fair hearing on it, analyze all of the

24  authorities you cite.  You can put on whatever

25  witnesses you like.  If you can show a clearly

126

MAY-23-2001  10:04                                                    P.02/02

43

1   established right, then you'll get a decision.

2       What you want me to do is suspend the

3   statutory scheme that the clerk has been

4   following for the better part of 200 years for

5   your clients.  I'm not prepared to do that based

6   upon your construction of the word mortgagee.  So

7   the answer is no.  Of course you can always

8   disagree with me and head to the river.

9       MR. CAHN:  Thank you very much, your Honor.

10                      ---ooOoo---

11   I hereby certify that the foregoing is a true and correct

12   transcript.  *Diane Zegel*  5/17/01

13

14

15

16

17       *Signed* 5/22/01   **SO ORDERED**

18

19

                                    JAMES M. CATTERSON

COUNTY CLERK'S OFFICE
STATE OF NEW YORK        SS.:
COUNTY OF SUFFOLK
    I, EDWARD P. ROMAINE, Clerk of
the Court of Record thereof, do hereby certif
annexed with the original *So. ordered*
office *May 22, 2001*
copy thereof, and of the whole of such origin
    In Testimony Whereof, I have hereunto set my hand and affixe
the seal of said County and Court this *22* *May 2001*
                                *Edward P. Romaine*  Clerk.

Form No. 236                              12-182..12/89cs

# Exhibit E

**MERSCORP, INC.**
**RULES OF MEMBERSHIP**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **RULE 1** | **MEMBERSHIP** | **Page 2** |
| **RULE 2** | **REGISTRATION ON THE MERS® SYSTEM** | **Page 8** |
| **RULE 3** | **OBLIGATIONS OF MERS** | **Page 15** |
| **RULE 4** | **RULE CHANGES** | **Page 18** |
| **RULE 5** | **FEES** | **Page 20** |
| **RULE 6** | **PROCEDURES** | **Page 23** |
| **RULE 7** | **DISCIPLINARY ACTIONS** | **Page 24** |
| **RULE 8** | **FORECLOSURE** | **Page 26** |
| **RULE 9** | **USE AND OWNERSHIP OF INFORMATION** | **Page 29** |
| **RULE 10** | **INTERIM SECURITY INTERESTS** | **Page 33** |
| **RULE 11** | **SERVICES** | **Page 34** |
| **RULE 12** | **WARRANTIES** | **Page 35** |
| **RULE 13** | **INDEMNIFICATION** | **Page 39** |
| **RULE 14** | **NOTIFICATION TO MERS OF PENDING LAWSUITS** | **Page 41** |

# RULE 1

## MEMBERSHIP

*Section 1.*    MERSCORP, Inc. ("MERS") shall make the services of its mortgage electronic registration system (the "MERS® System") available to any Member of MERS. A Member is defined as an organization or natural person who has signed a Membership Agreement and is not more than 60 days past due as to the payment of any fees due and owing to MERS.

*Section 2.*    Actions with respect to approval or disapproval of applications for membership shall be taken on behalf of MERS by such persons as may from time to time be designated by the Board of Directors of MERS. Subject to Section 3 of this Rule, no applicant shall be approved unless it meets each of the standards of financial condition, operational capability and character defined below:

(a) If the applicant anticipates registering transactions on the MERS® System, the applicant has demonstrated to the satisfaction of MERS that it has adequate personnel capable of registering transactions on the MERS® System with necessary promptness and accuracy, that such personnel shall complete the computer-based training program designated by MERS, and that the applicant has internal security procedures in place to conform to any condition and requirement which MERS reasonably deems necessary for its protection and the protection of other Members:

(b) MERS has received no information which, in the sole discretion of MERS, would adversely reflect on the applicant, or any person associated with the applicant as defined in Section 3 below, to such extent that access of the applicant to the MERS® System should be denied, and any such applicant may be deemed not to meet the qualifications set forth in this paragraph only if:

(i) MERS shall have reasonable grounds to believe that the applicant, or any person associated with the applicant, has been or is responsible for (A) fraud, fraudulent acts or breach of fiduciary duty, (B) making a misstatement of a material fact or omitting to state a material fact to MERS in connection with its application to become a Member, or thereafter while a Member, or (C) the violation of such statutes, rules and regulations applicable to the applicant.

(ii) the applicant, or any person associated with the applicant, has been convicted prior to the filing of its application to become a Member, or at any time thereafter while a Member, of any crime, felony or misdemeanor which involves the purchase, sale or pledge of a mortgage loan or any interest therein or arose out of conduct of the business of funding, acquiring, lending on the security of, or servicing mortgage loans (or any business ancillary or related to any of the foregoing), or involves robbery, larceny, embezzlement, fraudulent conversion, forgery or misappropriation of funds or other property, or other dishonest acts; or

(iii) the applicant has been, or while a Member is, prohibited from transacting business with one or more of the following:     (A) Fannie Mae, (B) Freddie Mac, (C) Ginnie Mae, (D) the U.S. Department of Housing and Urban Development, or (E) the U.S. Department of Veterans Affairs; provided, however, that such prohibition shall not be the sole basis for denial of membership.

(c)    Eligible organizations and natural persons seeking to become Members shall make application on such form as MERS shall from time to time prescribe.    In connection with its application, an applicant shall submit its audited financial statements for its two most recent fiscal years.    MERS shall review the application to verify that the applicant satisfies all of the standards for membership, and in connection therewith the applicant shall make available to MERS such books and records and shall provide such other information as MERS shall reasonably request for such purpose.    Failure of an applicant to cooperate in providing requested books, records, and information shall be grounds for denial of the application for membership.

*Section 3.*    MERS may approve the application of any applicant, either unconditionally or on an appropriate temporary or other conditional basis, if MERS in its sole discretion determines that any standard specified in this Rule, as applied to such applicant, or any person associated with such applicant, is unduly or disproportionately severe or that the conduct of such applicant or person associated with such applicant has been such as not to make it against the interest of MERS, the existing Members, and the public to approve such application.    MERS shall notify each applicant of the action taken

with respect to its application and the reasons therefore. For purposes of this Rule, the term "person associated with" when applied to any person or entity shall mean (i) any partner, senior officer, director or controlling person of such person or entity or (ii) any officer or employee of such person or entity who has, or shall have, access to the MERS® System.

