# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSE TREVINO and LORRY S. TREVINO, Individually And On Behalf of All Others Similarly Situated,<br><br>         **Plaintiffs,**<br><br>   **v.**<br><br>MERSCORP, INC., MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., CITIGROUP INC., COUNTRYWIDE FINANCIAL CORPORATION, FANNIE MAE, FREDDIE MAC, GMAC-RFC HOLDING COMPANY, LLC d/b/a GMAC RESIDENTIAL FUNDING CORPORATION, HSBC FINANCE CORPORATION, JPMORGAN CHASE & CO., WASHINGTON MUTUAL BANK, and WELLS FARGO & COMPANY,<br><br>         **Defendants.** | C.A. No. 07-568-JJF |

## PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

**Of Counsel:**

HARWOOD FEFFER LLP
Robert I. Harwood, Esq.
Jeffrey M. Norton, Esq. (*pro hac vice*)
Roy Shimon, Esq.
488 Madison Avenue
New York, NY 10022
(212) 935-7400
rharwood@hfesq.com
jnorton@hfesq.com
rshimon@hfesq.com

Dated: April 28, 2008

ROSENTHAL, MONHAIT & GODDESS, P.A.
Carmella P. Keener (#2810)
Citzens Bank Center, Suite 1401
Wilmington, DE 19899-1070
(302) 656-4433
ckeener@rmgglaw.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ........................................................................................ iii

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................1

II.   SUMMARY OF THE ARGUMENT ..................................................................2

III.  STATEMENT OF FACTS .................................................................................5

      A.    The Plaintiffs...........................................................................................5

      B.    MERS......................................................................................................7

      C.    The Control Defendants...........................................................................9

IV.   ARGUMENT....................................................................................................10

      A.    Standard Of Review...............................................................................10

      B.    The Mortgage Note Is An Enforceable Contract Against MERS........11

            1.    The Mortgage Note Binds MERS.............................................12

            2.    MERS Has Obligations Under The Mortgage Note ................14

            3.    MERS Breached the Mortgage Note Resulting In
                  Damages To Plaintiffs And The Class......................................16

      C.    MERS Has Been Unjustly Enriched ....................................................20

      D.    MERS Breached Its Duty Of Good Faith And Fair Dealing ...............22

      E.    Piercing MERS' Corporate Veil ..........................................................24

            1.    Determination On "Piercing" Is Premature ............................25

            2.    The Control Defendants Are The Alter Ego Of MERS...........27

                  a.    MERS And The Control Defendants Operated
                        As A Single Economic Unit.........................................29

                        (i)    MERS Is Grossly Undercapitalized.................30

(ii)   MERS Does Not Issue Dividends....................33

(iii)  Insolvency........................................................34

(iv)  MERS Is A Façade For The
Control Defendants...........................................35

3.  Shielding Control Defendants From Contractual
Liability Would Result In A Manifest Injustice ......................36

4.  The Control Defendants' Liability Through Agency...............40

F.  Defendants Ignore That Washington Mutual May
Also Be Directly Liable ......................................................................46

V.  CONCLUSION.............................................................................................47

# TABLE OF AUTHORITIES

**Cases**                                                              **Page No.**

*Acciai Speciali Terni USA, Inc. v. Momene,*
202 F. Supp. 2d 203 (S.D.N.Y. 2002)....................................................................28

*Associated Indem. Corp. v. Small,*
No. 06-00187- (CYW)(RCL),
2007 WL 844773 (W.D. Mo. Mar. 19, 2007)........................................................11

*BP Amoco Chem. Co. v. Sun Oil Co.,*
316 F. Supp. 2d 166 (D. Del. 2004)........................................................................40

*Billops v. Magness Constr. Co.,*
391 A.2d 196 (Del. 1978) .......................................................................................27

*Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,*
296 F.3d 164 (3d Cir. 2002)....................................................................................27

*Canavan v. Beneficial Fin. Corp.,*
553 F.2d 860 (3d Cir. 1977)...............................................................................27, 46

*Chestertown Bank v. Walker,*
163 F. 510 (4th Cir. 1908) ................................................................................20, 23

*Chicago Dist. Council of Carpenters Pension Fund v. Marzullo,*
No. 94C4616, 1995 WL 549104 (N.D. Ill. Sept. 11, 1995)....................................15

*Christopher v. First Mut. Corp.,*
No. 05-01149, 2006 WL 166566 (E.D. Pa. Jan. 20, 2006)....................................18

*David v. Mast,*
No. 1369-K, 1999 WL 135244 (Del. Ch. Mar. 2, 1999) ................................. 27-28

*Dewitt Truck Brokers v. W. Ray Flemming Fruit Co.,*
540 F.2d 681 (4th Cir. 1976) ......................................................................29, 33, 37

*Diebold Inc. v. Positran Mfg., Inc.,*
No. C.A. 02-374(GMS),
2002 WL 31234450 (D. Del. Oct. 4, 2002) ..............................................10, 29, 33

*Ethypharm S.A. France v. Bentley Pharm., Inc.,*
388 F. Supp. 2d 426 (D. Del. 2005)...........................................................26, 42, 46

*Ferguson v. Ferguson,*
    470 N.Y.S.2d 715 (App. Div. 3d. Dep't 1983)........................................................15

*First Wisconsin Nat'l Bank v. Oby,*
    188 N.W.2d 454 (Wis. 1971)..........................................................................14, 15

*Gordon v. SouthTrust Bank,*
    108 Fed. Appx. 837, 840-41 (5th Cir. 2004) ...................................................15, 18

*Haft v. Dart Group Corp.,*
    841 F. Supp. 549 (D. Del. 1993)...........................................................................13

*Harper v. Delaware Valley Broad., Inc.,*
    743 F. Supp. 1076, *aff'd,* 932 F.2d 959 (3d Cir. 1991)....................................28, 36

*Hills Stores Co. v. Bozic,*
    769 A.2d 88 (Del. Ch. 2000).....................................................................17, 20, 21

*In re Buckhead Am. Corp.,*
    178 B.R. 956 (D. Del. 1994)...........................................................................26, 31

*In re LG Philips Displays USA, Inc.,*
    No. 06-102459(BLS),
    2006 WL 1748671 (Bankr. D. Del. June 21, 2006)................................................13

*In re Olympic Mills Corp.,*
    477 F.3d 1 (1st Cir. 2007).....................................................................................13

*In re Philip Serv. (Delaware), Inc.,*
    284 B.R. 541 (Bankr. D. Del. 2002),
    aff'd, 303 B.R. 574 (D. Del. 2003).......................................................................13

*In re Phillips Petroleum Sec. Litig.,*
    738 F. Supp. 825 (D. Del. 1990)............................................................................36

*In re Sina,*
    No. A06-200,
    2006 WL 2729544 (Minn. App. Sept. 26, 2006)....................................................12

*In re Student Fin. Corp.,*
    No. 02-11620,
    2004 WL 609329 (D. Del. Mar. 23, 2004) ......................................................21, 22

*Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.,*
    456 F. Supp. 831 (D. Del. 1978).........................................................................25

*Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*,
   65 Fed. Appx. 803 (3d Cir. 2003) ............................................................. 26-27, 46

*Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*,
   No. Civ.A. 00-83-JJF,
   2006 WL 1995128 (D. Del. July 17, 2006), *aff'd*,
   2007 WL 2153278 (3d Cir. July 27, 2007) ............................................................. 43

*Kaplan v. First Options, Inc.*,
   19 F.3d 1503 (3d Cir. 1994) .................................................................................. 29

*Laifail, Inc. v. Learning 2000, Inc.*,
   No. 01-599(GMS),
   2002 WL 31667861 (D. Del. Nov. 25, 2002) ........................................................ 28

*Lank v. Moyed*,
   909 A.2d 106 (Del. Supr. 2006) ............................................................................ 20

*Leeward Petroleum, Ltd v. Mene Grande Oil Co.*,
   415 F. Supp. 158 (D. Del. 1976) ........................................................................... 10

*MetCap Sec. LLC v. Pearl Senior Care, Inc*,
   C.A. No. 2129-VCN,
   2007 WL 1498989 (Del. Ch. May 16, 2007) ................................................... 20-21

*Midland Interiors, Inc. v. Burleigh*,
   No. Civ. A. 18544,
   2006 WL 3783476 (Del. Ch. Dec. 19, 2006) ........................................................ 37

*Mortgage Elec. Registration Sys., Inc. v. Azize*,
   965 So. 2d 151 (Fla. App. 2 Dist. 2007) ............................................................... 12

*Mortgage Elec. Registration Sys., Inc. v. Coakley*,
   838 N.Y.S.2d 622 (App. Div. 2d Dep't 2007) ...................................................... 12

*Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*,
   No. 02 CV 7666,
   2004 WL 1886293 (S.D.N.Y. Aug. 24, 2004) ..................................................... 15

*Norwest Bank Indiana, N.A. v. Friedline*,
   591 N.E.2d 599 (Ind. App. 3 Dist. 1992) ............................................................. 19

*Pearson v. Component Tech. Corp.*,
   247 F.3d 471 (3d Cir. 2001) ............................................................................ 24, 30

*Pereira v. Cogan,*
    No. 00 CIV. 619(RWS),
    2001 WL 243537 (S.D.N.Y. Mar. 8, 2001) ............................................................28

*Phipps v. Sch. Dist. of Kansas City,*
    645 S.W.2d 91 (Mo. App., W.D. 1982)..................................................................20

*Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,*
    842 F.2d 1466 (3d Cir. 1988).....................................................................40, 41, 43

*Pina v. Henkel Corp.,*
    No. Civ. A. 4048,
    2008 WL 819901 (E.D. Pa. Mar. 26, 2008)...........................................................26

*Publicker Indus., Inc. v. Roman Ceramics Corp.,*
    603 F.2d 1065 (3d Cir. 1979)............................................................................24, 41

*Ruddy v. Equitable Life Assurance Soc'y of United States,*
    No. DKC00-70,
    2000 WL 964770 (D. Md. June 20, 2000)..............................................................19

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.,*
    No. Civ. 04-1199-SLR,
    2005 WL 851126 (D. Del. Apr. 13, 2005)...........................................24, 26, 41, 46

*Satellite Fin. Planning Corp. v. First Nat'l Bank,*
    633 F. Supp. 386 (D. Del. 1986)......................................................................26, 42

*Seaboard Prop., Inc. v. Bunchman,*
    278 F.2d 679 (5th Cir. 1960) .................................................................................26

*Spanish Tiles, Ltd. v. Hensey,*
    No. 05C07025(RFS),
    2005 WL 3981740 (Del. Super. Mar. 30, 2005).....................................................11

*Sterling Nat'l Mortgage Co. v. Mortgage Corner, Inc.,*
    97 F.3d 39 (3d Cir. 1996).......................................................................................22

*Total Care Physicians, P.A. v. O'Hara,*
    798 A.2d 1043 (Del. Super. 2001).........................................................................21

*Trustees of the Nat'l Elevator Indus. Pension,*
*Health Benefit & Educ. Funds v. Lutyk,*
    332 F.3d 188 (3d Cir. 2003)..........................................................25, 29, 30, 31, 35

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,*
    No. Civ. A. 95-1231-RCL,
    2007 WL 861094 (D.D.C. Mar. 20, 2007)................................................. 25, 26-27

*United States v. Bestfoods,*
    524 U.S. 51 (1998).........................................................................................40, 46

*United States v. Golden Acres, Inc.,*
    702 F. Supp. 1097 (D. Del. 1988),
    *aff'd,* 879 F.2d 860 (3d Cir.1989) .......................................................29, 35, 36, 37

*United States v. Normandy House Nursing Home, Inc.,*
    428 F. Supp. 421 (D. Mass. 1977) .........................................................................37

*United States v. Pisani,*
    646 F.2d 83 (3d Cir. 1981)..........................................18, 28, 29, 30, 33, 35, 36, 37

*VLIW Tech., LLC v. Hewlett-Packard Co.,*
    840 A.2d 606 (Del. Supr. 2003).......................................................................11, 16

*Westwacker K-Parcel LLC v. Pac. Mut. Life Ins. Co.,*
    No. 05C4988,
    2007 WL 2743588 (N.D. Ill. Sept. 11, 2007) .........................................................18

*Zubik v. Zubik,*
    384 F.2d 267 (3d Cir. 1967)....................................................................................36

**Miscellaneous**

Restatement (Second) of Agency § 27 (1958)....................................................................38

Restatement (Second) of Contracts (1981) ........................................................................11

Merriam-Webster's Collegiate Dictionary, Tenth Edition .................................................23

## I.    NATURE AND STAGE OF PROCEEDINGS

Plaintiffs Jose Trevino and Lorry S. Trevino ("Plaintiffs") brought this action against defendants on behalf of themselves and on behalf of a class of similarly situated individuals who were subject to mortgage enforcement actions and who were compelled to pay excessive, improper, unverifiable, and unreasonable costs, fees, and expenses (the "Class"). The action is premised primarily on a breach of contact claim under the theory that the mortgage note gives the mortgagee the right to be reimbursed for its actual and reasonable costs, fees, and expenses associated with enforcement but no more. Plaintiffs allege defendants consistently and flagrantly breach this obligation and, as a result, they and other Class members have been damaged.