*Section 4.*    Notwithstanding the foregoing, MERS may decline to accept the application of any applicant upon a determination by MERS that the MERS® System does not have adequate space, data processing capacity or other operational capability at that time to permit the inclusion of additional Members without impairing the ability of the MERS® System to provide services for existing Members; provided, however, that applicants whose applications are denied solely pursuant to this section shall be approved as promptly as the capabilities of the MERS® System permit, in the reasonable judgment of MERS, in the order in which their applications were filed with MERS or in such other order as may be determined by MERS from time to time in its reasonable judgment.

*Section 5.*    An applicant whose application to become a Member has been approved by MERS shall be considered a Member after signing and delivering to MERS a Member Agreement as approved by the Board of Directors of MERS and paying the initial MERS membership fee.

*Section 6.*    Each Member shall immediately notify MERS if at any time it fails to meet any of the membership criteria specified in this Rule.

*Section 7.*    Any Member may withdraw its membership from MERS by giving 90 days written notice to the President or Secretary of the Corporation. Such withdrawal shall be effective on the ninetieth day after receipt at which time all rights and obligations of the withdrawing Member shall cease, except any obligation of such Member to pay fees or assessments assessed prior to withdrawal to the extent such obligation has not been fulfilled and except for any conditions the Board of Directors may establish for the de-registration of mortgages from MERS, including fees to defray the costs of such de-registration.

(a)    Any Member that sells, transfers, or otherwise disposes of all or substantially all of its assets to any entity that is not a member of MERS, shall be treated as having withdrawn from membership in MERS as of the effective time of such disposition of assets or combination with such entity unless the acquiring entity signs a Membership Agreement with MERS and as such shall be bound by the Rules of Membership and Procedures of MERS.

(b)    If any Member that merges or otherwise combines with any other entity and such other entity is the surviving entity and is a non-Member of MERS, then the Member Agreement entered into by the Member shall remain in full force and effect as to the acquiring non-Member entity unless the surviving non-Member withdraws from membership or is removed in accordance with the Rules of Membership or Procedures.

(c)    If any Member merges, is acquired by or otherwise combines with another MERS Member (or an entity that is not a MERS member but who agrees to become a member), the non-surviving Member's registered loans on the MERS® System shall be transferred to the surviving Member's Organizational Identification Number (Org ID) on the MERS® System. This transfer shall be defined as an Intracompany Transfer subject to the then-current fee for such Intracompany Transfer. The surviving Member shall not be allowed to retain or use the nonsurviving Member's Org ID Number. Members have an affirmative obligation to notify MERS in writing of any merger with or acquisition of another member.

*Section 8.*    A Member may change its Membership Profile on the MERS® System at any time.  Each Member shall designate one individual within its organization as its contact person for all of such Member's dealings with MERS.  It is the Member's responsibility to update the MERS® System if the contact person changes.

## RULE 2

### REGISTRATION ON THE MERS® SYSTEM

*Section 1.* MERS, in its sole discretion, shall determine the type and level of access to the MERS® System permitted to each Member and the types of transactions that such Member may register on the MERS® System. No Member may register or attempt to register any transaction not authorized under the Rules of Membership or the Procedures.

*Section 2.* Subject to Section 1 above, each Member may register any mortgage loan on the MERS® System in accordance with the Procedures.

*Section 3.* Each Member shall promptly, or as soon as practicable, register on the MERS® System, in accordance with the Rules of Membership and the Procedures, any and all of the following transactions to which such Member is a party which involve a mortgage loan registered on the MERS® System until such time as the mortgage loan is deactivated from the MERS® System:

(a) the pledge of any mortgage loan or security interest therein and the corresponding release of such security interests;

(b) the pledge of any servicing rights or security interest therein and the corresponding release of such servicing rights or security interests;

(c) the transfer of beneficial ownership of a mortgage loan by a Member to a Member;

(d) the transfer of beneficial ownership of a mortgage loan by a non-Member to a Member;

(e) the transfer of beneficial ownership of a mortgage loan by a Member to a non-Member;

(f) the transfer of servicing rights with respect to a mortgage loan by a Member to a Member;

(g) the registration of servicing rights with respect to a mortgage loan from a non-Member to a Member;

(h) the transfer of servicing rights with respect to a mortgage loan from a Member to a non-Member (requiring deactivation);

(i) the initiation of foreclosure of any mortgage loan registered on the MERS® System;

(j) the release of a lien with respect to a mortgage loan registered on the MERS® System;

(k) the creation of a sub-servicing relationship with respect to a mortgage loan registered on the MERS® System; and

(l) any renewal, extension or modification of a mortgage loan registered on the MERS® System that involves the recording of a new security instrument and does not merely change the rate, principal balance or term.

*Section 4.*    (a)    The transfer to a non-Member of servicing rights with respect to a mortgage loan registered on the MERS® System shall require the deactivation of such mortgage loan from the MERS® System in accordance with these Rules and the Procedures.  Upon the withdrawal or removal of a Member, all mortgage loans for which such Member acts as servicer shall be deactivated from the MERS® System, provided, however, that the mortgage loans shall remain registered with MERS if the substitute servicer is a Member and all MERS fees relating to the servicing transfer to the substitute servicer are paid.  The transfer to a non-Member of a beneficial interest in a mortgage loan registered on the MERS® System shall not require the de-registration of such mortgage loan from the MERS® System unless:  (i) the servicer is a non-Member of MERS or (ii) such non-Member beneficial owner shall require deactivation.

(b)    As long as there are no contrary instructions, when the beneficial ownership of a mortgage loan registered on the MERS® System is vested in a non-Member, MERS and Mortgage Electronic Registration Systems, Inc. shall at all times

comply with the instructions of the Member shown on the MERS® System as the servicer of such mortgage loan with respect to transactions relating to such mortgage loan. Such Member shall indemnify and hold harmless MERS, and any employee, director, officer or affiliate of MERS, for any and all liability incurred as a result of compliance by MERS with instructions given by such Member on behalf of the non-Member beneficial owner.