Plaintiffs bring this action in the first instance against Merscorp, Inc., and Mortgage Electronic Registration Systems, Inc. (collectively "MERS" unless indicated otherwise) for MERS' role as mortgagee of record on all the mortgages subject to this action. However, because MERS is no more than a front for its primary shareholders (the "Control Defendants"), created and operated not to generate revenue but for the sole purpose of achieving the Control Defendants' financial and administrative objectives, Plaintiffs also bring claims against the Control Defendants through piercing the corporate veil.

Defendants filed four separate motions to dismiss (D.I. 40, 42, 45, 47) Plaintiffs' Amended Class Action Complaint (the "Amended Complaint") (D.I. 10)[1] with supporting memoranda, as follows: (1) MERS' Opening Brief in Support of its Motion to Dismiss Plaintiffs' Amended Class Action Complaint ("MERS Mem.") (D.I. 41);  (2)

---

[1]    References to paragraphs in the Amended Complaint are indicated as "AC ¶___".
References to Court docket entries are indicated as "D.I. ___"

- 1 -

Countrywide Financial Corp., Washington Mutual Bank, Wells Fargo & Co, HSBC Finance Corporation, Fannie Mae, JP Morgan Chase & Co., and Citigroup, Inc.'s Opening Brief in Support of Motion to Dismiss Amended Complaint with Respect to Shareholder Defendants ("SH Mem.") (D.I. 48); (3) GMAC-RFC Holding Company, LLC's Opening Brief in Support of its Motion to Dismiss ("GMAC Mem.") (D.I. 43); and (4) Freddie Mac, filing no separate brief but adopting co-defendants' arguments (*see* D.I. 45).[2]

Plaintiffs submit this omnibus memorandum of law in opposition to the various motions to dismiss by MERS and the Control Defendants.

## II.    SUMMARY OF THE ARGUMENT

1.    Residential mortgage loans are documented by two things; a note evidencing the debt (the "Mortgage Note"), and a mortgage securing that note (the "Mortgage" or "Deed of Trust"). The Mortgage Note is the agreement between the lender and the borrower to lend and pay back money, respectively. The Mortgage Note also provides that the lender is entitled to be "*paid back* ... for all its costs and expenses in enforcing the note ... includ[ing] ... reasonable attorneys' fees." Implicit in this agreement is that the lender can only seek reimbursement for reasonable and actual costs, fees, and expenses incurred to enforce the Mortgage Note.

---

2    As acknowledged in the "Shareholder Defendants" motion to dismiss, the parties have discussed that certain defendants are not properly identified in the pleadings (*see* SH Mem. at 1, n.1). Although Plaintiffs indicated that they would make a non-substantive amendment to the pleadings to correct names using corrections provided by defendants' respective counsel, and circulated a stipulation to that effect, Plaintiffs have been unable to secure defendants' signatures to date. In any event, it appears defendants are not challenging the pleadings on that basis.

2.      Plaintiffs and members of the Class were all subject to enforcement proceedings to one degree or another.[3] Plaintiffs and members of the Class all paid costs, fees, and expenses that were greater than the amounts actually incurred by the mortgagee during enforcement proceedings or that were otherwise improper, unreasonable, and/or unverifiable. Plaintiffs and members of the Class were never reimbursed for such payments. Plaintiffs allege this practice amounts to a breach of contract as well as a breach of good faith and fair dealing in every instance where such conduct occurred.

3.      Defendants challenge the validity of the contract and therefore Plaintiffs allege, in the alternative, that the practice of collecting and retaining improper, unreasonable, and/or unverifiable costs, fees, and expenses amounts to unjust enrichment.

4.      MERS, a 40-person company with approximately $11 million in gross annual revenue, is the mortgagee of record on approximately 50 million mortgages nationwide. As mortgagee of record, MERS is contractually liable on each one of those mortgages. At all relevant times, MERS was mortgagee of record on the Plaintiffs' mortgage as well as the mortgages of each member of the Class.

5.      MERS was established by the Control Defendants, each a major lending institution, for the purpose of circumventing burdensome and expensive local recording laws in order to facilitate a brisk and lucrative secondary mortgage market while at the same time placing a liability buffer between the beneficial owners and the residential borrowers.

---

[3]     Enforcement proceedings means any action taken by the mortgagee, or anyone acting on behalf of the mortgagee, to enforce the terms of the Mortgage Note up to and including foreclosure.

6. When mortgages are recorded, rather than name the lender as mortgagee of record, lenders, including the Control Defendants, name MERS as the mortgagee of record. As mortgagee MERS is endowed with full authority to enforce the Mortgage Note and Mortgage and foreclose on the property. The practical effect of the MERS assignment is that beneficial interest in the mortgages can change hands freely and become securitized, bundled, packaged, and repackaged in a thriving secondary market without the need or expense of updating county records or even notifying the borrowers as to who holds the beneficial interest in their mortgage.

7. When enforcement actions and foreclosures are commenced, they are done in the name of MERS even though MERS is not directly involved in the process. Rather, MERS appoints employees of the loan servicers (typically one of the Control Defendants), as "MERS agents" to handle and oversee the process. Effectively, MERS agents work for the loan servicer, fulfilling the servicer's normal duties, but wearing the MERS hat.

8. MERS was created and remains dominated and controlled by the Control Defendants. The Control Defendants, together with other MERS shareholders, make up nearly half of MERS' board of directors and have permanent, designated seats on the board. MERS is maintained for the sole purpose of furthering the Control Defendants' business interests and does not, itself, derive any benefit from the arrangement. In fact, MERS does not pay dividends and avoids taking in more revenue than it needs to operate.

9. Because Plaintiffs sufficiently allege that the Control Defendants are the alter ego of MERS, the Control Defendants are liable for conduct alleged in the Amended Complaint. Even if the Control Defendants were not determined to be the alter ego of

-4-

MERS, there remains sufficient basis to disregard their corporate separateness through agency liability.

10.     Finally, defendants wrongly argue that there are no facts or allegations supporting direct liability against any of the Control Defendants.    To the contrary, Plaintiffs specifically allege that Washington Mutual was the lender and beneficial owner of their mortgage and obliged to honor all terms of the Mortgage Note. By ignoring these allegations, defendants necessarily concede the point.[4]

For these reasons, each of the defendants' motions to dismiss should be denied.

## III.    STATEMENT OF FACTS

### A.    The Plaintiffs

In the spring of 2006, Lorry and Jose Trevino fell behind on their mortgage with Washington Mutual due to an unfortunate confluence of events whereby both Mr. and Mrs. Trevino suffered serious health problems and could not work. Mrs. Trevino remains disabled and largely confined to home due to chronic illness.

In April 2006, the Trevinos received a collection notice demanding payment of past due amounts, plus fees and expenses, and threatening foreclosure within thirty (30) days. Thereafter, the Trevinos made efforts to work with Washington Mutual and get back in good standing.    In May, however, they received a letter from a law firm

---

[4]    Plaintiffs misalleged that Washington Mutual was the lender and loan servicer on Plaintiffs' mortgage but that Wells Fargo was the loan servicer at the time enforcement proceedings were undertaken (in March/April 2006). Subsequent to filing the Amended Complaint, it was determined that Washington Mutual remained the lender and loan servicer throughout the enforcement and loan modification process and that the mortgage was subsequently transferred to Wells Fargo in November 2006.    Since defendants possess this information and are fully aware as to which one of them held the beneficial interest in the Plaintiffs' mortgage at the time of enforcement, this certainly is no surprise. If Plaintiffs are given the opportunity to amend the pleadings to make the modifications noted above in footnote 2, they will make this correction as well.

informing them that the firm had been retained to initiate foreclosure proceedings against them. Shortly thereafter, the Trevinos entered into a loan modification agreement with Washington Mutual providing for revised payment terms and reimbursement of over $3,000.00 in fees and expenses, including:

- "Title Update & Recording Fees".....................................$310.00
- " Foreclosure Fees & Costs".........................................$1,270.00
- "Administrative Fee" .......................................................$300.00
- "Appraisal/BPO Fee".......................................................$300.00
- "Late charged Balance" ..................................................$823.36
- "Property Inspection Fees" ...............................................$68.40

          **Total Costs, Fees Expenses**        **$3,072.32**

Despite all the charges levied against and paid by the Trevinos, other than the one letter sent by the law firm that initiated the non-judicial foreclosure proceedings, no other action was taken.[5] Indeed, public records demonstrate that there were absolutely no county recordings between 2003 and 2007 (MERS remained mortgagee throughout). *See* St. Louis County Deed Search Results, Plaintiffs' Request For Judicial Notice ("RJN"), Exhibit A. Likewise, it appears no appraisal was done on the property.[6] The other fees charged to and paid by the Trevinos are either unverifiable, vague, or unreasonable. Certainly, the minimal work undertaken by the law firm, *after the Trevinos had already*

---

[5]    No foreclosure sale took place in this instance and the initiation of a non-judicial foreclosure involves no more than sending a brief notice to the homeowner and simultaneously publishing notice in the local paper.

[6]    As alleged in the Amended Complaint, residential appraisals are comprehensive undertakings requiring significant time inside and around the home. *See* AC ¶¶ 52-54. As noted, Ms. Trevino is home-bound and would have noticed an appraisal being done of her home. In any event, no appraisal report was ever supplied and there is no evidence that an appraisal was ever done.

- 6 -

***begun negotiating a loan modification agreement***, could not amount to $1,270.00. And, even if it did, that is an entirely unreasonable cost to pass along.[7]

## B.    MERS

Although Washington Mutual was the lender and loan servicer on the Plaintiffs' mortgage, MERS was listed on the Deed of Trust and in the county records as the mortgagee of record. *See* AC ¶¶ 24-25, RJN, Ex. A. Because of this, MERS is primarily liable for breaches of the Mortgage Note.[8]

Mortgage Electronic Registration Systems, Inc., a Delaware corporation based in Vienna, Virginia, is the wholly owned, operational arm of Merscorp, Inc. The two share employees and management and occupy the same facility. *See* AC ¶¶ 8(a)-(g). By all accounts, including that of its President and CEO, R.K. Arnold, MERS functions as a single, "synchronized" unit. *Id.*; Deposition of R.K. Arnold taken in *Merscorp, Inc. & Mortgage Electronic Registration Systems, Inc. v. Romaine* ("*Romaine* Case"), Case No. 2004-04735 (N.Y.S.Ct., Suffolk County), RJN, Ex. B, pp. 573-74.    MERS was established by the Control Defendants and others in the mortgage industry to streamline the recording process and facilitate a secondary market in mortgages. AC ¶ 8(e).