*Section 5.*    *(a)*    Each Member, at its own expense, shall cause Mortgage Electronic Registration Systems, Inc., to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. Mortgage Electronic Registration Systems, Inc. is a wholly owned subsidiary of MERS created for the purpose of serving as the mortgagee of record in the appropriate public records. The Member shall monitor the public records to verify that it has complied with the preceding sentence and shall maintain an adequate quality assurance program to ensure that its verification procedures are effective. The Member hereby warrants to MERS that either (i) an appropriate mortgage, or deed of trust, or other such instrument as may be required under applicable state law, naming Mortgage Electronic Registration Systems, Inc. as mortgagee, or (ii) an appropriate assignment of mortgage, or assignment of deed of trust, or other such instrument as may be required under applicable state law, naming Mortgage Electronic Registration Systems, Inc. as mortgagee, has been or as soon as practicable shall be, properly prepared and delivered to the appropriate recording office and the Member shall promptly register on the MERS® System the date on which such instrument was delivered. As soon as practicable, the Member shall register on the MERS® System the specific recordation information

provided by the custodian of public records which evidences that Mortgage Electronic Registration Systems, Inc. is mortgagee of record with respect to such mortgage loan. Upon the Member's becoming aware of any discrepancy between the information shown on the MERS® System and the information in the public records, the Member shall promptly correct the information on the MERS® System.

(b) At or prior to the time a Member registers a mortgage loan on the MERS® System, such Member shall provide evidence reasonably satisfactory to MERS demonstrating that Mortgage Electronic Registration Systems, Inc. is, or as soon as practicable shall be, properly recorded as mortgagee of record in the appropriate public records with respect to such mortgage loan.

(c) Mortgage Electronic Registration Systems, Inc. shall not act as mortgagee of record for the purpose of procuring borrowers for the Member or making mortgage loans on behalf of the Member.

(d) Reference herein to "mortgage(s)" shall include deed(s) of trust, and any other form of security instrument under applicable state law.  References herein to "mortgagee of record" shall include the named beneficiary under a deed of trust in those jurisdictions where deeds of trust are used to secure loans, and any similar status as used in connection with any other form of security instrument under applicable state law.

*Section 6.*    MERS shall at all times comply with the instructions of the holder of mortgage loan promissory notes.  In the absence of contrary instructions from the beneficial owner, MERS and Mortgage Electronic Registration Systems, Inc. may rely on instructions from the servicer shown on the MERS® System in accordance with these Rules and the Procedures with respect to transfers of beneficial ownership, transfers of servicing rights, and releases of security interests applicable to such mortgage loan.  The beneficial owner shall give any such contrary instructions to MERS and Mortgage Electronic Registration Systems, Inc. in writing and they may rely on such instructions until receipt of further written instructions from the beneficial owner.

*Section 7.*    Each Member shall review for accuracy and completeness all information shown on the MERS® System with respect to mortgage loans and related transactions registered by such Member, and promptly update any incorrect information.

*Section 8.*    Within ten (10) business days of receiving notice from the Member servicing the loan that the mortgage loan has been paid in full, MERS shall give notice to all Members shown on the MERS® System as having interests in such mortgage loan. The Member servicing the mortgage loan shall be responsible, at its own expense, to:

(a)  take, or cause to be taken, appropriate action, including delivery to the appropriate recording office of an instrument of satisfaction or release (which may be signed by a certifying officer of Mortgage Electronic Registration Systems, Inc.), to

extinguish the lien of such mortgage in the proper manner within the applicable state imposed time frames, and register on the MERS® System the date of such action, or

(b)  notify MERS that, in fact, the mortgage loan has not been paid in full. If MERS is notified that a lien release has not been executed in compliance with applicable state imposed time frames, and the Member fails to take such action or give MERS notice that the mortgage loan has not been paid in full, then MERS reserves the right to release such mortgage.  Such Member, upon demand, shall reimburse Mortgage Electronic Registration Systems, Inc. for its out-of-pocket costs in connection with release of the mortgage, including any penalties for failure to release the mortgage or take other action in a timely manner, and shall pay an administrative fee determined by Mortgage Electronic Registration Systems, Inc., and

(c)  indemnify MERS and Mortgage Electronic Registration Systems, Inc. with respect to any liability which may arise as a result of the failure of such Member to take such action or give MERS such notice in a timely and accurate manner.  Without limiting the generality of the foregoing, such indemnification shall extend to circumstances in which a mortgage is released by Mortgage Electronic Registration Systems, Inc., but the mortgage loan has not been paid in full, or in which such Member wrongfully refuses to authorize Mortgage Electronic Registration Systems, Inc. to release the mortgage.

## RULE 3

## OBLIGATIONS OF MERS

*Section 1.*    MERS shall within two (2) business days forward to the appropriate Member or Members, in the form prescribed by and otherwise in accordance with the Procedures, all properly identified notices, payments, and other correspondence received by MERS with respect to mortgage loans registered on the MERS® System for which Mortgage Electronic Registration Systems, Inc. serves as mortgagee of record.

*Section 2.*    MERS shall provide to Members certain standard reports concerning information contained on the MERS® System, as specified in the Procedures, and such other reports as MERS may determine from time to time.

*Section 3.*    (a)    Upon request from the Member, Mortgage Electronic Registration Systems, Inc. shall promptly furnish to the Member, in accordance with the Procedures, a corporate resolution designating one or more employees of such Member, selected by such Member, as "certifying officers" of Mortgage Electronic Registration Systems, Inc. to permit such Member (i) to release the lien of any mortgage loan registered on the MERS® System to such Member, (ii) assign the lien of any mortgage naming MERS as the mortgagee when the Member is also the current promissory note-holder, or if the mortgage is registered on the MERS® System, is shown to be registered to the Member, (iii) to foreclose upon the property securing any mortgage loan registered on the MERS® System to such Member, (iv) to take any and all actions necessary to protect the interest of the Member or the beneficial owner of a mortgage loan in any

bankruptcy proceeding regarding a loan registered on the MERS® System that is shown to be registered to the Member, (v) to take such actions as may be necessary to fulfill such Member's servicing obligations to the beneficial owner of such mortgage loans (including mortgage loans that are removed from the MERS® System as a result of the transfer thereof to a non-Member), (vi) to take action and execute all documents necessary to refinance, amend or modify any mortgage loan registered on the MERS® System to such Member, (vii) endorse checks made payable to MERS to the Member that are received by the Member in payment on any mortgage loan registered on the MERS® System that is shown to be registered to the Member. In instances where Mortgage Electronic Registration Systems, Inc. designates an employee of a Member as a certifying officer of MERS for the limited purposes described above, such Member shall indemnify MERS and any of its employees, directors, officers, agents or affiliates against all loss, liability and expenses which they may sustain as a result of any and all actions taken by such certifying officer.