MERS' role in the mortgage process is two-fold. First, through the mortgage instrument (*i.e.*, Mortgage or Deed of Trust), MERS becomes the mortgagee of record

---

[7]    Plaintiffs' investigation has revealed that foreclosure attorneys typically work on a flat-fee, per-case rate in the range of $400-$500. AC ¶ 36. If this is indeed the rate at which the law firm here was paid, the Trevinos were overcharged at least $770.00 in "foreclosure fees and costs" alone.

[8]    As noted herein, Washington Mutual was the lender and loan servicer on the Plaintiffs' mortgage, albeit not the mortgagee of record. Consequently, Washington Mutual may be subject to direct liability for the claims asserted in the Amended Complaint.

and is named in the county land records as such. As mortgagee, MERS has full authority to enforce the terms of the mortgage and Mortgage Note. The lending member of MERS is not recorded as a mortgagee.[9] AC ¶¶ 8(e)-(f), 21-33.

Second, MERS maintains a database (the "MERS System") of the beneficial owners and loan servicers of the mortgages where it stands as the mortgagee of record. AC ¶ 8(e). Because of the MERS System, mortgages can freely trade hands in the secondary market without the need or expense of updating county land records or the hassle of notifying borrowers as to what entity (or entities, or trust, or fund, etc.) holds the beneficial interest in their mortgage. No matter how many times the mortgage changes hands, the county land records remain consistent and unchanged at all times with MERS listed as mortgagee. *See e.g.*, RJN, Ex. A.

MERS employs roughly 40 people in a small suburban office located in Vienna, Va. AC ¶ 8(a). MERS' gross annual income of approximately $11 million is made up entirely from its members' annual dues and registration fees. *See* AC ¶¶ 8(a)-(b), *See* RJN, Ex. B, p. 628. MERS pays no dividends to its shareholders and, in fact, derives no discernable benefit from its role in the mortgage process. RJN, Ex. D, p. 725. Indeed, MERS does not operate to generate a profit but rather solely to cover its costs and operating expenses. *See* RJN, Ex. D, pp. 86-87, transcript of hearing in *Romaine* Case; RJN, Ex. B, pp. 583-84.

---

9       A mortgage lender can become a member of MERS and have its mortgage loans registered in the MERS System by paying annual membership dues plus a nominal fee for every residential mortgage entered in the system. Its members contractually agree to appoint MERS to act as their common agent and as the mortgagee on all loans they register on the MERS System. All of the Control Defendants are owners as well as members of MERS. AC ¶ 8(c).

Despite its thin employee and financial composition, last year MERS announced
it was mortgagee of record on *50 million mortgages nationwide*. *See* RJN, Ex. F, Press
Release, dated May 24, 2007, entitled "50 Millionth Loan Registered on the MERS®
System." Because MERS is not equipped to handle enforcement and foreclosure efforts
on this scale, part of the MERS arrangement is to deputize employees of the loan
servicers to act as MERS agents in the enforcement process. AC ¶ 29, Ex. D; *see also*
RJN, Ex. E, p. 16. In this way, the loan servicer performs his or her normal duties (*i.e.*,
retain counsel, send collection notices, etc.) but does so under the guise of MERS.

### C.    The Control Defendants

MERS was established and remains dominated and controlled by its 30
shareholders -- a number of whom sit and have designated seats on MERS' board of
directors, including several of the Control Defendants. AC ¶¶ 9(a)-(j). Of these
shareholders, the Control Defendants are the most dominant and consist of the nation's
leading mortgage lenders and largest beneficiaries of the secondary mortgage market
made possible by MERS. AC ¶ 9(k). In contrast to MERS, the Control Defendants
employ hundreds of thousands of individuals and collectively generate tens of billions of
dollars in annual revenue.

By design, the Control Defendants are the primary beneficiaries of the
arrangement with MERS. It costs the Control Defendants virtually nothing to operate
and maintain MERS yet, by relieving them of the burdens of local recording requirements
and communications with borrowers, it facilitates an immensely profitable and efficient
secondary mortgage market. Having MERS in place also puts a liability buffer between
the lender and the borrower and obfuscates who holds the beneficial interest in a

- 9 -

mortgage. Even though the Control Defendants continue to enforce mortgages as they have done in the past, today they can do so as agents of MERS. The two parties who gain absolutely nothing from this arrangement are the borrowers and MERS.

## IV.    ARGUMENT

### A.    Standard Of Review

The Amended Complaint "must be liberally construed, with the benefit of all proper inferences being given to the plaintiff. Nor must every essential fact be set down in the pleadings: it is sufficient if a fair reading of the complaint provides sufficient notice of the claim and its scope." *Leeward Petroleum, Ltd v. Mene Grande Oil Co.*, 415 F. Supp. 158, 162 (D. Del. 1976). Because "[t]he purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case," the court looks to "'whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer.'" *Diebold Inc. v. Positran Mfg., Inc.*, No, C.A. 02-374(GMS), 2002 WL 31234450, at *1 (D. Del. Oct. 4, 2002).

Therefore, "[a]t this stage of the proceedings, the issue is not the likelihood of plaintiff's prevailing, but whether plaintiff may be allowed to present evidence." *Leeward Petroleum*, 415 F. Supp. at 163. The complaint will be sustained so long as it "fairly puts the defendant [ ] on notice as to the nature of the claims, and the substance of the allegations; and the Court cannot say as a matter of law that the plaintiff is entitled to no relief under any provable state of facts." *Id.* at 162. Because the Amended Complaint sufficiently puts defendants on notice as to the claims against them, defendants' motions to dismiss should be denied.

- 10 -

### B.    The Mortgage Note Is An Enforceable Contract Against MERS

In order to survive a motion to dismiss on a breach of contract claim, under both Missouri and Delaware law, the plaintiff must demonstrate: (a) the existence of a valid and enforceable contract between the parties; (b) a breach of an obligation imposed by the contract; and (c) damages resulting from the breach. *See Associated Indem. Corp. v. Small*, No. 06-00187-(CYW) (RCL), 2007 WL 844773, at *9 (W.D. Mo. Mar. 19, 2007); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. Supr. 2003).[10] Here, Plaintiffs sufficiently allege: (a) the Mortgage Note was an enforceable contract between MERS, as mortgagee of record, and the Plaintiffs, as mortgagors; (b) MERS breached the Mortgage Note by charging and collecting costs, fees, and expenses from Plaintiffs that it neither incurred nor was entitled to; and (c) Plaintiffs suffered damages as a result.[11] Because Plaintiffs' allegations against MERS sufficiently lay out a claim for breach of contract, MERS' motion to dismiss should be denied.

---

[10]    Defendants argue that Missouri contract law should apply since the Plaintiffs' mortgage was executed in that state. *See* MERS Mem. at 9. Whichever law applies (whether determined now or later in the litigation), Plaintiffs submit there is no material difference in the contract laws of the several states or, for that matter, the Restatement (Second) of Contracts, as applied to the straightforward allegations in this action.

[11]    *See, e.g.*, *Spanish Tiles, Ltd. v. Hensey*, No. 05C07025(RFS), 2005 WL 3981740, at *3 (Del. Super. Mar. 30, 2005) ("Plaintiffs have alleged that there was a contract, that the contract was assumed by one of the defendants and later breached, resulting in damages to [plaintiffs]. As such, Plaintiffs have met the minimal requirements for a well pleaded complaint."); *VLIW Tech.*, 840 A.2d at 612 (complaint met pleading burden "by averring that a contract between VILW and H-P existed, that the licensed technology was being used … in contravention of the Agreement, and that VLIW was damaged as a result. The allegation of these facts in the [] complaint was sufficient to put the defendants [] on notice of VLIW's claims against them").

### 1.    **The Mortgage Note Binds MERS**

MERS makes the untenable (and hypocritical) argument that the Mortgage Note "cannot form the basis of a breach of contract claim **against MERS** because, on its face, nothing in the Note obligates MERS to perform under its terms." MERS Mem. at 13 (emphasis in orig.). Although it is technically correct that MERS does not appear on the Mortgage Note, the Deed of Trust (AC, Ex. B) specifically nominates MERS to stand in the shoes of the lender, its successors and assigns under the mortgage and Mortgage Note. Thus, the fact that MERS is not specifically named on the Mortgage Note is irrelevant because the Deed of Trust grants MERS express authority to enforce the provisions of the Mortgage Note.

It is also a specious argument to make because MERS has prevailed in virtually every case where its standing to pursue enforcement was challenged. *See, e.g.*, *Mortgage Elec. Registration Sys., Inc. v. Coakley*, 838 N.Y.S.2d 622 (App. Div. 2d Dep't 2007) (MERS was lawful holder of promissory note and therefore had standing to bring foreclosure action); *In re Sina*, No. A06-200, 2006 WL 2729544 (Minn. App. Sept. 26, 2006) (MERS has standing as record mortgagee); *Mortgage Elec. Registration Sys., Inc. v. Azize*, 965 So. 2d 151 (Fla. App. 2 Dist. 2007)(so long as MERS can show it is holder of the mortgage and note, it has standing to foreclose). MERS' prior conduct as a plaintiff is tantamount to a concession that it a contractual party to the Mortgage Note. Consequently, MERS cannot use its authority as the mortgagee of record when it suits them, but deny its authority when facing liability.

To the extent MERS is somehow suggesting it can pick and choose which provisions of which document it can enforce and be liable for, it is axiomatic that the

mortgage instruments operate in tandem and represent the entirety of the agreement between the parties. As the First Circuit recognized in *In re Olympic Mills Corp.*, 477 F.3d 1, 14 (1st Cir. 2007), it is a "long-recognized principle" that:

> in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other.

Because the loan agreement and promissory note in *Olympic Mills* were signed on the same day, between substantially the same parties, as part of the same transaction for a unitary purpose, the First Circuit held that both writings had to be read in tandem together in determining the obligations of the parties. *Id.* at 15, 17; *see also In re LG Philips Displays USA, Inc.*, No. 06-102459(BLS), 2006 WL 1748671, at *4 (Bankr. D. Del. June 21, 2006) ("'all of the contracts that comprise an integrated agreement must either be assumed or rejected, since they all make up one contract.'"); *In re Philip Serv. (Delaware), Inc.*, 284 B.R. 541, 546 (Bankr. D. Del. 2002), aff'd, 303 B.R. 574 (D. Del. 2003) (holding that promissory note delivered in connection with merger agreement was fully integrated with merger agreement, thereby constituting one agreement, the terms of which dictated both parties' obligations).

MERS cannot take the position that it has all the rights under the mortgage agreement and Mortgage Note but none of the obligations. *See In re LG Philips Displays USA*, 2006 WL 1748671, at *4 ("a party may not pick and choose among elements of a contract to assume or reject"); *Haft v. Dart Group Corp.*, 841 F. Supp. 549, 564 (D. Del. 1993) ("Of course, central to contract law is the notion that the parties are bound by the terms of their agreement."). As Plaintiffs sufficiently allege, MERS cannot enforce the

Mortgage Note to collect costs, fees, and expenses associated with enforcement proceedings and then take the position that it is not liable for breach of contract when it turns out those sums exceed the amounts to which MERS or its agents were entitled. Accordingly, the Mortgage Note can serve as the basis of Plaintiffs' breach of contract claim against MERS.

### 2.    MERS Has Obligations Under The Mortgage Note

In similar fashion, MERS advances an utterly illogical argument in the alternative regarding its obligations (or rather lack thereof) under the Mortgage Note.  According to MERS, the Mortgage Note imposes an *obligation* on Plaintiffs to pay costs, fees, and expenses associated with enforcement proceedings and confers a *right* to the mortgagee to recover such sums. However, MERS contends that it may ignore the concomitant obligations and limitations the Mortgage Note imposes on it to ensure such sums are accurate and reasonable. MERS Mem. at 2, 12-15.  This flawed approach runs counter to basic contract law and, tellingly, MERS cites no supporting authority for the position. MERS Mem. at 15.