(b) Upon request by Mortgage Electronic Registration Systems, Inc. , the Member shall deliver to Mortgage Electronic Registration Systems, Inc. a corporate resolution naming the Corporate Secretary of Mortgage Electronic Registration Systems, Inc. as a "certifying officer" of the Member solely for the purpose of installing Mortgage Electronic Registration Systems, Inc. as mortgagee of record on mortgage loans which have been registered on the MERS® System by the Member.

(c)    At the request of the beneficial owner of a mortgage loan, or any designee thereof as shown on the MERS® System, Mortgage Electronic Registration Systems, Inc. shall provide to such beneficial owner or designee a recordable assignment for such mortgage loan to another party designated by the beneficial owner or designee; provided, however, that such beneficial owner or designee shall warrant to Mortgage Electronic Registration Systems, Inc. that such assignment shall be promptly recorded. Requests for recordable assignments may be made only for purposes of deactivating a mortgage loan from the MERS® System.  The deactivation of a mortgage loan for any reason shall be subject to the payment of all applicable fees and expenses, including, without limitation, the costs of preparing and recording the assignment.   All such applicable fees and expenses shall be included in a fee schedule.

*Section 4*.     Unless otherwise specifically stated herein, any action required or permitted to be taken by MERS or Mortgage Electronic Registration Systems, Inc. pursuant to these Rules shall be taken on behalf of MERS by such persons as may from time to time be designated by the respective Boards of Directors of MERS and Mortgage Electronic Registration Systems, Inc.

## RULE 4

## RULE CHANGES

*Section 1.*    (a)  MERS shall notify in writing all Members of any proposed changes to the Rules of Membership, and shall provide a copy of such proposed changes to all Members no fewer than ninety (90) days prior to the proposed implementation date of such changes.

(b)  Members may submit to MERS for its consideration their comments with respect to any such proposal, and such comments shall be reviewed by MERS and filed with the records kept by MERS.    Notwithstanding the receipt of any such comments, the Board of Directors of MERS, in its sole discretion, shall have the right to amend, add to or repeal any Rule or part thereof after the expiration of such ninety (90) day comment period, so long as such amendment is not contrary to the Certificate of Incorporation of MERS.

(c)  Each Member shall be bound by any amendment to the Rules with respect to any transaction occurring subsequent to the time such amendment takes effect as fully as though such amendment were now a part of the Rules; provided, however, that no such amendment shall affect the Member's right to withdraw from MERS in accordance with the procedures set forth in these Rules before such amendment or change becomes effective.

(d)     MERS shall provide a ninety (90) day written notice for any changes to the MERS Membership Terms and Conditions.

**RULE 5**

**FEES**

*Section 1.*    (a)    Each Member shall pay such fees, charges and assessments to MERS for membership, registrations, transfers, and other transactions on the MERS® System and other services rendered by MERS as shall be determined from time to time by MERS in its sole discretion, and specified in a fees schedule promulgated by MERS which may change from time to time.

(b)    MERS shall provide all Members with at least thirty (30) days advance written notice of changes to the fees schedule with the effective date of the new fees.

(c)    Transaction fees for the transfer of servicing between MERS Members (including Intra-company Transfers) shall be payable by the transferor.  If the transferor fails to pay such transaction fees due to bankruptcy, or because the transferor is no longer in business or cannot otherwise be located or contacted, and MERS has exhausted all reasonable means of collection, then the transferee shall be responsible for the payment of those transaction fees because the transferee has received the benefit of the service provided by MERS and is in the best position to protect itself by holding back a portion of the purchase price when purchasing the corresponding loans.  The transferee will also be responsible for the cost if the servicing transfer transactions have not been initiated on the MERS® System, and the transferor cannot initiate the transactions

themselves due to the circumstances listed in the preceding sentence and the transferee requests such transaction to be initiated by MERS.

(d)     If a Member registers a mortgage loan on the MERS® System pursuant to the Rules of Membership and Procedures, and that Member subsequently transfers the servicing rights to that mortgage loan to another Member without first paying the registration fee to MERS pursuant to Rule 5, Section 1(a), and the transferor fails to pay such transaction fees due to bankruptcy, or because the transferor is no longer in business or cannot otherwise be located or contacted, and MERS has exhausted all reasonable means of collection, then the transferee shall be responsible for the payment of those transaction fees because the transferee has received the benefit of the service provided by MERS and is in the best position to protect itself by holding back a portion of the purchase price when purchasing the corresponding loans.   If the transferor has not registered the mortgage loan on the MERS® System and is unable to register the mortgage loan due to bankruptcy, or because the transferor is no longer in business or cannot otherwise be located or contacted, then the transferee must register the mortgage loan and pay the corresponding registration fee pursuant to Rule 5, Section 1(a).

*Section 2.*     MERS shall have the authority to charge a Member for any unusual expenses caused directly or indirectly by such Member, or incurred at its request, including, without limitation, the cost of producing records pursuant to a court order or other legal process in any litigation or other legal proceeding to which such Member is a party or in which such records relating to such Member are so required to be produced,

whether such production is required at the instance of such Member or of any other person, provided however, that MERS shall give the Member written notice of such Court Order or legal process in advance of producing the records to enable the Member to pursue its legal rights to refuse the request.

*Section 3.*   Each Member shall pay interest on any delinquent fee payments at the rate set from time to time by MERS.  Said interest rate shall be specified in the fees schedule.

# RULE 6

## PROCEDURES

*Section 1.* (a)  MERS shall prescribe from time to time reasonable Procedures with respect to the business and operation of MERS and Mortgage Electronic Registration Systems, Inc. and the execution of transactions on the MERS® System. Each Member shall be bound by such Procedures and any amendment thereto in the same manner as it is bound by the provisions of the By-Laws and these Rules.