Despite MERS' claim to the contrary, the Mortgage Note is an enforceable contract, the terms of which are binding on both MERS and the borrower.    Under "BORROWER'S PROMISE TO PAY," the Mortgage Note reads, "In return for a loan that I received, I promise to pay…plus interest to the order of the Lender." AC, Ex. A., Mortgage Note, Section 1.  Therefore, once the loan was issued, the Note became an enforceable contract, whereby MERS, as nominee for the lender, and the borrower became contractually bound by the terms of the Mortgage Note. *See First Wisconsin Nat'l Bank v. Oby*, 188 N.W.2d 454, 457-59 (Wis. 1971) (where bank agreed to make

- 14 -

loan to borrower in exchange for promise to repay all sums borrowed, terms of agreement became enforceable on both parties once bank issued the loan); *Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*, No. 02 CV 7666, 2004 WL 1886293, at *2 (S.D.N.Y. Aug. 24, 2004) (where promissory note executed in exchange for loan given, parties were bound by provisions of promissory note).[12]

According to the Payment of Note Holder's Costs and Expenses provision of the Mortgage Note, in the event of foreclosure, "the Note Holder will have the right to be *paid back* by [borrower] for all of *its costs and expenses* in enforcing the Note to the extent not prohibited by applicable law." AC, Ex. A, Mortgage Note, Section 6(E) (emphasis added). Even if MERS was not contractually obligated to collect costs, fees, and expenses from borrowers at the time of contracting, once MERS invoked its reimbursement authority under the Mortgage Note, it became obligated to collect only such sums that were actually incurred during enforcement proceedings. *See, e.g., Oby*, 188 N.W.2d at 458 ("The test of mutuality of obligation, and therefore sufficiency of consideration, is not to be applied at the time the respective promises are made, but rather as of the time when one or the other is sought to be enforced.").[13] Accordingly, if MERS,

_____

[12]    *See also Gordon v. SouthTrust Bank*, 108 Fed. Appx. 837, 840-41 (5th Cir. 2004) (holding that lending bank's failure to disburse loan proceeds in a precise manner directed under promissory notes constituted breach of promissory notes); *Chicago Dist. Council of Carpenters Pension Fund v. Marzullo*, No. 94C4616, 1995 WL 549104, at *2 (N.D. Ill. Sept. 11, 1995) (rejecting defendant's argument that promissory note was void for want of consideration because defendant received value and consideration for issuing the promissory note).

[13]    Similarly, in *Ferguson v. Ferguson*, 470 N.Y.S.2d 715, 716 (App. Div. 3d Dep't 1983), the court rejected the claim that because only one party had the right to terminate the contract, the contract lacked mutuality of obligation. In finding that argument to be "without merit," the court held that an initial absence of mutuality of obligation "'may be

- 15 -

either directly or through its agents, demanded or collected costs, fees, and expenses from borrowers in amounts that exceeded actual debts incurred, the Mortgage Note was breached.

### 3.    MERS Breached The Mortgage Note Resulting in Damages To Plaintiffs And the Class

Unable to evade its contractual obligations under the Mortgage Note, MERS inexplicably and incorrectly argues that Plaintiffs failed to allege any breach: "nowhere does the Amended Complaint allege the Plaintiffs ever actually **paid** the allegedly excessive fees and expenses to MERS or anyone else." MERS Mem. at 15 (emphasis in orig.). This is just wrong. Throughout the Amended Complaint, Plaintiffs expressly and/or implicitly allege that MERS demanded, collected, and retained improper costs, fees, and expenses from Plaintiffs and members of the class. For example:

> (a) Specifically, prior to and during the Class Period, **MERS has extracted and continues to extract improper costs, fees, and expenses from Plaintiffs and members of the Class in excess of sums they actually incurred and/or were obligated to pay.** AC ¶ 1 (emphasis added).

> (b) Plaintiffs, on their own behalf, and as representatives of a Class of similarly situated individuals, **seek to recover compensatory damages in the amount of costs, fees, and expenses, including attorneys' fees, collected or obtained by MERS or its agents that exceeded any sums MERS actually incurred or was obligated to pay** in connection with any enforcement actions involving Plaintiffs and members of the Class. AC ¶ 3 (emphasis added).

> (c) In some cases, due to the overcharging, **borrowers are also left unable to recoup residual equity from their homes upon foreclosure sales to third parties. Even after the terms of the Mortgage Note are otherwise satisfied, the charges are added to the knock-down price paid by the purchaser and retained by the attorneys.** This has the effect of deleting or nullifying any possibility of surplus monies from

remedied by the subsequent conduct of the parties.'" *Id.* (citing 21 N.Y. Jur. 2d, Contracts, § 11, pp. 423-24).

the sale that all state laws require remain the property of the mortgagee-borrowers. AC ¶ 61 (emphasis added).

(d) ***Funds resulting from increased value that the borrowers are entitled to after satisfying the Mortgage Note now represent a windfall to MERS*** and its agents who were obligated to pay and/or accept lesser amounts. AC ¶ 62 (emphasis added).

(e) As a result of defendants' breaches of their obligations under the Mortgage Note, as described above, ***Plaintiffs and the Class have been damaged in the amount of the attorneys' fees, costs, expenses, and other overcharges not actually incurred by MERS or its agents. Damages sustained by Plaintiffs and the Class are a direct result of defendants' breaches of the Mortgage Note.*** Accordingly, defendants are liable to Plaintiffs and the Class. AC ¶ 69 (emphasis added).

(f) As a result of defendants' breaches of the Mortgage Notes, Plaintiffs and the other members of the Class were damaged by the amount of costs, fees, and expenses, including attorneys' fees, that were overcharged in connection with enforcement and foreclosure proceedings pursued against them by MERS and/or MERS' agents, assigns or successors-in-interest. ***Plaintiffs and other members of the Class are therefore entitled to recover such amounts that were improperly demanded and paid.*** AC ¶ 73 (emphasis added);

(g) Defendants wrongfully over-charged Plaintiffs and members of the Class, and directed and/or permitted their agents, including the loan servicers lenders and attorneys who are beneficiaries of MERS, ***to retain the fees and expenses that were in excess of those agreed upon as well as the interest or other profits earned on the proceeds, which were unlawfully received from Plaintiffs and the other Class members.*** AC ¶ 76 (emphasis added);

(h) By reason of the foregoing, ***Plaintiffs and each individual Class member, are entitled to the return of the sums paid in excess of the costs, fees, and expenses actually incurred*** or obligated to be paid by defendants. AC ¶ 77 (emphasis added).

These allegations, if accepted as true, establish that MERS breached the Mortgage Note and that Plaintiffs suffered damages as a result. *See Hills Stores Co. v. Bozic*, 769 A.2d 88, 110-13 (Del. Ch. 2000).

In *Hills Stores*, a corporation brought a breach of contract action against former members of its board of directors for collecting severance and other payments in amounts substantially greater than were authorized by their employment contracts. Although the contracts gave the defendants the right to collect certain payments upon a change in control of the corporation, the court found that the language of the agreements precluded defendants' receipt of excess payments, and defendants' retention of such excess payments constituted a breach of contract. *Id.*; *see also Westwacker K-Parcel LLC v. Pac. Mut. Life Ins. Co.*, No. 05C4988, 2007 WL 2743588, at \*5, 7-8 (N.D. Ill. Sept. 11, 2007) (where court granted summary judgment to the plaintiff in a breach of contract action after it was demonstrated that plaintiff paid attorneys' fees and interest payments to defendant in excess of what the mortgage loan documents permitted); *VLIW*, 840 A.2d at 613 (allegation that plaintiff "has been damaged by [defendant's] breach of the 1990 Agreement" was sufficient to allege breach of contract damages); *Westwacker K-Parcel LLC*, 2007 WL 2743588, at \*5, 7-8 (granting summary judgment upon plaintiff's demonstration that he was damaged in amount of attorneys' fees and interest payments made to defendant in excess of what the mortgage loan documents permitted); *United States v. Pisani*, 646 F.2d 83, 90 (3d Cir. 1981)(where defendant collected payments in excess of amounts it was entitled to under Medicare program, damages measured as amount of costs collected in excess of those defendant actually incurred); *Gordon*, 108 Fed. Appx. at 841 (where lending bank collected excessive interest payments under promissory notes, damages measured as amount of excess payments it already made to lender); *Christopher v. First Mut. Corp.*, No. 05-01149, 2006 WL 166566, at \*4 (E.D. Pa. Jan. 20, 2006) ("[i]f [defendants] demanded more than the amount due to them under the

- 18 -

mortgages, as [plaintiff] asserts, then they breached the contracts"); *Ruddy v. Equitable Life Assurance Soc'y of United States,* No. DKC00-70, 2000 WL 964770, at \*5 (D. Md. June 20, 2000) (although breach of contract claim for collection of excessive payments under whole life policy was barred by statute of limitations, court held in dictum that contract was breached, "at the very latest, when [defendant] demanded additional payments from Plaintiff to maintain the policy").

Similar to the "Payment of Note Holder's Costs and Expenses" provision in the Mortgage Note, a provision in the promissory note at issue in *Norwest Bank Indiana, N.A. v. Friedline,* 591 N.E.2d 599 (Ind. App. 3 Dist. 1992) provided that, "'[i]f suit is brought to collect this Note, the Note holder shall be entitled to collect *all reasonable costs and expenses of suit, including, but not limited to,* reasonable attorney fees . . ..'" *Id.* at 601 (emphasis in original). The corresponding mortgage instrument also provided that "'[L]ender shall be entitled to collect in such [a foreclosure] proceeding all expenses of *foreclosure, including, but not limited to,* reasonable attorney's fees and costs . . ..'" *Id.* (emphasis in original). Upon foreclosing on the defaulting mortgagor's property, the mortgage note holder required the mortgagor to pay for costs of environmental assessments conducted on the property as part of the foreclosure process. The court held, however, that "reasonable cost and expense of suit" and "expense of foreclosure" could be properly found to "contemplate common or incidental expenses *incurred* when suing on a note or foreclosing on another's property." *Id.* at 601 (emphasis added). In denying the mortgagee these fees, the court held that although a lender may conduct environmental assessments as part of its foreclosure process, such an expense was not required for the lender to foreclose on the property and was not something that

- 19 -

reasonably would be contemplated by a borrower as a normal foreclosure expense. *Id.* at 601-602.

Here, although MERS had full authority under the Mortgage Note to collect reasonable costs, fees, and expenses that were actually incurred in the course of enforcement, demanding and collecting any excess sums constitutes a breach of contract. A reasonable borrower would not contemplate being responsible for fees not incurred, fees that were unreasonable, or fees that were unverifiable.[14] However, this is exactly what MERS demanded and collected. Notably, MERS does not, and could not, argue that its collection of such sums was authorized or proper under the Mortgage Note. *See Hills Stores*, 769 A.2d at 112 (in finding a breach of contract, holding that "defendants have failed to advance any argument that [defendants] were entitled to the [excessive payments] they received....This failure is fatal to them").[15] Accordingly, Plaintiffs have sufficiently alleged that MERS breached the terms of the Mortgage Note and that Plaintiffs and the Class were damaged thereby.

## C.    **MERS Has Been Unjustly Enriched**

Unjust enrichment is the "'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *MetCap Sec. LLC v. Pearl Senior Care, Inc,*

---

[14]    To the extent there exists any ambiguity in the contract language, the issue should be resolved in Plaintiffs' favor under to the doctrine of *contra proferentem*. *See Phipps v. Sch. Dist. of Kansas City*, 645 S.W.2d 91, 102 (Mo. App.W.D. 1982); *Lank v. Moyed*, 909 A.2d 106, 110 (Del. Supr. 2006).

[15]    *See also Chestertown Bank v. Walker*, 163 F. 510, 512 (4th Cir. 1908) (where the Fourth Circuit held that a mortgage note's provision providing for a defaulting borrower's payment of costs incurred by the lender should certainly not be construed to mean the borrower had to pay the bank the requested fees "regardless of whether or not [bank] had incurred any such cost of collecting").

C.A. No. 2129-VCN, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007). In finding that a party is entitled to an equitable remedy for unjust enrichment, courts look to several factors: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *Id.*; *see also Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1056 (Del. Super. 2001).