(b)  MERS shall give Members sixty (60) days notice prior to implementation of any amendment to the Procedures.

**RULE 7**

**DISCIPLINARY ACTIONS**

*Section 1.*    MERS, in its sole reasonable discretion may sanction a Member for one or more violations of these Rules or the Procedures or for errors, delays or other conduct detrimental to the operation of MERS or Mortgage Electronic Registration Systems, Inc., the MERS® System or other Members, including, without limitation, a Member's failure to provide adequate training and supervision to its employees to enable proper use of the MERS® System, by imposing any of the following:

       (a) removal as a Member, but only if the notice requirements of Rule 7, Section 2 below have been met by MERS;

       (b) suspension, for a period and upon terms determined by MERS;

       (c) fines, in an amount determined by MERS;

       (d) censure; or

       (e) any other fitting requirements that may be determined by MERS.

*Section 2.*    MERS shall give written notice to the applicable Member of the terms of any such violation and possible sanction, which shall include a brief description of the basis for the imposition of the sanction. The Member shall then have fifteen (15) days from the date of receipt of the notice to provide a written response and have an opportunity to be heard. At the expiration of the fifteen (15) days, if MERS determines that a breach has occurred and that sanctions may be imposed, the Member shall be given thirty (30) days to cure the breach. If the breach is not cured within the thirty (30) days, MERS may impose such sanctions on the Member. If the Member does not cure the

breach during the thirty (30) day curing period, then upon the expiration of the curing period, MERS shall notify any other member of MERS for whom the breaching Member acts as an authorized servicer or sub-servicer of mortgage loans registered on the MERS® System.

*Section 3.*  If the nature of the breach is the same or similar to a breach by the Member that has occurred within the last year, there may not be a curing period.

## RULE 8

## FORECLOSURE

*Section 1.*    (a)    With respect to each mortgage loan for which Mortgage Electronic Registration Systems, Inc. is the mortgagee of record, the beneficial owner of such mortgage loan or its servicer shall determine whether foreclosure proceedings with respect to such mortgage loan shall be conducted in the name of Mortgage Electronic Registration Systems, Inc., the name of the servicer, or the name of a different party to be designated by the beneficial owner.

(b)    The Member servicing a mortgage loan registered on the MERS® System shall be responsible for processing foreclosures in accordance with the applicable agreements between such Member and the beneficial owner of such mortgage loan.

(c)    In the State of Florida, the authority to conduct foreclosures in the name of MERS granted to a Member's Certifying Officers under Paragraph Three of the Member's MERS Corporate Resolution is revoked.  Effective June 1, 2006, the Member shall be sanctioned $10,000.00 per violation for commencing a foreclosure in Florida in the name of MERS.

(d)    In the event that the beneficial owner or its designated servicer determines that foreclosure proceedings shall be conducted in the name of a party other than Mortgage Electronic Registration Systems, Inc., the servicer designated on the MERS® System shall cause to be made an assignment of the mortgage from Mortgage Electronic Registration Systems, Inc. to the person designated by the beneficial owner, and such beneficial owner shall pay all recording costs in connection therewith.

*Section 2*:    (a)    If a Member chooses to conduct foreclosures in the name of Mortgage Electronic Registration Systems, Inc., the note must be endorsed in blank and in possession of one of the Member's MERS certifying officers.  If the investor so allows, then MERS can be designated as the note-holder.

(i)    The Member shall not plead MERS as the note-owner in any foreclosure document; including but not limited to, the foreclosure complaint.

(ii)    The Member shall not plead MERS as a co-plaintiff in a foreclosure action.

(iii)   If the note is lost or cannot be located, the Member shall not commence a foreclosure action in the name of MERS, but rather must assign the mortgage out of MERS.

(b)   In non-judicial foreclosure states, if the Member chooses to foreclose in MERS name under the power of sale provision in the security instrument and is not seeking a deficiency judgment, then the note does not need to be in the possession of the Member's MERS Certifying Officer when commencing the foreclosure action; provided, however, that under no circumstances may the Member allege that the note is in their possession unless it so possesses.

(c)   If the Member pleads MERS as the note-owner or as a co-plaintiff or commences a foreclosure in the name of MERS when the note is lost or cannot be located, it shall be considered a violation of the MERS Membership Rules and MERS may dismiss such foreclosure action.   Effective June 1, 2006, the Member shall be sanctioned $1,000.00 for the first violation and $5,000.00 for each subsequent violation of this Rule.

(d)   For all foreclosures conducted in the name of MERS, the member shall take all reasonable and necessary steps to avoid having Mortgage Electronic Registration Systems, Inc. take title to the applicable property that is the subject of a mortgage loan.  Mortgage Electronic Registration Systems, Inc. shall not be obligated to take title to any property that is the subject of a mortgage loan; provided, however, that if the Member so requests, Mortgage Electronic Registration Systems, Inc. may take title at the conclusion of the foreclosure sale upon prior written consent to the

Member from Mortgage Electronic Registration Systems, Inc.  If title is taken in the name of Mortgage Electronic Registration Systems, Inc., the Member shall take all necessary and reasonable steps to remove Mortgage Electronic Registration Systems, Inc. from title as soon as possible.

       (e)  If title is put into Mortgage Electronic Registration Systems, Inc.'s name and there is a violation of state, county or city codes or any other applicable regulation; including, but not limited to, non-payment of tax bills, the Member shall be responsible to promptly take all necessary action to prevent fines or judgments from being entered against MERS.  If the Member fails to do so, MERS may take such action and will sanction the member for all costs and expenses; including, but not limited to, attorney fees.