Plaintiffs adequately state a claim against MERS for unjust enrichment by alleging that MERS collected and retained costs, fees, and expenses from Plaintiffs and members of the Class in excess of amounts MERS actually incurred and/or was obligated to pay in enforcing the Mortgage Note. *See, e.g., Hills Stores*, 769 A.2d at 110 (holding that collection and retention of severance and other payments in excess of amounts authorized by contract constituted unjust enrichment).

MERS erroneously claims that Plaintiffs' unjust enrichment claim should fail because of the existence of an enforceable contract between MERS and Plaintiffs. MERS Mem. at 19-20, n.32. Setting aside, for the moment, that MERS simultaneously takes the position that the Mortgage Note is not an enforceable contract between the parties (MERS Mem. at 12-15), the argument still fails. Although it is true that unjust enrichment claims are often dismissed where the plaintiff has an adequate remedy under an express written contract, actions for unjust enrichment are permitted when the validity of a contract is challenged. *In re Student Fin. Corp.*, No. 02-11620, 2004 WL 609329, at ** 6-7 (D. Del. Mar. 23, 2004) ("the Court concludes that [plaintiff's] unjust enrichment claim must survive the instant motion because if the Notes are rescinded due to fraudulent conduct or omissions, there is no valid contract that would preclude

[plaintiff's] unjust enrichment theory"). Because MERS challenges the validity of the Mortgage Note, and Plaintiffs' rights to any contractual remedies, it would be improper to dismiss Plaintiffs' unjust enrichment claim at this juncture.

Rather than address the issue of whether its collection and retention of unearned and/or inflated fees from Plaintiffs and the Class constitutes unjust enrichment, MERS again claims that it could not have been unjustly enriched because "nowhere in the Amended Complaint do Plaintiffs allege they gave or paid MERS anything." MERS Mem. at 17. However, as Plaintiffs already demonstrated (*see* Sec. III(B)(3), *supra*), this argument blatantly ignores numerous allegations contained in the Amended Complaint. Without repeating those here, it suffices to state that Amended Complaint is replete with allegations that, if proven, establish that MERS demanded, collected, and retained unreasonable, unverifiable, inflated, and/or spurious costs, fees, and expenses from Plaintiffs and members of the Class. *See* AC ¶¶ 1, 3, 61, 62, 69, 73, 76, 77. Plaintiffs' allegations, if true, thus establish that Plaintiffs and members of the Class actually paid improper costs, fees, and expenses and that MERS was unjustly enriched thereby. Accordingly, Plaintiffs sufficiently state a claim against MERS for unjust enrichment.

**D.    <u>MERS Breached Its Duty Of Good Faith And Fair Dealing</u>**

For the reasons stated above, the Mortgage Note constitutes a valid contract, and thus, implied in the Note is a covenant of good faith and fair dealing owed by MERS to borrowers. *See In re Student Fin. Corp.*, 2004 WL 609329 at *6. This covenant requires MERS to "'act reasonably to fulfill the intent of the parties to the agreement.'" *Id.* (internal citation omitted). The implied covenant of good faith and fair dealing is thus "a

rule of construction used to fulfill the reasonable expectations of the parties . . .." *Sterling Nat'l Mortgage Co. v. Mortgage Corner, Inc.*, 97 F.3d 39, 43 (3d Cir. 1996).

According to the Mortgage Note, in the event enforcement efforts are undertaken, "the Note Holder will have the right to be *paid back* by [borrower] for all of *its costs and expenses* in enforcing the Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees." AC, Ex. A, Mortgage Note, Sec. 6(E) (emphasis added). The language "paid back" necessarily means reimbursement of those sums expended. *See Merriam-Webster's Collegiate Dictionary, Tenth Edition* ("Reimbursement" means: (1) to pay back to someone or repay; (2) to make restoration or payment of an equivalent to.). Consequently, by its terms, the Mortgage Note permits MERS to seek repayment of costs and expenses actually incurred during enforcement efforts. *See Chestertown Bank*, 163 F. at 512 (holding that mortgage note's provision providing for defaulting borrower's payment of costs incurred by lender could not be construed to mean borrower had to pay lender requested costs "regardless of whether or not [bank] had incurred any such cost").

MERS does not argue that its collection of the costs, fees, and expenses from Plaintiffs and the Class reasonably fulfilled the intent of the Mortgage Note; instead, it again argues that "nowhere in the Amended Complaint" do Plaintiffs allege that MERS itself collected such costs and expenses. MERS Mem. at 22. However, as discussed above, MERS blatantly disregards Plaintiffs' numerous allegations that MERS, or its agents, demanded, collected, and retained inflated, unverifiable, and spurious costs, fees, and expenses from the Plaintiffs and members of the Class. *See* AC ¶¶ 1, 3, 61, 62, 69, 73, 76, 77. As Plaintiffs further allege, a reasonable borrower would not anticipate being

- 23 -

obligated to repay anything more than actual costs, fees, and expenses in the event of enforcement. *See* AC ¶¶ 35, 45. By the conduct alleged in the Amended Complaint, MERS breached its duty of good faith and fair dealing by demanding, collecting, and retaining excessive sums without regard to the terms of the Mortgage Note.

### E.    Piercing MERS' Corporate Veil

There are two distinct ways in which Plaintiffs can pierce the corporate veil to impose liability on the Control Defendants for MERS' unlawful conduct: (1) alter ego liability; and (2) agency liability. *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, No. Civ. 04-1199-SLR, 2005 WL 851126, at *3 (D. Del. Apr. 13, 2005) (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484-86 (3d Cir. 2001)); *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069-70 (3d Cir. 1979) (corporate veil may be pierced under either alter ego or agency analysis). Although such a determination is premature at this stage of the proceedings, Plaintiffs have sufficiently alleged facts to establish both means for piercing the corporate veil of MERS to impose liability on the Control Defendants.[16]

---

[16]    The Control Defendants misguidedly posit that Plaintiffs ignored a "critical step" in establishing the Control Defendants' liability by failing to allege that the corporate veil between Mortgage Electronic Registration Systems, Inc. and Merscorp, Inc. should be pierced. SH Mem. at 5-7; GMAC Mem. at 7. This argument, however, is a red herring for two reasons: (a) because Mortgage Electronic Registration Systems, Inc. and Merscorp, Inc. are, for all intents and purposes, the identical entity sharing the same employees, address, management, etc. (*see* AC ¶¶ 8(a)-(g)), and MERS' own description of itself which makes no distinction between entities (MERS Mem. at 5-6, and AC, Ex. D, Glossary-27, RJN, Ex. B, pp. 573-74); and (b) because Plaintiffs name both Mortgage Electronic Registration Systems, Inc. and Merscorp, Inc. as primary defendants and seek to impose direct liability on both defendants. It is therefore unnecessary for Plaintiffs to pierce the corporate veil between Mortgage Electronic Registration Systems, Inc. and Merscorp, Inc. in order to impose liability against the Control Defendants. Even assuming Plaintiffs had to first make this showing, the allegations and judicially noticed facts overwhelmingly establish the oneness of MERS.

MERS, while observing certain corporate formalities, is nothing more than a contrivance of the Control Defendants to facilitate a lucrative secondary market in mortgages. MERS generates no profits, pays no dividends, and is so grossly undercapitalized that it would be strained to cover but a scant few breach of contract claims despite its role as mortgagee of record on tens of millions of mortgages. MERS seemingly plays an important and ubiquitous role in the mortgage industry yet recognizes no benefit from its position. Meanwhile, thanks to MERS, borrowers are left in the dark as to the beneficial owners of their mortgages and those entities (including the Control Defendants that profit the most) continue to enjoy a shield from contractual liability. Stated simply, maintaining the corporate form in a case such as this, where potentially hundreds of thousands of people could be left without relief, would result in a colossal injustice.

## 1.    Determination On "Piercing" Is Premature

Where an action seeks to pierce the corporate veil, the "central factual issue is control, *i.e.*, whether the parent corporation dominates the activities of the subsidiary." *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 841 (D. Del. 1978). Importantly, the relationship between a corporation and its shareholders and the amount of control shareholders have over the corporation are highly fact-intensive and case-specific determinations. *See, e.g., United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, No. Civ. A. 95-1231-RCL, 2007 WL 861094, at ** 1-2 (D.D.C. Mar. 20, 2007) (holding that alter ego determination is highly fact-specific); *Trustees of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir. 2003) (analysis of alter ego factors is necessarily "highly factual and may vary

substantially."); *Ashland Oil*, 456 F. Supp. at 840-41 ("Whether an agency relationship exists between a parent corporation and its subsidiary is normally a question of fact.").

Necessarily, the determination of whether a corporate veil may be pierced is a fact-intensive inquiry ill-suited for a motion to dismiss. *See Pina v. Henkel Corp.*, No. Civ. A. 4048, 2008 WL 819901, at *8 (E.D. Pa. Mar. 26, 2008) (motion to dismiss denied where pleadings did not establish alter ego liability but was enough to allow plaintiff to more fully develop record); *Satellite Fin. Planning Corp. v. First Nat'l Bank*, 633 F. Supp. 386, 400 (D. Del. 1986) ("The question of control, central to the determination of the agency issue, cannot be resolved in this motion to dismiss."); *Seaboard Prop., Inc. v. Bunchman*, 278 F.2d 679, 681 (5th Cir. 1960) ("Generally speaking, the question of whether an agency relationship exists is a question of fact to be resolved by the jury."); *In re Buckhead Am. Corp.*, 178 B.R. 956, 975 (D. Del. 1994) ("In any event, as plaintiff aptly notes, 'the nature and extent of the dominion and control exercised by [defendants] over DIA is a question of fact, not subject to resolution on a motion to dismiss.' Consequently, defendants' motion to dismiss this count will be denied.").

Accordingly, courts have routinely denied motions to dismiss in order to afford plaintiffs an opportunity to conduct discovery. *See, e.g., SRI Int'l*, 2005 WL 851126, at *3 (denying motion to dismiss so discovery could proceed on issue of defendant's liability under alter ego and agency tests); *Ethypharm S.A. France v. Bentley Pharm., Inc.*, 388 F. Supp. 2d 426, 432 (D. Del. 2005) (in denying motion to dismiss, holding that, "[b]ecause it is unclear what the relationship is between defendant and [defendant's agent], it is unclear how much control defendant has over [defendant's agent].... Plaintiffs are entitled to discovery on this issue") (citations omitted); *Harbert*, 2007 WL

- 26 -

861094, at *1 (denying motion to dismiss because "[i]n light of the fact-specific nature of the determination, the Court finds that an alter ego analysis is a matter for the jury"); *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, 65 Fed. Appx. 803, 808 (3d Cir. 2003) (denying motion to dismiss because "discovery is necessary when an agency relationship is alleged, thereby implicitly allowing allegations of agency to survive a facial attack") (citing *Canavan v. Beneficial Fin. Corp.*, 553 F.2d 860, 865 (3d Cir. 1977) (in denying motion to dismiss and granting plaintiff discovery, holding that, "[b]ecause the existence of an agency relationship hinges largely on the particular facts of each case, discovery was essential to the preparation of an agency theory argument in this case.")); *Billops v. Magness Constr. Co.*, 391 A.2d 196, 198 (Del. 1978)("It is our opinion that there are sufficient facts of record which, along with the reasonable inferences therefrom, show day-to-day control of the business of the Brandywine Hilton Inn by the franchisors so that the latter's motion for summary judgment should have been denied leaving the issue of actual agency to be resolved at trial.").

Accordingly, the Control Defendants' motions to dismiss Plaintiffs' veil piercing claims should be denied as premature.