## RULE 9

## USE AND OWNERSHIP OF INFORMATION

*Section 1*  (a) Each Member shall at all times keep confidential and shall not sell or otherwise disclose any information contained on the MERS® System that is (i) not owned by such Member, (ii) was not originally provided by Member to MERS, or (iii) not available in public records or otherwise known to the Member.  MERS and the Member shall use a reasonable degree of care consistent with the Standards for Safeguarding Customer Information (16 C.F.R. parts 314) (the "Safeguards Rule") to preserve the confidentiality of any such information, and to take all reasonable action by instruction, agreement or otherwise with its directors, officers, employees, affiliates and agents to satisfy its obligation with respect to confidentiality, non-disclosure and limitation of use of any such information.  The obligations of MERS and the Member under this Rule 9 shall survive termination of this agreement

(b) MERS shall have no ownership rights whatsoever in or to any information contained on the MERS® System.  Notwithstanding the foregoing, MERS is authorized to (i) use the information contained on the MERS® System to compile transaction volume reports to track current or previous usage levels, project future usage and provide the mortgage industry with usage data which may be used to gauge the success of the MERS® System, but excluding any references to a particular borrower name or address other than in reports given to the MERS Board of Directors, (ii) use the information contained on the MERS® System as part of its quality control process to monitor compliance with operational standards and time frames, (iii) furnish any

information contained on the MERS® System to any governmental authority pursuant to a subpoena or court order, provided, however, that MERS shall undertake, to the extent it reasonably can under the circumstances, to notify all Members shown on the MERS® System as having an interest in a mortgage loan which is the subject of such subpoena or court order to allow such Members time to attempt to quash such subpoena or court order, or (iv) provide information and reports (as approved by the Board) regarding mortgage activity and mortgage loans registered on the MERS® System that otherwise could have been obtained through the public land records if not for the implementation of MERS.

(c) Any reports given to third parties shall not identify individual Members or borrower names and addresses as to transaction information without the Member's prior consent.

*Section 2.* (a) MERS acknowledges and agrees that: (a) the Member will be entering customer information into the MERS® System to which MERS has access as a part of the services provided to the Member, and (b) such customer information is subject to Section 1 of Rule 9 of the MERS Rules of Membership – "Use and Ownership of Information".

(b) MERS has implemented and will maintain an information security program consisting of reasonable administrative, physical, and technical safeguards designed to meet the Objectives set forth in 16 C.F.R. 314.3(b) of the Safeguards Rule.

MERS's controls and procedures designed to safeguard the confidentiality and security of the information stored on the MERS® System are generally described in the MERS Integration Handbook (Volumes I and II).  MERS believes the controls and procedures so described meet the Objectives specified in the Safeguards Rule.  MERS agrees to maintain controls and procedures designed to safeguard the confidentiality and security of the information stored on the MERS® System that are no less stringent than those described in the current version of the MERS Integration Handbook.  MERS further agrees that any changes or modifications to such controls and procedures will also be designed to meet the Objectives specified in the Safeguards Rule.  Each Member shall inform MERS in writing whenever the Member believes that the controls and procedures designed to safeguard the confidentiality and security of the information stored on the MERS® System fail to meet the Objectives specified in the Safeguards Rule.  MERS agrees the Member (or a mutually agreeable third party representative) will be given access to monitor that MERS has satisfied the provisions of this paragraph, including access to any audits, summaries of test results or other equivalent evaluations of the controls and procedures designed to safeguard the confidentiality and security of the information stored on the MERS® System.  MERS will promptly report to the Member any actual or suspected breach of the confidentiality or security of any information contained on the MERS® System.

(c) As part of the controls and procedures described in paragraph (b) of this section, MERS maintains, and will continue to maintain, a Disaster Recovery Plan, a summary of which will be supplied to the Member upon request.  MERS agrees that the

Disaster Recovery Plan will be reviewed at least annually and will include annual testing to ensure that the MERS® System can be restored within 48 hours after the declaration of a disaster under the plan.

**RULE 10**

**INTERIM SECURITY INTERESTS**

*Section 1.*     The pledge of a security interest in any mortgage loan registered on the MERS® System to an interim funding lender, such as a warehouse lender, shall be shown as released on the MERS® System when the security interest has been released in accordance with the methods and procedures established among the interim funding lender, the lender granting the security interest and the subsequent purchaser of such mortgage loan, if any, as specified below.

*Section 2.*     An interim funding lender's security interest shall be shown as released on the MERS® System: (i) for investors selecting Option 1 of the Procedures, when the beneficial owner registers its interest on the MERS® System; or (ii) for investors selecting Option 2 of the Procedures, when the beneficial owner registers its ownership of the loan and the interim funding lender registers the release of its security interest on the MERS® System.

*Section 3.*     In the event that Member provides to MERS specific wiring instruction information relating to mortgage loans registered on the MERS® System, MERS and Member agree that: (i) such information is for informational purposes only, (ii) Member makes no representations or warranties about the accuracy and completeness of such information, and (iii) Member shall not be liable to MERS, any other member, or any other party based on the provision of, and reliance on, such information.

# RULE 11

## SERVICES

MERS shall provide, either directly or through a third party, all services, resources, software, equipment and facilities (collectively, the "Services") as determined from time to time by the Board of Directors of MERS and described more particularly in the Procedures.    MERS shall provide the Services in compliance with reasonable performance standards (the "Performance Standards") as determined from time to time by the Board of Directors of MERS and described more particularly in the Procedures.

## RULE 12

## WARRANTIES

*Section 1*.    <u>Work Standards</u>.  MERS represents and warrants that the Services shall be rendered with promptness and diligence in accordance with the practices and high professional standards used in well-managed operations performing services similar to the Services and shall be performed in a workmanlike and cost effective manner. MERS represents and warrants that it shall use, and shall require all third-party vendors to use, adequate numbers of qualified personnel with suitable training, education, experience, and skill to perform the Services and satisfy the Performance Standards.

*Section 2*.    <u>Maintenance</u>.  MERS represents and warrants that the equipment and software used in the performance of the Services shall be maintained so that they operate in accordance with the Performance Standards, including (i) maintaining such equipment in good operating condition, subject to normal wear and tear, (ii) undertaking prudent repairs and preventive maintenance on such equipment, and (iii) performing prudent software maintenance, including timely updating software used in the performance of the Services, including the MERS® System, to meet any applicable legal or regulatory changes.

*Section 3*.    <u>Technology.</u>  MERS represents and warrants that the Services shall be provided using proven technology which shall take advantage of technological advancements in the industry.

*Section 4*.  <u>Non-Infringement.</u>  MERS represents and warrants that it shall, and shall require its Third Party Vendors to, perform its responsibilities in a manner that does not infringe, or constitute an infringement or misappropriation of, any patent, copyright, trademark, trade secret or other propriety rights of any third party.

*Section 5*.  <u>Software Ownership or Use.</u>  MERS represents and warrants that, with respect to the software used in the performance of the Services, it either owns, or is authorized to use, the software in the performance of the Services.