### 2.    The Control Defendants Are The Alter Ego Of MERS

As the Third Circuit recognized in *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002), "Abuses of the corporate form allow courts to impose liability on the corporation's shareholders. *The purpose of . . . piercing the corporate veil 'is to prevent an independent corporation from being used to defeat the ends of justice*, to perpetuate fraud, to accomplish a crime, or otherwise to evade the law. . .." (Emphasis added.) Piercing the corporate veil is thus

"'a tool of equity,'" "'a remedy that is involved when [a subservient] corporation is acting as an *alter ego* of [a dominant corporation].'"[17] *Id.* (emphasis in original; internal citations omitted). "In the interests of justice, in an 'appropriate case,' a party wronged by actions taken by an owner shielded by the veil of a corporate shell may exercise its equitable right to pierce that screen and 'skewer' the corporate owner." *David v. Mast*, No. 1369-K, 1999 WL 135244, at *2 (Del. Ch. Mar. 2, 1999).

In order to state a claim for piercing the corporate veil under an alter ego theory, a plaintiff must show that: (1) the corporation and its shareholders "operated as a single economic entity" and (2) that an "'overall element of injustice or unfairness ... [is] present.'" *Laifail, Inc. v. Learning 2000, Inc.*, No. 01-599(GMS), 2002 WL 31667861, at *11 (D. Del. Nov. 25, 2002) (quoting *Harper*, 743 F. Supp. at 1085).[18] Stated otherwise, the alter ego standard "may be restated as: 'whether the two entities operated as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them." *Harper*, 743 F. Supp. at 1085.

---

[17]    Although often applied in cases involving parent and subsidiary corporations, "[t]his standard has been applied in cases involving veil piercing as between a corporation and its shareholders or directors." *Acciai Speciali Terni USA, Inc. v. Momene*, 202 F. Supp. 2d 203, 208 (S.D.N.Y. 2002); *see also Pisani*, 646 F.2d at 86; *Harper v. Delaware Valley Broad., Inc.*, 743 F. Supp. 1076, 1085, *aff'd*, 932 F.2d 959 (3d Cir. 1991); *Pereira v. Cogan*, No. 00 CIV. 619(RWS), 2001 WL 243537, at *21 (S.D.N.Y. Mar. 8, 2001) (citing *David v. Mast*, No. 1369-K, 1999 WL 135244, at *2 (Del. Ch. Mar. 2, 1999)).

[18]    Although federal law controls the issue of whether to pierce the corporate veil, the analysis would be the same if it was conducted under Delaware state law. *See Golden Acres, Inc.*, 702 F. Supp. at 1104 (in choosing to apply federal law, "we find that the Delaware test for piercing the corporate veil is altogether compatible with the federal analysis laid out in *Pisani*.... Thus, even if we were to incorporate Delaware law in this case, we might well look to federal cases such as *Pisani* for specific guidance").

## a.     MERS And The Control Defendants
## Operated As A Single Economic Unit

An alter ego analysis "must start with an examination of factors which reveal how

the corporation operates and the particular defendant's relationship to that operation."

*Harper*, 743 F. Supp. at 1085; *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097,

1104 (D. Del. 1988), *aff'd,* 879 F.2d 860 (3d Cir. 1989). In *Pisani*, 646 F.2d at 88-89, the

Third Circuit set forth several of these factors for a court to consider in determining

whether a "single economic" unit exists between entities as to warrant treating them as

alter egos. These factors include: (1) whether the corporation was adequately capitalized

for the corporate undertaking; (2) nonpayment of dividends; (3) failure to observe

corporate formalities; (4) whether the corporation was insolvent at the time; (5) whether

the dominant shareholder siphoned corporate funds; (6) absence of corporate records; and

(7) whether, in general, the corporation simply functioned as a facade for the operations

of the dominant shareholder.[19] *Id.* (citing *Dewitt,* 540 F.2d at 686-87); *see also, Diebold*

*Inc.*, 2002 WL 31234450, at *2; *Golden Acres*, 702 F. Supp. at 1104. The *Pisani* list of

factors, however, is "not conjunctive, nor is it an exclusive list." *Diebold*, at *2; *see also*

*Lutyk*, 332 F.3d at 196 ("The alter ego doctrine is not applied by a test, but by

consideration of relevant 'factors . . . [to determine] whether the debtor corporation is

little more than a legal fiction.'"); *Golden Acres*, 702 F. Supp. at 1104 ("some

combination" of *Pisani* factors is required to pierce the corporate veil) (citing *Dewitt,* 540

F.2d at 685);

---

[19]     In articulating the federal alter ego standard, the *Pisani* court adopted the analysis
used by the Fourth Circuit in *Dewitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540
F.2d 681 (4th Cir. 1976). Since "being adopted by the *Pisani* court, the *Dewitt* alter ego
analysis has been applied repeatedly by the Third Circuit." *Golden Acres*, 702 F. Supp. at
1104 n.4 (citing cases).

- 29 -

What factors apply or how much weight should be afforded to each depends on the facts of the case and claims asserted. *See, e.g., Kaplan v. First Options, Inc.*, 19 F.3d 1503, 1522 (3d Cir. 1994) ("alter ego status is determined by conduct of the parties that is material to the dispute at hand"); *Lutyk*, 332 F.3d at 196 (in alter ego analysis, "[p]erhaps as important as what the District Court did consider was what it properly did *not* consider") (citing *Pearson*, 247 F.3d at 495 (factors need to be "relevant")). An examination of the *Pisani* factors relevant to this action demonstrates that MERS has, at all relevant times, been nothing more than a facially legitimized front for the Control Defendants.

### (i)    **MERS Is Grossly Undercapitalized**

MERS is not operated for the purpose of conducting business or obtaining profits on its own behalf. Instead, as Plaintiffs allege, the Control Defendants operate MERS for a single, self-serving purpose; namely, to benefit the Control Defendants by lowering the cost of their mortgage lending operations, facilitating a secondary mortgage market unburdened by local recording requirements, and placing a liability barrier between themselves and the borrowers. *See* AC ¶ 9(j). As Charles C. Martorana, counsel for MERS in the *Romaine* Case, represented to the court, "MERS is a . . . form of utility in the sense that it performs a service for the mortgage lending industry and as such, *it is not designed to make big profits, it is there to provide a service to the mortgage lending industry*." *See* RJN, Ex. D, pp. 86-87 (emphasis added).

That MERS serves no purpose other than serving the needs of its shareholders was corroborated by MERS' President and CEO, R.K. Arnold, in a deposition conducted in the *Romaine* Case:

- 30 -

Q:    In all the meetings that you had with potential shareholders, did any of them raise the topic or discuss the topic with you of prospective returns on their investments, financial returns, monetary returns or profits from their investment in MERS?

A:    I would say the answer is no, because originally –

Q:    All right. Never mind. You've answered the question.

A:    -- they were going to have – their ownership interest was just to begin the concept of MERS so that MERS had some capital to start with. As we went forward and we became an operating company, then we ran into the reality that our owners are also our chief users, and so to maximize the income MERS would, of course, bring more money out of their pocket. And that's the opposite direction of the way the corporation was founded. *We're supposed to drive down the costs. So extra profits in MERS are not what these companies are after, they're after lower costs in their own operations so they would want to pay MERS less.*

*See* RJN, Ex. B, pp. 583-84 (emphasis added). It is clear, therefore, that the Control Defendants do not operate MERS to serve any independent corporate function beyond enriching themselves unencumbered by local laws and liability. *See In re Buckhead Am. Corp.*, 178 B.R. at 975 (plaintiff stated alter ego claim by alleging "a series of transactions involving [defendant] and entities controlled by him which could support a finding that [defendant] used [corporations] to enrich himself to the detriment of the corporations and their creditors").

Considering that MERS was established and operates to serve the cost saving and streamlining interests of the Control Defendants, it is of little surprise that MERS has been purposefully undercapitalized since its inception. Although Plaintiffs submit that MERS' undercapitalization is patently obvious considering its potential liabilities, the case law underscores the point. To wit, "'[t]he primary inquiry of this Court is to ask whether, under the circumstances, reasonably prudent [individuals] with general business background would deem the company undercapitalized.'" *Lutyk*, 332 F.3d at 197.

Plaintiffs sufficiently allege that MERS is undercapitalized:

AC ¶ 8(a):     Defendant Merscorp, Inc. is a Delaware corporation with its principal place of business located at 1595 Spring Hill Rd, Suite 310, Vienna, Virginia 22182. According to Dunn & Bradstreet, Inc., *Merscorp, Inc. has approximately 40 employees and reports yearly income of less than $9.5 million.* (emphasis added);

AC ¶ 8(b):     Defendant Mortgage Electronic Registration System, Inc., d/b/a MERS, is a wholly-owned subsidiary of Defendant Merscorp, Inc. Like Merscorp, MERS is a Delaware corporation and shares an address with Merscorp, Inc. at 1595 Spring Hill Rd, Suite 310, Vienna, Virginia 22182. According to Dunn & Bradstreet, Inc., *MERS, Inc. has approximately 20 employees (overlapping those of Merscorp, Inc.) and reports yearly income of approximately $1.7 million.* (emphasis added);

AC ¶ 9(k):     *With a mere $11 million in annual income and 40 employees, MERS is hardly the financial titan it would need to be to stand as mortgagee on the tens of millions of Mortgage Notes that it does.* In contrast, the Control Defendants annual profits run to the hundreds of billions of dollars for the mortgages where MERS stands as the primary mortgagee. (emphasis added);

AC ¶ 9(l):     It is incontrovertible that the Control Defendants' profits are greater and come with far more efficiency and less exposure to liability through the existence of MERS. It is not hard to conclude, therefore, that *based on its diminutive size and meager asset base, MERS is grossly undercapitalized to cover the potential liability stemming directly from its role as primary mortgagee on tens of millions of Mortgage Notes.* (emphasis added).[20]

In claiming that Plaintiffs have failed adequately to allege that MERS is undercapitalized, the Control Defendants argue that Plaintiffs are "required to prove that, in light of (a) the standard capitalization in the particular industry, (b) initial capital, (c) whether the corporation has met or can meet its debts, and (d) anticipated revenues,

---

[20] Consistent with these allegations, Mr. Arnold testified that the only forms of revenue for MERS are "prepayments, registration and membership dues." *See* RJN, Ex. B, p. 628. According to Mr. Arnold, registration fees are only $3.95 per loan (*Id.* at 624), prepayments are just prepaid registration fees (*Id.*), and annual membership dues collected by MERS for 2001 amounted to only $365,000 (*Id.* at 633).

MERS was not a financially legitimate enterprise." SH Mem. at 15. Setting aside the Control Defendants' erroneous statement that Plaintiffs are required to "prove" undercapitalization at the motion to dismiss stage, Plaintiffs nonetheless have satisfied these alleged requirements. As detailed above, Plaintiffs sufficiently allege that MERS: (a) is, and has been undercapitalized from its inception; (b) earns very little revenue and is, in fact, operated intentionally to avoid profits; and (c) due to its lack of profits and revenue, MERS cannot possibly cover the potential liability stemming directly from its role as primary mortgagee on tens of millions of Mortgage Notes. Based on Plaintiffs' allegations and the aforementioned judicially noticed facts, a reasonably prudent individual with general business background would deem MERS to be undercapitalized.[21]

### (ii)    MERS Does Not Issue Dividends

Another *Pisani* factor in favor of piercing the corporate veil is the fact that MERS does not issue dividends. 646 F.2d at 88. Indeed, in a deposition given in the *Romaine* Case by Mark Fleming, Vice President of the Federal Home Loan Mortgage Corporation, and former director of MERS, Mr. Fleming testified to the following:

---

[21]    *See Pisani*, 646 F.2d at 88-89 (piercing corporate veil to hold shareholder personally liable for overpayments collected by corporation where plaintiff alleged that shareholder used personal funds to finance corporation); *Dewitt*, 540 F.2d at 686-87 (corporate veil pierced to impose individual liability on president of corporation in light of undercapitalization, siphoning of funds, and misrepresentations made to corporation's creditors); *Diebold*, 2002 WL 31234450, at *2 (allegations that corporation was undercapitalized and near bankruptcy due to defunct agreements that accounted for roughly eighty percent of corporation's operating revenues was sufficient to withstand defendants' motion to dismiss on alter ego liability). Likewise, plaintiffs allege that MERS is undercapitalized, that the transactions giving rise to MERS' unlawful conduct account for all of MERS' operating revenue, and that the Control Defendants personally benefited from MERS' operation while MERS itself did not.