*Section 6*.  <u>Authorization.</u>  MERS represents and warrants that it has the requisite corporate power and authority to carry out its responsibilities.

*Section 7*.  <u>Viruses.</u>  MERS represents and warrants that it and any third-party vendors providing the Services shall not code or introduce any Viruses (defined herein) into the MERS® System and any other systems and software used to provide the Services and it shall take reasonable business precautions to ensure that no Viruses are coded or introduced into the MERS® System and any other systems and software used to provide the Services.  The term "Viruses" shall mean any (i) program code, programming instruction or set of instructions intentionally construed with the ability to damage, interfere with or otherwise adversely affect computer programs, data files or operations; or (ii) other code typically designated to be a virus.

*Section 8.*  <u>Disabling Code.</u>  MERS represents and warrants that it and any third-party vendor providing the Services shall not insert into the MERS® System and in any other systems and software used to provide the Services any code which would have the effect of disabling or otherwise shutting down all or any portion of the MERS® System or Services.

*Section 9.*  <u>Millennium Compliant.</u>  MERS represents and warrants that the MERS® System shall have the ability to provide all of the following functions:  (a) consistently handle date information before, during and after January 1, 2000, including without limitation accepting date input, providing date output, and performing calculations on dates or portions of dates; (b) function accurately and without interruption before, during and after January 1, 2000, without change in operations associated with the advent of the new century; (c) respond to two-digit year-date input in a way that resolves any ambiguity as to century in a disclosed, defined, and predetermined manner; and (d) store and provide output of date information in ways that are unambiguous as to century.

*Section 10.*  <u>Licensing and Qualification.</u> MERS  and  Mortgage  Electronic Registration Systems, Inc. represents and warrants that each has obtained all state licenses and has qualified to conduct business in all fifty states and the District of Columbia where such licensing and/or qualification is required by law for an entity serving as mortgagee of record, solely as nominee, in an administrative capacity, for the beneficial owner thereof.

*Section 11.*     <u>Disaster Recovery Plan.</u>        MERS represents and warrants to the Member that it has in place and will continue to maintain a fully effective disaster recovery plan.  MERS will routinely (no less often than once per year) test its disaster recovery plan to ensure its continued effectiveness and capability of protecting its Members in the event of a disaster.  MERS will provide the results of such test to the a Member in writing upon request.

# RULE 13

## INDEMNIFICATION

*Section 1.*  MERS and Mortgage Electronic Registration Systems, Inc. agree to indemnify the Member and the Member agrees to indemnify MERS and Mortgage Electronic Registration Systems, Inc. in accordance with Section 9 of the MERS Terms and Conditions .  In addition to Section 9 of the Terms and Conditions, the following provisions shall apply:

(a) the indemnified party may but shall not be obligated to participate in the defense at its own expense and using counsel of its own choosing; provided, however, that the indemnifying party has the right to control the defense.

(b) the indemnified party shall cooperate and provide assistance as the indemnifying party reasonably requests and shall be entitled to recover reasonable costs of providing assistance.

(c) the indemnifying party shall keep the indemnified party informed on status of claim and litigation.

(d) the indemnifying party shall not, without indemnified party's written consent, compromise or settle the claim if such compromise or settlement would impose

an injunction or other equitable relief upon indemnified party or such compromise or settlement does not include the third party's release of the indemnified party.

(e) if indemnifying party fails to timely defend, contest or otherwise protect against the claim and fails to contest in writing the indemnified party's right to indemnification, the indemnified party may, but shall not be obligated to defend and make any compromise or settlement and recover the costs thereof from the indemnifying party.

(f) If the indemnifying party contests in writing the indemnified party's right to indemnification, then the indemnified party shall defend the claim and may seek to recover all expenses paid by the indemnified party from the indemnifying party, and if successful, shall not be liable to pay the fees and expenses of initiating the mediation or arbitration pursuant to the Member Agreement.

**RULE 14**

**NOTIFICATION TO MERS OF PENDING LAWSUITS**

**AND ADDITIONAL INDEMNIFICATION PROVISIONS**

Section 1.  The provisions set forth in this Rule 14 are in addition to those provisions set forth in Rule 13 of the MERS Rules of Membership and Paragraph 9 of the MERS Membership Terms and Conditions.  To the extent that any provision of this Rule 14 conflicts with any provision of Rule 13 of the MERS Rules of Membership or Paragraph 9 of the MERS Membership Terms and Conditions, the provisions of this Rule 14 shall control.

Section 2.  Without regard to responsibility under Paragraph 9 of the MERS Membership Terms and Conditions:

(a)    It is the Member's affirmative duty to immediately notify MERSCORP, Inc. of any and all lawsuits or written threats to initiate lawsuits that (i) involve a mortgage loan in which the Member has ownership rights, servicing or subservicing rights, secured interests, or any other significant right or interest, and (ii) name (or threaten to name) MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (whether or not the Member is also a named party).

(b)    The Member shall notify MERSCORP, Inc. of any claims that are filed against MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (whether or not the Member is also a named party) in response to a proceeding initiated by such Member (either in its own name or in the name of MERSCORP, Inc. and/or

Mortgage Electronic Registration Systems, Inc.), including without limitation counterclaims that are filed in response to a foreclosure action commenced by the Member in the name of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc.

(c)    If the Member has transferred or otherwise terminated its rights and interests in a mortgage loan, and receives notice of a lawsuit, a written threat to initiate a lawsuit or a claim (as such lawsuits, threatened lawsuits and claims are described in Section 2(a) and (b) of this Rule 14) from the MERSCORP, Inc. mailroom, the Member must notify MERSCORP, Inc. of (i) such lawsuit, threatened lawsuit or claim, and (ii) the transfer or termination of the Member's rights and interests in the subject mortgage loan.

Section 3.    The Member shall notify MERSCORP, Inc. of all lawsuits, threatened lawsuits or claims (as such lawsuits, threatened lawsuits and claims are described in Section 2(a) and (b) of this Rule 14), regardless of the method, person or entity by which the Member receives notice of such lawsuits, threatened lawsuits or claims.