Q: "Okay. And, has there been any discussion about paying dividends to its members or shareholders?"

A: There was discussion a long time ago in principle, but, *in practice there has been no discussion of that.*

Q: Has that been ruled out or is that something that you just haven't done yet?

A: That -- you know, let's put it this way: The members of MERS joined MERS and have invested in MERS for reason of the efficiencies that MERS will provide them, and that doesn't directly apply to Freddie Mac, it applies to the servicing community. It is, after all, a servicing problem. So, that's what the members of MERS are interested in, so, *no, this discussion of dividends is not something that has come up, nor do I really anticipate it coming up*.

RJN, Ex. C, p. 725 (emphasis added). The fact that MERS does not issue dividends is further evidence that its corporate purpose is a sham. MERS' shareholders are not investors in a legitimate profit making enterprise but rather puppeteers manipulating the corporate structure for their own financial goals.

### (iii)    Insolvency

Although MERS is currently solvent, if even a tiny fraction of the liabilities from this action are realized, MERS would be forced into bankruptcy if not indemnified or otherwise salvaged by the Control Defendants. Plaintiffs have no current knowledge of whether such indemnity agreements exist.[22] Certainly, discovery would shine additional light on this as well as many other aspects of the relationship between MERS and the Control Defendants.

---

[22]    Although MERS appears to have indemnity agreements with its members, which include the Control Defendants (*see* sec. E(4), below), it remains unclear if those agreements would be enforceable or cover any liability relating to this action.

- 34 -

#### (iv)    **MERS Is A Façade For The Control Defendants**

For the reasons already stated, it is clear that MERS serves at the pleasure of the Control Defendants: (a) it was created by them to avoid the cost and time burdens of county filing requirements and to facilitate a brisk and immensely profitable secondary mortgage market; (b) it avoids profits intentionally and does not realize any benefit from its role; (c) it operates on a shoe string, employs very few people, and deputizes employees of lending institutions as agents (without compensation) in order to fulfill its foreclosure responsibilities; (d) its board is largely controlled by its shareholders, including several of the Control Defendants; and (e) it operates at the will of and for the primary benefit of the Control Defendants. Had the Control Defendants not established MERS as a front for their greater business interests, the mortgage industry would not be what it has become today.

Notably, in the *Romaine* Case, when Justice Catterson asked MERS' attorney, Mr. Martorana, what would happen to all the mortgages, where MERS is mortgagee, if MERS went into bankruptcy, Mr. Martorana responded, that MERS' principal shareholders would "rush to restore the mortgage electronic system because it is so vital for their business going forward. There is – I just don't foresee your Honor, how MERS is going to go out of business ..... it has big brothers and sisters so-to-speak by way of Fannie Mae, Freddie Mac, ready to assist to be sure that MERS stays in business." RJN Ex. D, pp. 113-14. Mr. Martorana's statements to the court further illustrate that MERS is nothing more than a pawn, albeit one that serves a critical and essential purpose, of the Control Defendants' mortgage businesses.    Accordingly, since Plaintiffs' allegations, if

- 35 -

true, establish that the Control Defendants operate as the alter ego of MERS, the corporate veil should be pierced.

### 3. Shielding Control Defendants From Contractual Liability Would Result In A Manifest Injustice

The "presence of a number of [*Pisani*] factors may itself be sufficient evidence of injustice or unfairness." *Golden Acres*, 702 F. Supp. at 1106 (citing *Pisani*, 646 F.2d at 88); *see also Lutyk*, 332 F.3d at 194. Although Plaintiffs' allegations, combined with judicially noticed facts, are sufficient to warrant piercing the corporate veil, Plaintiffs independently allege that a monumental injustice would result from failing to impose liability on the Control Defendants. *See Golden Acres*, 702 F. Supp. at 1107 ("Even if unfairness or injustice had to be shown independently from the factors set out above, that burden has been met by the plaintiff.").

In order to state a claim for imposing alter ego liability, a plaintiff must also "'present an element of injustice or fundamental unfairness.'" *Pisani*, 646 F.2d at 88; *see also Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir. 1967) (the corporate existence should be disregarded "when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime"); *In re Phillips Petroleum Sec. Litig.*, 738 F. Supp. 825, 838 (D. Del. 1990) (holding that Delaware courts will pierce the corporate veil "'only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or equitable considerations among members of the corporation require it, are involved").

Importantly, in order to establish the injustice or unfairness necessary to pierce the corporate veil, Plaintiffs are not required to allege fraud by the Control Defendants. *See Harper*, 743 F. Supp. at 1085 ("plaintiff need not allege or plead fraud under an alter

- 36 -

ego theory"); *Golden Acres*, 702 F. Supp. at 1107 ("Defendants' argument that the corporate veil ... may not be pierced in the absence of plain fraud is, as well, without merit. ..." [P]roof of plain fraud is not a necessary element in a finding to disregard the corporate entity.") (citing *Dewitt,* 540 F.2d at 684). In fact, in *Pisani*, the Third Circuit emphasized the need for an alter ego doctrine that did not require a finding of fraud. *Golden Acres*, 702 F. Supp. at 1107 (citing *Pisani*, 646 F.2d at 89 ("'If HEW had to prove fraud where such a defendant kept no corporate records and inadequate books, such schemes would be difficult to prevent.'")). Thus, in the absence of fraud, piercing the corporate veil may be necessary based on "equitable considerations and the plain justice of a situation . . .." *United States v. Normandy House Nursing Home, Inc.*, 428 F. Supp. 421, 423 (D. Mass. 1977) (citation omitted).

In *Golden Acres*, the plaintiff brought a breach of contract claim on behalf of the Department of Housing and Urban Development ("HUD"), seeking to pierce the corporate veil to impose liability on the corporation's shareholder. In holding that the interest of justice warranted piercing the corporate veil, the court recognized that:

> When it agreed to insure the loan to [the corporation], HUD naturally assumed that [the corporation] would be managed like a normal corporation, with sufficient regard for solvency, corporate formalities, and corporate obligations. Refusal to pierce the corporate veil in this case would be unfair in that it would punish HUD for its misplaced trust and reward defendants for their abuse of the corporate form.

*Id.* at 1107; *see also Midland Interiors, Inc. v. Burleigh*, No. Civ. A. 18544, 2006 WL 3783476, at *6 (Del. Ch. Dec. 19, 2006) (holding judgment creditor could pierce corporate veil of judgment debtor corporation to reach assets of sole stockholder-employee of corporation because failing to pierce would "encourage similar fraudulent behavior").

From the outset, Plaintiffs recognized and alleged that preserving the corporate entity in this instance would be deleterious and unjust to Plaintiffs and the Class. Indeed, in their Amended Complaint, Plaintiffs allege that "sufficient basis exists to pierce the corporate veil of MERS and hold the Control Defendants jointly and severally liable to Plaintiffs and the Class. *Adherence to the fiction that MERS is an entity wholly independent from the Control Defendants would promote a grave injustice to those injured by the conduct alleged herein*." AC ¶ 9(m) (emphasis added).    Specifically, as detailed above, Plaintiffs allege that MERS, through its agents (including the Control Defendants), significantly overcharged Plaintiffs and members of the Class for costs not actually incurred.    Plaintiffs further allege that, during the Class Period, hundreds of thousands of mortgage loans issued in MERS' name have been subject to enforcement proceedings and/or fallen into foreclosure and have been subjected to the imposition of these costs. AC ¶ 12.

The potential damages in this case are staggering.    As noted above, MERS barely has the capital to conduct its own business, let alone to cover its potential liability. Consider the following:

- A January 2008 national report put the number of recent foreclosures in the multi-millions, with *over two million foreclosures in 2007 alone*;[23]

---

[23]    This   publicly   available   information   is   provided   by   RealtyTrac (http://www.realtytrac.com), an online marketplace for foreclosure properties. On January 29, 2008, it released year-end data from its "2007 U.S. Foreclosure Market Report," showing a total of 2,203,295 foreclosure filings for 2007 -- an increase of 75 percent from 2006.    The report also shows that a staggering 1 percent of all U.S. households were in some stage of foreclosure during 2007. The full report is available at http://www.realtytrac.com/ContentManagement/pressrelease.aspx?ChannelID=9&ItemID =3988&accnt=64847.

- The Class, estimated to cover hundreds of thousands of individuals (and likely many more) consists of individuals not only subject to foreclosure actions but also individuals who paid improper, unverifiable, and/or unreasonable costs, fees, and expenses at any point in the enforcement process;

- The Class Period extends back to September 2001 and continues through the present;

- Plaintiffs estimate that the average Class member paid between $250.00 and $2,500.00 in improper, unverifiable, and/or unreasonable costs, fees, and expenses relating to an enforcement action;

- Last year, MERS announced that it hit the 50 million mark on mortgages where it stands as mortgagee of record (subject to contractual liability on each one);[24]

- MERS has a single suburban office, employs roughly 40 employees, and reports approximately $11 million in annual revenue;

- The Control Defendants collectively report annual revenue in the tens of billions of dollars and employ hundreds of thousands of individuals;

- Much of the Control Defendants' immense wealth comes from the very mortgages where they placed MERS between themselves and the borrowers as the named mortgagee; and

- The rapid rise (and crash) of the secondary mortgage market was aided substantially by the creation of MERS.

It is not difficult to conclude that MERS is ill-equipped to handle its potential liability from even a fraction of the mortgages assigned to it by the Control Defendants and other MERS shareholders and members. Indeed, the damages resulting from this action could easily run into the hundreds of millions of dollars and beyond. Consequently, a judgment against MERS would be no more than a pyrrhic victory for the Plaintiffs and hundreds of thousands of Class members who were unjustly taken advantage of in a time of severe financial distress. Many even lost their homes to

---

[24]    *See* RJN, Ex. F.

foreclosure, unable to pay the fee and expense amounts in addition to their past due balance. Unfortunately, Class members cannot be restored to their homes but they can recover overpayments taken unjustly and in breach of contract. That is, of course, if the Control Defendants are rightly held responsible for the actions that occurred in the name of MERS.

### 4.    The Control Defendants' Liability Through Agency

Even if Plaintiffs fail to convince the Court that the Control Defendants are liable as alter egos of MERS, they are still liable though their agency relationship with MERS. Indeed, the Amended Complaint is replete with allegations supporting such liability. As explained in the Amended Complaint and herein, it was, in actuality, the Control Defendants and other MERS members who committed the offending practices – even though they were wearing MERS' hats at the time.

A corporation whose shares are owned by a second corporation "may assume the role of the second corporation's agent in the course of one or more specific transactions." *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988). In *United States v. Bestfoods*, 524 U.S. 51 (1998), the Supreme Court identified three scenarios in which a parent corporation may be held directly liable for the actions of its subsidiary: (1) where "the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture"; (2) where "a dual officer or director ... depart[s] so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility"; and (3) where "an agent of the parent with no hat to wear but the parent's hat . . . manage[s] or direct[s] activities at the facility." *Id.* at 71; *see*

- 40 -

*also BP Amoco Chem. Co. v. Sun Oil Co.*, 316 F. Supp. 2d 166, 170 (D. Del. 2004). The Amended Complaint supports a finding that the Control Defendants are liable for MERS' actions through each of these scenarios.

Importantly, although *Bestfoods* was decided in the parent-subsidiary context, it is not necessary for corporations to be in a parent-subsidiary relationship in order for agency liability to be imposed on one corporation for the actions of the other. *See Texaco*, 842 F.2d at 1477-78 (agency liability may be imposed where corporations operate independently and maintain separate existences). Thus, in determining whether to impose liability on a corporation for the actions of another corporation, courts focus on the arrangement between the corporations, including "the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim." *SRI Int'l*, 2005 WL 851126, at \*3; *see Publicker Indus.*, 603 F.2d at 1070 (describing agency as "notion that corporations simply acted interchangeably and in disregard of their corporate separateness").