(a)    All notifications required by this Rule 14 shall include (as applicable):

(i)    the name of the lawsuit, and the county, state and court in which the lawsuit is filed;

(ii)    the Mortgage Identification Number (MIN) of the mortgage loan involved;

(iii)    the date the complaint was filed and the date the Answer is due;

(iv)    the name and phone number of the contact person of the Member with respect to the subject lawsuit, threatened lawsuit or claim (which may be in-house counsel);

(v)    the name and telephone number of the attorney and law firm, if any, retained by the Member with respect to the subject lawsuit or claim; and

(vi)    a copy of all pleadings with respect to the subject lawsuit or claim in the possession of the Member or a copy of the written threat to initiate a lawsuit (as applicable).

(b)    All notices required by this Rule 14 shall be sent to the attention of the General Counsel of MERSCORP, Inc. either via fax to (703) 748-0183 (which is confirmed by transmission report or equivalent thereof), via e-mail to mers@mersinc.org (which is confirmed by delivery report or equivalent thereof), via registered or certified mail (return receipt requested and postage prepaid) to 1595 Spring Hill Road, Suite 310, Vienna VA  22182, or via a nationally recognized overnight courier (prepaid and providing proof of delivery) to 1595 Spring Hill Road, Suite 310, Vienna VA  22182.

(c)    A Member shall in no way be relieved of its obligations under Paragraph 9 of the MERS Membership Terms and Conditions by (i) the failure of the Member to receive proper notification from a third party with respect to a lawsuit, threatened lawsuit or claim, or (ii) the proper notification, pursuant to this Rule 14, of a lawsuit, threatened lawsuit or claim from the Member to MERSCORP, Inc.

Section 4.  It is the responsibility of the Member to inform its retained counsel of the Member's indemnification obligations under the MERS Membership Terms and Conditions and the MERS Rules of Membership (including without limitation this Rule 14).  With respect to a Member Indemnified Claim (as that term is defined in Paragraph 9 of the MERS Membership Terms and Conditions), Member and/or its retained counsel shall take all necessary and appropriate actions to assert promptly valid defenses available to MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable), even if such defenses are unavailable to the Member, including without limitation the defense that the claim against MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable) should be dismissed as a claim against an inappropriate party.

(a)    If a Member and/or its retained counsel fails to acknowledge in writing its obligations (including its obligation to defend) under Paragraph 9 of the MERS Membership Terms and Conditions with respect to a Member Indemnified Claim, within the earlier date of (i) thirty (30) days after receipt by the Member of notice of the Member Indemnified Claim, either from MERSCORP, Inc., Mortgage Electronic Registration Systems, Inc. or a third party, and (ii) thirty (30) days prior to the deadline for MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable) to submit an initial response to the Member Indemnified Claim, then MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable) shall have the right (but not the obligation) to hire independent counsel and to undertake

the defense, settlement and/or compromise of such Member Indemnified Claim on behalf of, and at the sole expense of, the Member.

(b)    Regardless of whether a Member, MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. defended a Member Indemnified Claim or none of these entities defended such claim, and regardless of whether MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. had notice of the Member Indemnified Claim, if a judgment is entered against MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. for such claim, the Member shall immediately post a Surety Bond or Letter of Credit for the amount of the judgment pending any motions to set aside or vacate the judgment; or appeal of the judgment; or any challenges made by either the Member or MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. to the judgment. It is the Member's responsibility to pay the amount of the judgment and any other related Indemnified Payments (as that term is defined in Paragraph 9 of the MERS Membership Terms and Conditions) on behalf of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable), and (ii) if MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. defends against the enforcement of a judgment (which MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. shall have the right to do in its discretion), the Member shall promptly reimburse MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable) the amount of the Indemnified Payments related to such defense.

(c)    With respect to a Member Indemnified Claim, the Member shall provide MERSCORP, Inc. with (i) copies of all public pleadings it receives from third parties (and notice of protected pleadings it receives from third parties), (ii) copies of all public pleadings it files on its own behalf, and (iii) copies of all pleadings it files on behalf of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc.

Section 5.    The obligations of the Member under this Rule 14 shall survive the termination of the Member's use of the MERS® System

# Exhibit F



Home Page | Contact Us | Location | Privacy Policy | Site M

**Newsroom** | **About Us** | **Events** | **Why MERS?** | **Knowledge Base** | **Careers**

**Tools & Services**

Downloads

Member Directory

Foreclosures

Enhancements

Forum

Advertising

Payment Options

**MERS for Homeowners**

📞 **Contact Us**

**Join Now**
**Become a Member**

*MERS* Products ▸

| MERS® System | MERS® Link | MERS® 1-2-3 | MERS® Commercial |
| MERS® eRegistry | MERS® eDelivery | MERS® ServicerID | MERS® iSearch |
| MERS Fraud Tools | | | |

Home » Newsroom > Press Release Details

# 50 Millionth Loan Registered on the MERS® System

**FOR IMMEDIATE RELEASE**
Contact: Karmela Lejarde, 703-761-1274

*Vienna, VA, May 24, 2007*—The 50 millionth loan was registered today on the MERS® System, nine years after the introduction of the "MERS as Original Mortgagee" (MOM) process began improving the mortgage lending industry by eliminating paper.

"When the MOM language was approved by Fannie Mae and Freddie Mac, we knew it would be an important new opportunity for mortgage lenders and servicers to streamline their operations and reduce costs," said R.K. Arnold, President & CEO of MERS. "Having fifty million loans registered since then is gratifying, especially when we realize that reducing lender costs to originate loans benefits borrowers, especially first-time homeowners."

MERS was created by the mortgage lending industry to eliminate the unnecessary costs of preparing and recording paper assignments when mortgage companies sell loans to their trading partners. Eliminating assignments also prevents loan servicing problems caused by broken chain of title. This means lower costs for the servicer and improved customer serv to the borrower.

"Lenders save at least $25 for every new loan they register on the MERS® System ," said Carson Mullen, Executive Vice President of the MERS Customer Division. "Since the beginning, MERS has saved the mortgage industry over $1 billion in unnecessary costs."

-30-

Home Page | Contact Us | Location | Privacy Policy | Site Map

Copyright© 2008 by MERSCORP, Inc. 1-800-646-MERS (6377)
Other products or company names are or may be trademarks or registered trademarks and are the property of their respective holders.