As Plaintiffs allege, the Control Defendants acted interchangeably with MERS in an arrangement whereby they were mutual agents of each other. In *Publicker Industries*, the Third Circuit recognized that:

> A legal framework might be provided by the principles of agency, in that it might be concluded that [parent corporation] and [subsidiary corporation] created mutual agencies in one another with respect to their dealings with [the plaintiff]. The underpinnings of this approach are described in Restatement (Second) of Agency s 27 (1958):
>
>> (A)pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal, which reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

- 41 -

*Id.* at 1070. The Third Circuit held that, "[u]nder the agency theory, then, it could be argued that [subsidiary], acting both on its own behalf and under apparent authority from [parent], bound [parent] as well as itself to the January contract with [plaintiff]. If established, this determination would permit [plaintiff] to sue [parent] alone, since obligors that are jointly liable may be sued independently. . .." *Id.*

Plaintiffs' allegations sufficiently state a claim for imposing agency liability on the Control Defendants for the conduct of MERS in enforcing the Mortgage Note. First, Plaintiffs allege that the Control Defendants were the principal shareholders of MERS. AC ¶¶ 8(c), 8(g), 9(a)-(i). Next, Plaintiffs allege that "[a]t all relevant times, MERS was under the utter and complete dominion and control of the Control Defendants who own, operate, control, manage, and direct the activities of MERS." AC ¶¶ 9(j), 15(c). Finally, Plaintiffs allege that MERS operated through its agents, including loan servicers (many of which are the Control Defendants). AC ¶¶ 8(f), 8(g), 9(h), 9(i), 10, 27-29, 37, 41, 43, 45, 47, 49, 55, 57, 59, 68, 72, 76, 80. *See Ethypharm*, 388 F. Supp. 2d at 432 ("Plaintiffs' complaint includes the language, 'Bentley, directly and through its agent, Belmac S.A.' This language is sufficient to put defendant on notice of plaintiffs' claim of vicarious liability for the acts of its alleged agent, Belmac."); *Satellite Fin. Planning Corp.*, 633 F. Supp. at 400 ("The complaint alleges that Commercial Credit and Control Data dominated and controlled First National Bank. These allegations suffice for plaintiffs to have stated breach of express and implied contract claims against Commercial Credit and Control Data based upon an agency theory.").

The Control Defendants' control over MERS is further evidenced by the fact that, in the event of foreclosure, the Control Defendants have the authority to determine

- 42 -

whether the Mortgage Note should be enforced to foreclose in MERS' name, in the Control Defendants' name, or in another party's name, as designated by the Control Defendants. Indeed, according to Rule 8, Sec. 1(a) of the MERS Rules of Membership:

> With respect to each mortgage loan for which MERS is the mortgagee of record, *the beneficial owner of such mortgage loan or its servicer shall determine whether foreclosure proceedings with respect to such mortgage loan shall be conducted in the name of the servicer, or the name of a different party to be designated by the beneficial owner.*

*See* RJN, Ex. E, p. 26 (emphasis added). Thus, when MERS enforces the Mortgage Note in its name, it is doing so under the direction of the loan servicer who is, in the overwhelming majority of instances, one of the Control Defendants. Because MERS breached and continues to breach the terms of the Mortgage Note in foreclosing under the Control Defendants' direction, the Control Defendants are likewise liable for those breaches. *See Texaco*, 842 F.2d at 1477 (corporation may be held liable on contracts made by agent even though corporation is not a party named in the contract); *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, No. Civ.A. 00-83-JJF, 2006 WL 1995128, at *3 (D. Del. July 17, 2006), *aff'd,* 2007 WL 2153278 (3d Cir. July 27, 2007) ("A principal is liable for the actions of its agent that are within the scope of the agent's actual or apparent authority.").

In addition to the above, Plaintiffs allege that the Control Defendants were so intertwined with MERS that employees of the Control Defendants simultaneously served as agents of MERS, acting on behalf of the Control Defendants. For example, Plaintiffs allege that the MERS "Foreclosure Guide" directs that when executing the mortgage loan documents:

> *the employees of the servicer [lender] will be certifying officers of MERS.* An employee of a lender, through his or her status as a certified

- 43 -

officer of MERS, is authorized to sign any necessary documents in connection with the foreclosure. *A corporate resolution of MERS grants the certifying officer this power. In other words, the same individual that signs the documents for the servicer will continue to sign the documents, but now as an officer of MERS.*

AC ¶ 29, Ex. D (emphasis added). *See also* RJN, Ex. E, "MERS Rules of Membership," Rule 3, Section 3(b) ("Members shall deliver to MERS, a corporate resolution naming the Corporate Secretary of MERS as a 'certifying officer' of the Member for the purpose of installing MERS as mortgage of record on mortgage loans which have been registered on MERS System by the Member.").

The MERS Rules of Membership further elaborate that, "Upon request from the Member, [MERS] shall promptly furnish to the Member, in accordance with the Procedures, a corporate resolution designating one or more employees of such Member selected by such Member, as "certifying officers" of [MERS] to permit such Member," *inter alia:*

"(iv) *to take any and all actions necessary to protect the interest of the Member or the beneficial owner of a mortgage loan in any bankruptcy proceeding regarding a loan registered on the MERS System* that is shown to be registered to the Member, (v) *to take such actions as may be necessary to fulfill such Member's servicing obligations* to the beneficial owner of such mortgage loans."

RJN, Ex. D, p. 15 (emphasis added). It is thus apparent that while serving as designated officers of MERS, employees of the Control Defendants are simultaneously acting on behalf of and for the benefit of the Control Defendants. Furthermore, Rule 8, Sec. 2 (a) of the MERS Rules of Membership reads: "*If a Member chooses to conduct foreclosures in the name of MERS, the note must be endorsed in blank and in possession of one of the Member's MERS certifying officers. If the investor so allows,*

- 44 -

*then MERS can be designated as the note-holder.*" RJN, Ex. E, pp. 26-27 (emphasis added).

As Plaintiffs allege, the Control Defendants and MERS acted in tandem at all relevant times and as mutual agents of each other in breaching the provisions of the Mortgage Note.[25] Accordingly, whether enforcing a Mortgage Note in the name of MERS or in their own name, the Control Defendants are equally liable for breaches related thereto.

Another example of the Control Defendants' acknowledgment of their primary responsibility (if not liability) for mortgages in MERS' name, is that if, "there is a violation of state, county or city codes or any other applicable regulation … *the Member shall be responsible to promptly take all necessary action to prevent fines or judgments from being entered against MERS.*" RJN, Ex. E, p. 28 (emphasis added.) Similarly, the indemnification provision of the Rules of Membership provides:

> *MERS and Mortgage Electronic Registration Systems, Inc. agree to indemnify the Member and the Member agrees to indemnify MERS and Mortgage Electronic Registration Systems, Inc.* in accordance with Section 9 of the MERS Terms and Conditions. In addition to Section 9 of the Terms and Conditions, the following provisions shall apply:

RJN, Ex. E, p. 39 (emphasis added).

---

[25]    *See, e.g.* AC ¶ 8(g):

> The beneficiaries of MERS include mortgage originators, mortgage servicers and sub-servicers, warehouse lenders, wholesale lenders, retail lenders, document custodians, settlement agents, title companies, insurers, and investors. In the various steps of administration of a mortgage, these beneficiaries act as agents of MERS, and with authority granted by MERS, whether they are acting on their own behalf or on behalf of MERS.

Plaintiffs sufficiently allege that the Control Defendants and MERS acted interchangeably and jointly in mortgage enforcement efforts in that the Control Defendants served their own interests while acting in their capacity as officers of MERS and MERS acted as an agent and under the control of the Control Defendants. *See Bestfoods*, 524 U.S. at 64. Accordingly, defendants may be held liable due to their agency relationship with MERS.[26]

### F. Defendants Ignore That Washington Mutual May Also Be Directly Liable

Defendants wrongly state that Plaintiffs have no direct claims of liability against any of the Control Defendants. SH Mem. at 4 (Plaintiffs "do not allege that Shareholder Defendants took any of the actions at issue, and do not assert any direct liability against the Shareholder Defendants."). Indeed, the Amended Complaint specifically alleges that "Washington Mutual is principal shareholder of MERS and was the original lender and loan servicer on Plaintiffs' Mortgage Note." AC ¶ 9(h).[27] According to MERS' Rules of Membership, as the loan servicer on Plaintiffs' mortgage loan, Washington Mutual possessed the right to foreclose with respect to Plaintiffs' mortgage loan at the time enforcement proceedings were commenced against them. *See* RJN, Ex. E, p. 26. This, combined with Plaintiffs' numerous allegations about the conduct of loan servicers, is sufficient to hold Washington Mutual liable as a primary violator. Moreover, in the event

---

[26] At a minimum, having sufficiently put the Control Defendants on notice of the agency claims against them, plaintiffs are entitled to discovery on the issue of the Control Defendants' control over MERS and its operations. *See SRI Int'l*, 2005 WL 851126, at *3; *Ethypharm*, 388 F. Supp. 2d at 432; *Jurimex*, 65 Fed. Appx. at 808; *Canavan*, 553 F.2d at 865 (*discussed supra*). On this basis alone, the Control Defendants' motion to dismiss should be denied.

[27] *See* footnote 3 for clarification and correction.

MERS is not determined to be primarily liable and Washington Mutual is not otherwise maintained as a defendant though piercing the corporate veil, the case could proceed against Washington Mutual.[28]

## V.    CONCLUSION

For the foregoing reasons, the motions to dismiss filed by defendants should be denied in their entirety.

Dated: April 28, 2008

**Of Counsel:**

**HARWOOD FEFFER LLP**
Robert I. Harwood, Esq.
Jeffrey M. Norton, Esq. (*pro hac vice*)
Roy Shimon, Esq.
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
rharwood@hfesq.com
jnorton@hfesq.com
rshimon@hfesq.com

**THE CHASE LAW FIRM, PC**
Matthew S. Chase, Esq.
8123 Delmar Boulevard
University City, MO 63130-3729
Tel: (314) 726-4040
Fax: (314) 726-6543
matthew@chaselawpc.com

**ROSENTHAL, MONHAIT &
GODDESS, P.A.**

By:   /s/ Carmella P. Keener
Carmella P. Keener (#2810)
Citzens Bank Center, Suite 1401
Wilmington, DE 19899-1070
Tel: (302) 656-4433
Fax : (302) 658-7567
ckeener@rmgglaw.com

*Attorneys for Plaintiffs*

---

[28]    It should be noted that there is a related companion case, entitled *O'Gara v. Countrywide Home Loans, Inc.*, C.A. 08-113, alleging direct claims against Control Defendant Countrywide for the same conduct alleged in this action but where MERS was not the mortgagee of record.

## CERTIFICATE OF SERVICE

I, Carmella P. Keener, hereby certify that on April 28, 2008, I electronically filed with the Clerk of Court the foregoing document using CM/ECF which will send notification of such filing to the following:

Kevin F. Brady, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899

Kenneth J. Nachbar, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

Richard D. Kirk, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130

John T. Dorsey, Esquire
Erin Edwards, Esquire
Young Conaway Stargatt
   & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

David J. Baldwin, Esquire
Potter, Anderson & Corroon LLP
350 Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899-0951

Katharine V. Jackson, Esquire
Reed Smith LLP
1201 N. Market Street, Suite 1500
Wilmington, DE 19801-1163

Stephen E. Herrmann, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801

David S. Eagle, Esquire
Kelly A. Green, Esquire
Klehr Harrison Harvey
   Branzburg & Ellers LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801

/s/ Carmella P. Keener
Carmella P. Keener (Del. Bar No. 2810)
Rosenthal, Monhait & Goddess, P.A.
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
ckeener@rmgglaw.com
Attorneys for Plaintiffs
Jose Trevino and Lorry S. Trevino